# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SYLVESTER ALLEN, JR.; DEJUANA BIGELOW; TABATHA DAVIS; FUTURE ALAMANCE; OLIVIA DAVIS; TALAUN WOODS; and ANGELA WILLIS,

     *Plaintiffs*,

v.

CITY OF GRAHAM; MARY KRISTINE ("KRISTY") COLE, individually and in her official capacity as Chief of the Graham Police Department; ALAMANCE COUNTY; TERRY A. JOHNSON, individually and in his official capacity as Sheriff of Alamance County; JOAQUIN VELEZ, individually and in his official capacity as Lieutenant of the Patrol Division of the Graham Police Department; GRAHAM POLICE OFFICERS JOHN and JANE DOES #1-15; and ALAMANCE COUNTY DEPUTY SHERIFFS JOHN and JANE DOES #16-30,

     *Defendants*.

**1:20-cv-0997**
**FIRST AMENDED COMPLAINT**[1]

---

[1] This First Amended Complaint is being filed upon consent from Defendants in *Allen, et al. v. City of Graham, et al.*, 20 Civ. 997, pursuant to Fed. R. Civ. P. 15(a)(2).

JUSTICE FOR THE NEXT GENERATION;
ALAMANCE ALLIANCE FOR JUSTICE;
GREGORY DRUMWRIGHT; EDITH ANN
JONES; QUENCLYN ELLISON, M.E., by
and through her guardian Quenclyn Ellison;
Z.P., by and through his guardian Quenclyn
Ellison; FAITH COOK; MELANIE
MITCHELL, J.A., by and through her
guardian Melanie Mitchell; B.A., by and
through her guardian Melanie Mitchell;
JANET NESBITT; ERNESTINE LEWIS
WARD; EDITH WARD; AVERY HARVEY;
and ASHLEY REED BATTEN,

     *Plaintiffs,*

       v.

TERRY JOHNSON, individually and in his
official capacity as Alamance County Sheriff;
CLIFF PARKER, individually and in his
official capacity as Alamance County Chief
Deputy Sheriff; JONATHAN FRANKS, in
his individual capacity and in his official
capacity as consultant to the Alamance
County Sheriff and Graham Police Chief;
ALAMANCE COUNTY SHERIFF'S
DEPUTIES JOHN AND JANE DOES #1
through #20, in their individual capacities;
MARY KRISTY COLE, individually and in
her official capacity as Graham City Chief of
Police; JOAQUIN VELEZ, individually and
in his official capacity as Graham Police
Lieutenant; CITY OF GRAHAM; and
GRAHAM POLICE OFFICERS JOHN AND
JANE DOES #21 through #40, in their
individual capacities,

     *Defendants.*

1:20-cv-00998

Plaintiffs Sylvester Allen, Jr., Dejuana Bigelow, Tabatha Davis, Future Alamance, Olivia Davis, Talaun Woods, and Angela Willis, by and through counsel, file this First Amended Complaint against Defendants City of Graham, Mary Kristine ("Kristy") Cole, individually and in her official capacity as Chief of the Graham Police Department, Alamance County, Terry S. Johnson, individually and in his official capacity as Alamance County Sheriff, Joaquin Velez, individually and in his official capacity as Lieutenant of the Patrol Division of the Graham Police Department, John and Jane Does #1-15, all presently unknown officers of the Graham Police Department, and John and Jane Does #16-30, all presently unknown officers of the Alamance County Sheriff's Office.

## INTRODUCTION

The right to vote and to do so free from violence, retribution, or intimidation from private actors or the government is one of the most sacred guarantees of a constitutional democracy. Indeed, "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016). Yet, as courts have recognized, "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process[.]" *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd* 673 F.3d 192 (3d Cir. 2012), *cert. denied* 133 S. Ct. 1471 (2013).

On October 31, 2020—North Carolina's last day of early voting and voter registration for the 2020 general election—the Graham Police Department ("GPD") and the Alamance County Sheriff's Office ("ACSO") ran afoul of these constitutional

Case 1:20-cv-00997-CCE-LPA   Document 24   Filed 12/11/20   Page 3 of 41

commands. Plaintiffs attempted to exercise their right to vote and assemble by participating in "I Am Change, Legacy March to the Polls," a march to the polls in the city of Graham in Alamance County, North Carolina, focused on social justice and political participation (the "March"). Defendants responded by firing pepper spray indiscriminately into the crowd of peaceful marchers, which included children as young as three years old, elderly individuals, and individuals with disabilities, on at least three occasions. As pepper spray filled the air, the protesters were forced to disperse; many suffered trouble breathing, vomiting, and other complications—some for days after the March.

Plaintiffs participated in the March, attempting to exercise their rights to protest. Three of the individual Plaintiffs and at least one member of Plaintiff Future Alamance also intended to vote at the end of the March. For that, GPD and ACSO subjected them to unwarranted and violent levels of force that caused all Plaintiffs to cease protesting and prevented those who had intended to vote that day from exercising their right to do so.

For example, Defendants pepper sprayed Plaintiff Dejuana Bigelow and her three-year-old child, both of whom are Black people, at the March, causing them to cough, have difficulty breathing, and suffer from burning in their eyes. To protect her child from the assault, Ms. Bigelow wrapped her child's head in her jacket and retreated to her car, leaving the March early. Plaintiff Olivia Davis, a Black nineteen-year-old, had intended to cast her first-ever vote at the end of the March. Instead, Ms. Olivia Davis was pepper sprayed and, while attempting to retreat from the police violence, was forcefully arrested by GPD officers and issued an order not to return to the City of Graham—the location of the early

voting site where she had intended to vote—for 72 hours. Plaintiff Talaun Woods, a Black twenty-one-year old, had planned to register and cast his first-ever vote at the end of the March, but was pepper sprayed twice before he was able to do so. Suffering from skin irritation, a headache, and vomiting from the pepper spray, he was forced to go home without registering to vote or voting. Because October 31, 2020 was the final day for voter registration, Mr. Woods was denied the ability to vote in the 2020 general election at all.

Through their conduct on the last day of voter registration and early voting in North Carolina—just three days before the end of the 2020 general election—Defendants prevented North Carolinians from peacefully protesting and from registering and casting their vote free from intimidation, threats, harassment, or coercion.

## PARTIES

1.     Plaintiff Dejuana Bigelow is a Black voter who resides in Graham, North Carolina. She is registered to vote in Alamance County.

2.     Plaintiff Sylvester Allen, Jr. is a Black voter with Native American lineage who resides in Graham, North Carolina. He is registered to vote in Alamance County.

3.     Plaintiff Tabatha Davis is a white voter who resides in Mebane, North Carolina. She is registered to vote in Alamance County.

4.     Plaintiff Future Alamance is a community organization formed in July 2020 and based in Alamance County. Its members include Black registered voters and other voters in Alamance County. The organization's work is focused on creating an inclusive Alamance with equality for the entire community.

5

5. Plaintiff Olivia Davis is a Black voter who resides in Burlington, North Carolina. She is registered to vote in Alamance County.

6. Plaintiff Talaun Woods is a Black resident of Burlington, North Carolina. He is eligible to vote in Alamance County but was unable to register to vote or vote in the 2020 general election due to Defendants' conduct.

7. Plaintiff Angela Willis is a Black voter who resides in Burlington, North Carolina. She is registered to vote in Alamance County.

8. Defendant Kristy Cole, sued individually and in her official capacity as Graham Chief of Police, is domiciled in the state. In her capacity as Chief of Police for GPD, Defendant Cole is responsible for the policy, practice, implementation, and supervision, of all GPD matters, including the appointment, training, supervision, and conduct of all GPD personnel. In addition, Defendant Cole is responsible for enforcing the rules of the GPD and ensuring that GPD personnel obey the laws of the United States and the State of North Carolina, including by conducting thorough and expeditious investigations into officer misconduct.

9. At all relevant times, Defendant Cole was acting within the scope of her employment and under color of state law.

10. Defendant Terry S. Johnson, sued individually and in his official capacity as the Sheriff of Alamance County, is domiciled in the state. In his capacity as Sheriff of Alamance County, Defendant Johnson is responsible for the policy, practice, implementation, and supervision, of all ACSO matters, including the appointment,

6

training, supervision, and conduct of all ACSO personnel. In addition, Defendant Johnson is responsible for enforcing the rules of the ACSO and ensuring that ACSO personnel obey the laws of the United States and the State of North Carolina, including by conducting thorough and expeditious investigations into officer misconduct.

11. At all relevant times, Defendant Johnson was acting within the scope of his employment and under color of state law.

12. Defendant City of Graham is a municipality organized and existing under the laws of the State of North Carolina. Defendant City of Graham, acting through GPD and Defendant Cole, is responsible for the policy, practice, supervision, and implementation of all GPD matters, including the appointment, training, supervision, and conduct of all GPD personnel. In addition, the City of Graham is responsible for ensuring that GPD personnel obey the laws of the United States and the State of North Carolina.

13. Defendant Alamance County is organized and existing under the laws of the State of North Carolina. Defendant Alamance County, acting through ACSO and Defendant Johnson, is responsible for the policy, practice, supervision, and implementation of all ACSO matters, including the appointment, training, supervision, and conduct of all ACSO personnel. In addition, Alamance County is responsible for ensuring that ACSO personnel obey the laws of the United States and the State of North Carolina.

14. Defendant Joaquin Velez, sued individually and in his official capacity as Lieutenant of the Patrol Division of GPD, is domiciled in the state. In his capacity as Lieutenant of the Patrol Division of GPD, Defendant Velez oversees all four patrol

platoons within GPD. He is responsible for the policy, practice, implementation, and supervision of all matters related to the GPD Patrol Division, the division responsible for first response to the events of October 31, 2020. Defendant Velez is responsible for training and supervising all GPD Patrol Division personnel, including by intervening in situations to ensure that GPD personnel obey the laws of the United States and the State of North Carolina. At all relevant times, Defendant Velez was acting within the scope of his employment and under color of state law.

15. Defendants John and Jane Does #1–15, whose true names are unknown to Plaintiffs and could not be discovered by Plaintiffs as of the date of the filing of this action, are all officers, agents, and/or employees of GPD. They are sued individually and in their official capacities as officers, agents, and/or employees of the City of Graham.

16. At all relevant times, Defendants John and Jane Does #1–15 were acting within the scope of their employment as GPD officers.

17. Defendants John and Jane Does #16–30, whose true names are unknown to Plaintiffs and could not be discovered by Plaintiffs as of the date of the filing of this action, are all officers, agents, and/or employees of ACSO. They are sued individually and in their official capacities as officers, agents, and/or employees of Alamance County.

18. At all relevant times, Defendants John and Jane Does #16-30 were acting within the scope of their employment as ACSO deputy sheriffs.

**JURISDICTION AND VENUE**

19. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1985(3), 52 U.S.C.

§ 10307(b), N.C. Gen. Stat. § 1-253, North Carolina common law, and North Carolina Constitution Article I, Sections 12 and 14.

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action includes claims arising under federal law, and under 28 U.S.C. § 1343 because this action requests relief under statutes protecting the right to vote and civil rights. This Court has pendent jurisdiction over the state law claims because the claims "form part of the same case or controversy" as the federal action. 28 U.S.C. § 1367(a).

21.     This Court has personal jurisdiction over Defendants as residents of North Carolina.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and under 28 U.S.C. § 1391(b)(1) because all Defendants reside within the State of North Carolina and at least one Defendant resides in this judicial district.

23.     This Court has the authority to provide the declaratory relief requested, and any further relief that may be appropriate, pursuant to 28 U.S.C. §§ 2201 and 2202 and N.C. Gen. Stat. § 1-253.

## STATEMENT OF FACTS

**A.** **Alamance County and Its Police Forces Have a History of Discrimination and Interference with Political Participation by Black Citizens.**

24.     Plaintiffs' experiences are only the latest in Alamance County's long—and violent—history of denying Black citizens and other people's access to political and social life.

25.     In 1870, the Ku Klux Klan lynched Wyatt Outlaw, the first Black person elected to serve in the municipal government of Graham. Mr. Outlaw was dragged from his home and hanged from a tree in the courthouse square. Another Black man who witnessed the lynching was found dead, drowned in a nearby pond.

26.     In 1914, Graham erected the Alamance County Confederate Monument to celebrate the soldiers who served in the Confederate Army at the site of the lynching of Mr. Outlaw. On one side, the monument reads: "CONQUERED THEY CAN NEVER BE, WHOSE SPIRITS AND SOULS ARE FREE."[2] It remains standing to this day.

27.     Upon information and belief, Defendants have in recent years devoted resources to ensuring that the monument is protected, such as by deploying law enforcement to the monument—including when protesters against police violence directed at Black communities have demanded the monument's removal.

---

[2] *Alamance County Confederate Monument, Graham*, Commemorative Landscapes - Univ. of N. Carolina Library (last accessed: Dec. 12, 2020), https://docsouth.unc.edu/commland/monument/10/.

Case 1:20-cv-00997-CCE-LPA   Document 24   Filed 12/11/20   Page 10 of 41

28.     Upon information and belief, neo-confederate groups, such as Alamance County Taking Back Alamance County ("ACTBAC"), have recently taken root in the county, and engaged in armed demonstrations to defend the monument.

29.     Alamance County's policing systems are not immune from this history, as the following exemplifies.

30.     In 2010, the United States Department of Justice ("DOJ") opened an investigation into the ACSO for racially discriminatory policing. In 2012, DOJ determined that ACSO engaged in a pattern of racially discriminatory policing that was "deeply rooted in a culture that begins with Sheriff [Terry] Johnson and permeates the entire agency."[3]

31.     Earlier this year, as protesters across the country took to the streets to demand police accountability and racial justice in the wake of the high-profile killing of George Floyd, GPD posted a message criticizing the purported "hypocrisy" of the Black Lives Matter movement on its official Facebook page.

32.     ACSO also has exhibited a pattern of engaging in discriminatory policing for the purpose of suppressing minority votes—often by engaging in racial profiling.

33.     Upon information and belief, in 2004, Defendant Johnson directed ACSO deputies to visit the homes of approximately 100 newly-registered Hispanic voters in the county, claiming without basis that he was concerned about voter fraud.

---

[3] Letter from United States Dep't of Justice to Alamance Cnty. at 2 (Sept. 18, 2012), https://www.justice.gov/iso/opa/resources/171201291812462488198.pdf.

34.     Upon information and belief, in 2017, ACSO arrested and charged 12 Alamance County residents—nine of whom were Black people—with illegally voting in the 2016 general election. That year, Alamance County led the State in voter fraud prosecutions.

35.     Protesters who participated in the March, further described below, intended to call attention to discriminatory policing and police violence, vote for change, and encourage others to do so.

**B.     The Right to Vote Is Protected by Law.**

36.     The right to vote includes the right to be free from physical violence or threats of physical violence in the exercise of the franchise. *See, e.g.*, *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) ("The protected right [to vote] includes the right to be free from bodily injury in the exercise of the right of franchise.") (citing *Ex Parte Yarbrough*, 110 U.S. 651, 662 (1884)); *Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 334 (E.D. La. 1965) (pattern of acts and threats of physical violence constituted intimidation of voters' attempt to exercise their civil rights).

37.     The Civil Rights Act of 1871 provides for damages and equitable relief

> if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of . . . an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy.

42 U.S.C. § 1985(3) ("Section 1985(3)").

38.     Section 1985(3) provides that an action will lie against the conspirators so

long as "one or more persons engaged" in the conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy." *Id.* Even as to those persons who do not directly participate in those activities, Section 1985(3) makes it unlawful to conspire with others to promote, organize, and otherwise facilitate those efforts.

39. The Voting Rights Act protects against intimidation in both elections and registration efforts. Section 11(b) of the Voting Rights Act prohibits actual or attempted "intimidation," "threats," or "coercion" against a person, either "for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b).

### C. Defendants' Unlawful Actions Intimidated, Threatened and Physically Harmed Voters, Including Plaintiffs.

#### 1. Defendants' Intimidating Conduct

40. On October 31, 2020, Sylvester Allen, Jr., Dejuana Bigelow, Tabatha Davis, Olivia Davis, Talaun Woods, and members of Future Alamance marched to the Elm Street polling place as part of the March.

41. The March was intended to encourage "people to go to the polls and vote for change."[4] It began at Wayman's Chapel AME Church and was scheduled to stop at Court Square, near the Confederate monument, where participants would join in a rally encouraging people to vote. At Court Square, organizers for the March were scheduled to

---

[4] The Times News, *Local Activists to Hold Halloween March in Graham* (Oct. 14, 2020), https://www.thetimesnews.com/story/news/2020/10/14/activist-announces-i-am-change-march-wednesday-press-conference/3658546001.

give speeches from a small stage, for which they had received a permit.

42.     March organizers planned for the March to ultimately culminate near the Elm Street polling place, an early-voting site where some participants would vote in the 2020 general election.

43.     The Elm Street polling place also served as a same-day voter registration site that day.

44.     The March was also intended to rally people in support of the Black Lives Matter movement, which protests police violence against Black communities.

45.     Particularly given the long history of racially discriminatory policing in Alamance County, the March was meant to serve as a moment of political power for Black communities.

46.     Protesters gathered together at the church at approximately 11:00 A.M., then walked from the church to Court Square.

47.     A small number of police officers were present along the roadway during the March.

48.     All protesters remained orderly and calm during the March. There were no arguments between protesters and any police officers.

49.     When March attendees arrived at Court Square, dozens of officers, including Defendants Velez and John and Jane Does #1-30, were already present and in formation.

50.     The officers, including Defendants Velez and John and Jane Does #1-30, were already wearing riot gear, gas masks, and face shields, and had pepper spray canisters

14

drawn.

51.     Clusters of neo-confederate or white supremacist counter-demonstrators had been present at Court Square shortly before the March attendees arrived.

52.     Just before the March attendees arrived at Court Square, the officers, including Defendants Velez and John and Jane Does #1-30, had instructed the neo-confederate or white supremacist counter-demonstrators to leave the area.

53.     Based on the officers' instructions, the neo-confederate and white supremacist counter-demonstrators were able to leave the area.

54.     Shortly after arriving at Court Square, the March attendees kneeled in a moment of silence for 8 minutes and 46 seconds in remembrance of George Floyd, representing the amount of time Minneapolis police officer Derek Chauvin pressed his knee on Mr. Floyd's neck, suffocating him to death, while other police officers stood by and failed to intervene.

55.     The March organizers had received a permit for this commemorative kneeling.

56.     Immediately after the remembrance, police officers ordered the nearly 200 protesters out of the streets and into other designated protest areas.

57.     Some of the protesters, including some Plaintiffs, were unable to hear and/or understand the officers' commands.

58.     Protesters, including some Plaintiffs, began to move out of the street, but because the area was crowded, they were not able to immediately exit.

59. Several protesters, including Ms. Bigelow and Mr. Allen, observed officers on the scene communicating with each other.

60. Upon information and belief, the GPD police officers and ACSO deputies, including Defendants John and Jane Does #1-30, were communicating with each other to coordinate a plan for dispersing the crowd.

61. The GPD police officers and ACSO deputies, including Defendants John and Jane Does #1-30, did not provide any warning that chemical irritants would be used to Plaintiffs or other March attendees.

62. Upon information and belief, less than one minute after ordering protesters to clear the street and move to other designated protest areas, officers, including indiscriminately discharged pepper spray against the protesters, including children as young as three years old, elderly individuals, and those with disabilities.

63. Upon information and belief, Defendants Velez and John Does #1-30 either themselves discharged pepper spray at protesters, including Plaintiffs, or were aware of, had the opportunity to prevent, and failed to prevent other officers from discharging pepper spray.

64. Pursuant to the ACSO Policy & Procedure Manual promulgated by Defendant Johnson, any use of a chemical agent must be promptly reported to senior officials with the Sheriff's Office, including Defendant Johnson.

16

65.     Also pursuant to the ACSO Policy & Procedure Manual, after receiving notice that a chemical agent was used, Defendant Johnson must develop an "operational plan" for continued response to the situation.

66.     Upon information and belief, Defendant Johnson received notice after the first time pepper spray was used on peaceful protesters.

67.     Upon information and belief, the operational plan Defendant Johnson developed after learning of the first use of pepper spray authorized deputies, including Defendant Officers John and Jane Does #16-30, to use pepper spray again.

68.     The protesters, including at least one Plaintiff, were able to move out of the roadway and onto the public square by the Confederate Monument. Some protesters gathered in the park area, and some gathered on the sidewalk across from the park.

69.     The March organizers decided to continue with their planned and permitted rally. Organizers for the March began speaking at a stage that was set up on the sidewalk, using speakers that were plugged into a generator for which the organizers had received a permit. Ms. Tabatha Davis, Ms. Olivia Davis, and Ms. Willis found spots near the stage. Mr. Allen was on the stage.

70.     Upon information and belief, while the March organizers were speaking to protesters, GPD and ACSO officers—including Defendants Velez and John and Jane Does #1-30—communicated with each other and decided to use pepper spray again.

71.     After approximately 30 minutes, ACSO deputies and GPD officers came to the stage and attempted to unplug the generator to end the rally without explanation.

17

72.     Less than a minute later, ACSO deputies and GPD officers began to unleash pepper spray at the March attendees for the second time without explanation or warning.

73.     Upon information and belief, Defendants Velez and John and Jane Does #1-30 again either themselves discharged pepper spray at protesters, including Plaintiffs, or were aware of, had the opportunity to prevent, and failed to prevent other officers from discharging pepper spray.

74.     The pepper spray began to blanket the area, forcing March attendees who had planned on voting at the polling place about a block away—including Ms. Tabatha Davis, Ms. Olivia Davis, and Mr. Woods—away from the area.

75.     As March attendees, including Plaintiffs, attempted to clear out of the area and disperse, officers continued to patrol the area, deploying pepper spray a third time at individuals who were allegedly not moving fast enough to leave.

76.     After being pepper sprayed, Ms. Tabatha Davis fled to protect herself. Because the pepper spray began to immediately irritate her eyes and throat, Ms. Tabatha Davis was forced to remove her eyeglasses and the face mask she was wearing to protect herself from Novel Coronavirus-19 ("COVID-19") infection.

77.     Many others, including children, elderly persons, and handicapped members of the crowd, also were forced to remove their protective face masks and leave the area because of the pepper spray. In the resulting chaos, Ms. Tabatha Davis lost her glasses. Because so many people were no longer wearing masks, she feared exposure to COVID-19.

78. On information and belief, many of the elderly March attendees had respiratory problems. Some were carrying inhalers with them. The pepper spray caused many of these elderly protesters to go into respiratory distress; some have had to seek medical attention for the complications they have suffered.

79. GPD and ACSO officers prevented paramedics on the scene from administering medical assistance to individuals who had been pepper sprayed.

80. Upon information and belief, Defendants Velez and John and Jane Does #1-30 themselves blocked paramedics from administering aid.

81. A video[5] recorded by News and Observer, a Raleigh-based publication, captured parts of the events.[6]

82. The News & Observer video shows three GPD officers restraining an elderly man and two GPD officers restraining a journalist with a camera. Moments later, two other GPD officers attempt to remove the camera from the journalist..

83. The News & Observer video also shows protestors inform one GPD officer, "You sprayed a kid." The officer appears to respond "I did."

84. Ms. Tabatha Davis, Ms. Olivia Davis, Mr. Woods, and at least one member of Future Alamance had all planned to vote on October 31, 2020, following the March;

---

[5] Julia Wall, *March to the Polls Event Mired by Pepper-Spray and Arrests*, The News & Observer (Oct. 31, 2020) ("News & Observer Video"), https://www.newsobserver.com/news/local/article246870132.html.

[6] Zachary Eanes & Carli Brosseau, *March to Alamance Polls Ends with Police Using Pepper-Spray on Protesters, Children*, The News & Observer (Oct. 31, 2020, updated Nov. 3, 2020) https://www.newsobserver.com/news/local/article246861942.html.

none were able to do so because of the violence Defendants directed at them and others.

85.    Upon information and belief, Defendants' violence prevented other participants in the March to cast their votes on October 31, 2020.

86.    This Saturday event occurred on the last day of early voting, leaving those who were pepper sprayed with no choice but to vote in person on Election Day, Tuesday, November 3, 2020—during the global pandemic[7] and regardless of what other weekday obligations they may have had.

87.    In addition, this event occurred on the last day of voter registration for the 2020 general election.

88.    Individuals like Mr. Woods, who were planning to register to vote that day but were unable to do so, were denied the right to vote in the 2020 general election altogether.

89.    Further, GPD and ACSO also arrested a number of March attendees, including Ms. Olivia Davis, releasing them only if they agreed to leave Graham and not return for 72 hours—until the late afternoon on Election Day, mere hours before the polls closed.

---

[7] Early voting was particularly important in the elections conducted during the ongoing COVID-19 pandemic. As recommended by the Centers for Disease Control, a best practice for in-person voting during the COVID-19 pandemic was the use of "early voting" to allow for effective social distancing and to reduce the risk of crowds gathering in lines outside polling places as well as inside polling places. *See* CDC, Coronavirus Disease 2019 (COVID-19): *Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated November 23, 2020).

90.     Further, Defendants' discharge of pepper spray against individuals marching to a polling place and seeking to exercise the right to vote intimidates North Carolina voters, particularly Black voters, and is likely to deter individuals from voting.

91.     Defendants sent a clear message to Black voters and others who speak out against police violence directed at Black people, including Plaintiffs, that they may face pepper spray or other violence when they vote or engage in peaceful assemblies.

92.     Indeed, some marchers who were pepper sprayed may not have returned to vote on Election Day.

93.     Discharging pepper spray at peaceful protesters marching to a polling place constitutes an attempt to intimidate, threaten, or coerce voters in a manner that prevents them from exercising their constitutional right to vote.

94.     Upon information and belief, Defendants' use of pepper spray on March attendees was motivated at least in part by the race of March attendees—the majority of whom were Black, and all of whom were marching in support of the Black community.

95.     By contrast, the neo-confederate or white supremacist groups that had gathered at Court Square were warned to clear the area before any force was used.

96.     At a subsequent press conference regarding the incident, a GPD spokesperson—speaking on behalf of Defendant Cole and the City of Graham—defended GPD officers' conduct, including that of Defendants John and Jane Does #1-15. The GPD spokesperson blamed March attendees and organizers for the violence.

97.     Neither Defendant Cole, Defendant Velez, Defendant Johnson, nor any other

21

senior official within GPD or ACSO has taken any public steps to investigate or discipline any officer in connection with the use of pepper spray on peaceful protesters on October 31, 2020.

## 2. Effect of Intimidation on Plaintiffs

98. Upon information and belief, at least four voters were prevented from voting in the 2020 general election on October 31, 2020 because of Defendants' conduct. This includes Ms. Tabatha Davis, Ms. Olivia Davis, Mr. Talaun Woods, and at least one member of Future Alamance.

99. Plaintiff Sylvester Allen participated in the March. Mr. Allen is a resident of Alamance County and had already voted in the 2020 general election. Mr. Allen participated in the 8 minute and 46 second moment memorial for George Floyd.

100. Within seconds of the memorial ending, Mr. Allen heard and saw law enforcement pepper spraying March participants. Mr. Allen was indirectly hit by the pepper spray.

101. Later, Mr. Allen was on the stage set up for the March's speakers. He saw police trying to take the generator that was powering the sound equipment for the March.

102. Within moments, law enforcement surrounded the stage and began to unleash pepper spray at protesters again. Law enforcement pepper sprayed Mr. Allen in the face. The pepper spray caused a burning sensation in and around Mr. Allen's eyes that continued for 20 minutes, and in his throat. For days after the assault, Mr. Allen continued to have irritation in his throat.

22

103.   Plaintiff Dejuana Bigelow participated in the March. Ms. Bigelow is a resident of Alamance County and had already voted in the 2020 general election.

104.   Ms. Bigelow brought her three-year-old daughter to Court Square to join the peaceful protest. About fifteen seconds after the memorial to George Floyd ended, she heard Graham police officers begin to say "Time is up. Everybody move. Move. Move. Move."

105.   No more than 20 seconds later, she began to see that officers were discharging pepper spray into the crowd. The pepper spray hit herself and her toddler; they both began coughing.

106.   It was difficult for them to breathe and Ms. Bigelow's eyes were burning. She took her daughter's jacket off and used it to cover her daughter's face. She looked up and saw white smoke from the police conduct and fled to her car with her daughter.

107.   Plaintiff Tabatha Davis participated in the March. She had planned to vote at the Elm Street polling site to which the March was headed.

108.   Once the March arrived at Court Square, Ms. Tabatha Davis participated in the memorial protest in honor of George Floyd, kneeling for 8 minutes and 46 seconds. Almost immediately afterwards, Ms. Tabatha Davis heard officers instruct the marchers to leave. Just seconds later, she saw officers discharge pepper spray into the crowd and soon began to feel the effect of the spray.

109.   Ms. Tabatha Davis, who has asthma, began coughing and had to remove her glasses because the chemical was getting in her eyes. She also had to remove the face mask

that she wore to protect herself from COVID-19. She saw that others in the area had to do the same, exposing them to a heightened risk of contracting the disease. She fled the square, losing her glasses in the process, and was unable to make it back to the polling station before it closed at 3:00 p.m. When she returned home, she could still smell the pepper spray on her clothing.

110.   Defendants' intimidating and violent conduct prevented Ms. Davis from voting at Elm Street on October 31, 2020. She was able to vote in person on November 3, 2020 but did so with the concern about facing crowded polls and longer lines and fearing she may face similar types of intimidation when she went to cast her vote.

111.   Plaintiff Future Alamance organized for its members to participate in the March. At least two members, including Ms. Tabatha Davis, intended to vote that day and were prevented doing so because of Defendants' conduct.

112.   Plaintiff Olivia Davis, who is nineteen years old, participated in the March with her partner. She was a first-time voter who had intended to vote at the Elm Street polling place on the day of the March.

113.   Ms. Olivia Davis was near the stage when officers began to discharge pepper spray for the second time. As officers began to discharge pepper spray, she suffered irritation in her eyes and throat.

114.   Ms. Olivia Davis and her partner began to move away from the officers standing on the sidewalk and discharging pepper spray, walking into the road and away from the curb. Defendant Officers John and Jane Does #1-4, employees of GPD,

24

approached them and attempted to move them out of the road.

115.     When Ms. Olivia Davis questioned why the officers were trying to move them and tried to explain that they were just trying to get away from the pepper spray, the four officers tackled her and slammed her on the ground.

116.     Defendant Officers John and Jane Does #1-2 then knelt firmly on Ms. Olivia Davis's back, yanking her arms forcefully back to restrain her. Defendant Officers John and Jane Does #3-4 also continued to forcibly restrain her.

117.     At no point during the entire interaction was Ms. Olivia Davis violent towards the officers.

118.     Ms. Olivia Davis was charged with obstruction and taken into custody.

119.     As a condition of her release, she was issued an order not to return to the City of Graham, where the Elm Street early polling place was located, for 72 hours.

120.     Accordingly, Ms. Olivia Davis was unable to cast her vote on October 31, 2020. She was able to vote in person on November 3, 2020 but feared further police violence when she went to cast her vote.

121.     Plaintiff Talaun Woods, who is twenty-one years old, participated in the March. Mr. Woods attended the March with the intention of registering to vote at the Elm Street polling place and casting his first-ever ballot that day.

122.     Mr. Woods was pepper sprayed twice at the March: first, after the memorial protest in honor of George Floyd, and again after law enforcement shut down the generator that had been permitted for the event.

123.    The pepper spray caused Mr. Woods to suffer from skin irritation, headache, and vomiting—forcing him to ask a friend to drive him home without his registering to vote or voting.

124.    Mr. Woods attempted to vote at his polling place on Election Day but was turned away because North Carolina's same-day voter registration period had ended on October 31, 2020.

125.    Plaintiff Angela Willis, who is fifty-two years old, participated in the March to protest police violence.

126.    She was pepper sprayed twice at the March: first, after the memorial protest in honor of George Floyd, and again after law enforcement shut down the generator that had been permitted for the event. The second time, Ms. Willis was pepper sprayed directly in the face from close range.

127.    The pepper spray caused immediate irritation, redness, and swelling to her eyes. Ms. Willis was unable to see. She also began to cough and wheeze as the pepper spray filled her lungs.

128.    A stranger began to help Ms. Willis by washing out her eyes; he identified himself as a paramedic and warned that the officers were preparing to deploy pepper spray a third time. Ms. Willis decided to leave the rally to avoid further injury.

129.    Ms. Willis has continued to suffer eye and lung problems. She continues to suffer from eye irritation and redness, has been told by her doctor that she might have a scarred cornea, and is seeing a specialist for necessary eye care. She has also been

prescribed the bronchodilator Albuterol to prevent bronchial spasms.

### 3.      Health Risks of Pepper Spray

130.      Defendants discharged, or approved the discharge of, pepper spray on protesters on at least three occasions on October 31, 2020, which caused Plaintiffs physical harm. Oleoresin capsicum, also known as pepper spray, is far from a trivial inconvenience to those exposed; rather, it poses serious risks of injury—even death.

131.      As the United States Court of Appeals for the Fourth Circuit has recognized, "[t]he effects of OC spray include (1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth." *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001).

132.      The use of pepper spray during the ongoing COVID-19" pandemic creates additional risks for those exposed. COVID-19 is spread through respiratory droplets, which are spread by coughing, sneezing, and talking.[8] In addition to burning of the eyes, nose, and mouth, exposure to pepper spray can cause increased nasal secretions, immediate coughing, and sneezing.

133.      Studies have found that individuals exposed to pepper spray can continue to

---

[8]      Coronavirus Disease 2019 (COVID-19) Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Spread.

experience significant adverse health consequences up to one month after exposure.[9]

134.    Defendants deployed, or approved the deployment of, pepper spray through aerosol guns, causing the gas to spread over entire areas. When used in such a manner, pepper spray cannot be targeted at specific people or even in a discrete direction. It inherently injures everyone exposed to it.

135.    Because pepper spray creates respiratory problems, many marchers exposed to pepper spray at the event could not keep on their masks worn to prevent the spread of COVID-19. This includes Ms. Tabatha Davis, who had to remove her mask and glasses after she was sprayed with pepper spray.

136.    When large groups of people congregate, remove their masks, and cough or sneeze, the risk of becoming infected with COVID-19 increases.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
52 U.S.C. § 10307 – Voter Intimidation
Plaintiffs Tabatha Davis, Olivia Davis, Talaun Woods, and Future Alamance
Against All Defendants

137.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

138.    Plaintiffs Tabatha Davis and Olivia Davis, as well as members of Plaintiff Future Alamance, intended to vote at the Elm Street polling site at the end of the March.

---

[9] Y.G. Karagama, J.R. Newton, & C.J.R. Newbegin. "Short-term and long-term physical effects of exposure to CS spray." Journal of The Royal Society of Medicine. J.R. Soc. Med. April 2003. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC539444/.

139. Plaintiff Talaun Woods intended to register to vote, and then vote, at the Elm Street polling site at the end of the March.

140. Defendants Velez and John and Jane Does #1-30 discharged pepper spray, or failed to intervene to stop the discharge of pepper spray despite being able to, on at least three separate occasions at Plaintiffs Tabatha Davis, Olivia Davis, Talaun Woods, and members of Future Alamance, as well as other peaceful marchers who intended to vote at the end of the March.

141. By discharging pepper spray, or by failing to intervene to prevent the discharging of pepper spray, Defendants Velez and John and Jane Does #1-30 intimidated, threatened or coerced, and/or attempted to intimidate, threaten, or coerce constitutionally eligible voters by directly interfering with the ability of Plaintiffs Tabatha Davis, Olivia Davis, Talaun Woods, and Future Alamance members to vote.

142. Defendants Cole, Velez, and Johnson each approved of at least one of the three separate occasions on which Defendants Velez and John and Jane Does #1-30 used or failed to prevent the use of pepper spray.

143. Defendants' actions also sent a clear message of intimidation to all those who wish to celebrate or exercise their right to vote.

144. Plaintiffs Tabatha Davis, Olivia Davis, and Talaun Woods, as well as members of Plaintiff Future Alamance, were prevented from voting on October 31, 2020 because of Defendants' illegal actions.

145. Ms. Tabatha Davis, Ms. Olivia Davis, and Mr. Talaun Woods were fearful

of attempting to vote on Election Day and were concerned they might be unable to vote.

146. Mr. Woods was in fact unable to vote on Election Day because Defendants' conduct on October 31, 2020 extinguished his final opportunity to register to vote.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – First Amendment Retaliation
### All Plaintiffs Against All Defendants

147. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

148. At all relevant times, Defendants were acting under color of state law.

149. Plaintiffs engaged in constitutionally protected speech and assembly by participating in a peaceful march to a polling site for the purposes of voting.

150. Defendants Velez and John and Jane Does #1-30 either themselves engaged in use of pepper spray, or were aware of, had a reasonable opportunity to prevent, and failed to prevent other officers' use of pepper spray, causing injuries to Plaintiffs.

151. Defendants Cole and Velez approved of and ratified the conduct of Defendants John and Jane Does #1-15 and other GPD officers who used pepper spray on Plaintiffs.

152. Defendant Johnson approved of and ratified the conduct of Defendants John and Jane Does #16-30 and other ACSO deputy sheriffs who used pepper spray on Plaintiffs.

153. Defendants Cole and Velez are final policymakers within the City of Graham for all matters related to GPD. Their decisions regarding GPD, including all officers thereof, constitute the official policies of Defendant City of Graham.

30

154.    Defendant Johnson is a final policymaker within Alamance County for all matters related to ACSO. His decisions regarding ACSO, including all deputies thereof, constitute the official policies of Defendant Alamance County.

155.    Defendants' conduct would likely deter a person of ordinary firmness from participating in further marches for fear of being subject to similar force and has, in fact, actually deterred at least some Plaintiffs from participating in further demonstrations.

156.    At least three Plaintiffs, Plaintiffs Dejuana Bigelow, Tabatha Davis, and Talaun Woods, have not attended other demonstrations out of fear of further police violence.

157.    Defendants have not used, or authorized use of, pepper spray on protesters who were demonstrating in support of maintaining Confederate monuments, even when those protesters demonstrated in the same area of Graham as Plaintiffs and even when those protesters demonstrated with weapons.

158.    Defendants engaged in their use of pepper spray just minutes after Plaintiffs and other peaceful marchers kneeled to commemorate George Floyd, a Black man who was killed by police officers.

159.    Defendants engaged in their use of pepper spray only after warning groups of neo-confederate or white supremacist counter-demonstrators that force would be used, without providing such a warning to Plaintiffs and others marching in support of police reform and the right to vote.

160.    Defendants' conduct was motivated at least in part by the subject matter of Plaintiffs' March—protesting police violence.

161.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained the injuries detailed above.

162.    Defendants' conduct was willful, wanton, and undertaken with a reckless or callous indifference to the federally protected rights of Plaintiffs.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth Amendment/Excessive Force
All Plaintiffs Against All Defendants

163.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

164.    At all relevant times, Defendants acted under color of state law.

165.    At all relevant times, Plaintiffs were peacefully marching to a poll site and did not disobey or refuse any police order.

166.    At no point did any Plaintiff pose any risk of injury or harm to themselves, other people, or property.

167.    Defendants Velez and John and Jane Does #1-30 nonetheless repeatedly used pepper spray on Plaintiffs, or were aware of, had a reasonable opportunity to prevent, and failed to prevent other officers' use of pepper spray on Plaintiffs.

168.    By using pepper spray on Plaintiffs without justification or failing to intervene to prevent the unjustified use of pepper spray by other officers, Defendants Velez and John and Jane Does #1-30 subjected Plaintiffs to excessive force.

169.     By tackling Ms. Olivia Davis, kneeling on her back, and forcefully pulling her arms behind her without justification, Defendant Officers John and Jane Does #1-4 subjected her to excessive force.

170.     Defendant Cole has, through her spokesperson, defended GPD's conduct, including the conduct of Defendant Officers John and Jane Does #1-15, and has blamed voters for the violence.

171.     Defendants Cole and Velez have failed to investigate or discipline any GPD officers, including Defendants Officers John and Jane Does #1-15, for using pepper spray on peaceful voters.

172.     Defendants Cole and Velez approved of and ratified the conduct of Defendant Officers John and Jane Does #1-15 and other GPD officers who used pepper spray on Plaintiffs.

173.     Upon information and belief, Defendant Johnson received notice after the first time pepper spray was used on peaceful protesters.

174.     Upon information and belief, the operational plan Defendant Johnson developed after learning of the first use of pepper spray authorized deputies, including Defendant Officers John and Jane Does #16-30, to use pepper spray again.

175.     Defendant Johnson has failed to investigate or discipline any ACSO deputies, including Defendants Officers John and Jane Does #16-30, for using pepper spray on peaceful voters.

176. Defendant Johnson approved of and ratified the conduct of Defendant Officers John and Jane Does #16-30 and other ACSO deputy sheriffs who used pepper spray on Plaintiffs.

177. Defendant Johnson is a final policymaker within Alamance County for all matters related to ACSO. His decisions regarding ACSO, including all deputies thereof, constitute the official policies of Defendant Alamance County.

178. Defendants Cole and Velez are final policymakers within the City of Graham for all matters related to GPD. Their decisions regarding GPD, including all officers thereof, constitute the official policies of Defendant City of Graham.

179. As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained the injuries detailed above.

180. Defendants' conduct was willful, wanton, and undertaken with a reckless or callous indifference to the federally protected rights of Plaintiffs.

## FOURTH CAUSE OF ACTION
42 U.S.C. § 1985(3) – Conspiracy to Deprive Civil Rights
All Plaintiffs Against All Defendants

181. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

182. Defendants conspired to prevent eligible voters, by force, intimidation, and threat, from exercising their right to vote.

183. GPD and ACSO officers, including Defendants Velez and John and Jane Does #1-30, communicated with each other to form a joint strategy to disperse March

34

attendees from the street and the stage.

184. Upon information and belief, Defendant Johnson formed an organizational plan for Defendants John and Jane Does #16-30 that authorized the use of pepper spray on peaceful marchers, including Plaintiffs.

185. Defendants decided to engage in the use of pepper spray as detailed above at least in part due to the race of the March attendees, the majority of whom were Black.

186. Upon information and belief, Defendants have not used, or authorized use of, pepper spray on protesters, the vast majority of whom are white, who were demonstrating in support of maintaining Confederate monuments, even when those protesters demonstrated in the same area of Graham as Plaintiffs and even when those protesters demonstrated with weapons.

187. Defendants violated 42 U.S.C. § 1985(3) by knowingly conspiring with each other to forcefully interrupt a peaceful protest by unlawfully discharging pepper spray.

188. Defendants violated 42 U.S.C. § 1985(3) by conspiring to prevent by force, intimidation, or threat, citizens from exercising their constitutional right to vote.

189. Defendants' unlawful discharging of pepper spray on three separate occasions, their communications with each other, and Defendant Johnson's formation of an organizational plan to authorize further pepper spray usage all constituted substantial steps in furtherance of the conspiracy.

190. Defendants knew or should have known that at the time of their unlawful discharging of pepper spray that such acts would prevent or deter constitutionally eligible

voters from exercising their right to vote in upcoming elections.

191. After Defendants deployed tear gas following the remembrance of George Floyd, a number of marchers were injured and forced to leave.

192. Defendants knew discharging pepper spray a second time would have the same consequence of forcing marchers to flee the area and prevent them from exercising their constitutional rights. Defendants also knew that discharging pepper spray a third time would have the same consequence.

193. Defendants' conduct intimidated or attempted to intimidate voters and prevented certain Plaintiffs from voting and/or registering to vote.

194. Defendants' conduct was willful, wanton, and undertaken with a reckless or callous indifference to the federally protected rights of Plaintiffs.

**<u>FIFTH CAUSE OF ACTION</u>**
Assault and Battery
All Plaintiffs Against Defendants Velez, John and Jane Does #1-30, Alamance County, and City of Graham

195. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

196. By using pepper spray on Plaintiffs without justification, Defendants Velez and John and Jane Does #1-30 intentionally caused bodily contact with Plaintiffs to which Plaintiffs did not consent.

197. By forcefully arresting Ms. Olivia Davis without justification, Defendant Officers John and Jane Does #1-4 intentionally caused bodily contact with Ms. Davis to which she did not consent.

36

198. Defendant Alamance County, as the employer of Defendants John and Jane Does #16-30, is responsible for their tortious conduct under the doctrine of *respondeat superior*.

199. Defendant City of Graham, as the employer of Defendants Velez and John and Jane Does #1-15, is responsible for their tortious conduct under the doctrine of *respondeat superior*.

200. As a direct and proximate result of Defendants' conduct, Plaintiffs were offended to a reasonable degree of personal dignity and sustained the injuries detailed above.

**SIXTH CAUSE OF ACTION:**
N.C. Const. Art. I, Sec. 12 & 14 – Freedom of Speech and Freedom of Assembly
All Plaintiffs Against Defendants Velez and John and Jane Does #1-30 in their
Official Capacities

201. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

202. The North Carolina Constitution also ensures that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained" N.C. Const. Art. I, § 14.

203. The North Carolina Constitution also provides that "[t]he people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances." N.C. Const. Art. I, § 12.

204. Plaintiffs were engaging in expressive, political speech protected by the North Carolina Constitution on October 31 when they gathered together to participate in

the March, a peaceful protest encouraging residents to exercise their right to vote.

205. Defendants Velez and John and Jane Does #1-30, while acting in their official capacities, discharged pepper spray at Plaintiffs without justification, or failed to intervene to prevent the use of pepper spray on Plaintiffs despite having a reasonable opportunity to do so.

206. The use of pepper spray on a person constitutes an adverse action.

207. Defendants Velez and John and Jane Does #1-30 were motivated at least in part by the protected conduct of March attendees in peacefully protesting.

208. Defendants Velez and John and Jane Does #1-30, through their use or condonation of violent force on October 31, unreasonably restricted Plaintiffs' speech and assembly rights by forcing Plaintiffs to flee and discontinue their peaceful protest. These actions directly interfered with Plaintiffs' free speech rights in violation of the North Carolina Declaration of Rights. Defendants Velez and John and Jane Does #1-30 prevented all Plaintiffs from participating in peaceful protest, and also prevented Ms. Tabatha Davis, Ms. Olivia Davis, and Mr. Woods from casting a vote that day.

209. The actions of Defendants Velez and John and Jane Does #1-30 had a chilling effect on speech in the community. Their decision to use state-sanctioned violent force in retaliation to residents peacefully engaging in protected speech sent a clear message that law enforcement in Alamance County may use similar force against any resident who chooses to voice an opinion through peaceful protest or voting. The officers' actions may deter other residents from exercising their free speech rights in the future.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a. Declare that Defendants' intimidating conduct—including discharging pepper spray at peaceful protesters on their way to vote—is contrary to law;

b. Declare that the harassment or intimidation of voters at or outside of the polls or on their way to the polls during the 2020 general election is contrary to law;

c. Declare that Defendants' conduct has violated both the Constitution of the United States and the North Carolina Constitution;

d. Award damages sufficient to compensate Plaintiffs for their injuries;

e. Award punitive damages to Plaintiffs against Defendants Cole, Velez, Johnson, and John and Jane Does #1-30;

f. Award attorney's fees and costs associated with this litigation; and

g. Grant such other relief as this Court may deem proper.

Dated: December 11, 2020

Respectfully submitted,

/s/ *Geraldine Sumter*
Geraldine Sumter (NC Bar No. 11107)
Ferguson Chambers & Sumter, P.A.
309 East Morehead St., Suite 110,
Charlotte, NC 28202
704-375-8461
GSumter@fergusonsumter.com

C. William Phillips*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
212-841-1081
cphillips@cov.com

Marianne Spencer*
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, DC 20001
202-662-5745
mspencer@cov.com

Leah Aden*
Natasha Merle**
Anuja D. Thatte*
Ashok Chandran*
NAACP LEGAL DEFENSE
AND EDUCATION FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
212-965-2200
laden@naacpldf.org
nmerle@naacpldf.org
athatte@naacpldf.org
achandran@naacpldf.org

Morgan Lewis*
COVINGTON & BURLING LLP
415 Mission Street
San Francisco, CA 94105-2533
415-591-7098
mlewis@cov.com

*Attorneys for Plaintiffs*

\* Appearing pursuant to Local Rule 83.1(d).
\*\* Application for appearance pursuant to Local Rule 83.1(d) forthcoming.

## CERTIFICATE OF SERVICE

I, Geraldine Sumter, hereby certify that on the 11th day of December, 2020, a true and correct copy of the foregoing was filed on the Court's CM/ECF filing system, through which service was effected upon Defendants City of Graham, Kristy Cole, Alamance County, and Terry S. Johnson through their counsel. Counsel for City of Graham has agreed to accept service for City of Graham employee Joaquin Velez.

*/s/ Geraldine Sumter*
Geraldine Sumter

Case 1:20-cv-00997-CCE-LPA   Document 24   Filed 12/11/20   Page 41 of 41