# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SYLVESTER ALLEN, JR., DEJUANA BIGELOW, TABATHA DAVIS, FUTURE ALAMANCE, OLIVIA DAVIS, TALAUN WOODS, and ANGELA WILLIS,

*Plaintiffs*,

v.

CITY OF GRAHAM, MARY KRISTINE ("KRISTY") COLE, individually and in her official capacity as Chief of the Graham Police Department, ALAMANCE COUNTY, TERRY A. JOHNSON, individually and in his official capacity as Sheriff of Alamance County, JOAQUIN VELEZ, individually and in his official capacity as Lieutenant of the Patrol Division of the Graham Police Department, GRAHAM POLICE OFFICERS JOHN and JANE DOES #1-15, and ALAMANCE COUNTY DEPUTY SHERIFFS JOHN and JANE DOES #16-30,

*Defendants*.

**FIRST AMENDED COMPLAINT**

**1:20-cv-0997**

1

JUSTICE FOR THE NEXT
GENERATION, ALAMANCE
ALLIANCE FOR JUSTICE, GREGORY
DRUMWRIGHT, EDITH ANN JONES,
QUENCLYN ELLISON, M.E., by and
through her guardian Quenclyn Ellison;
Z.P., by and through his guardian
Quenclyn Ellison; FAITH COOK,
MELANIE MITCHELL, J.A., by and
through her guardian Melanie Mitchell;
B.A., by and through her guardian
Melanie Mitchell; JANET NESBITT,
ERNESTINE LEWIS WARD, EDITH
WARD, AVERY HARVEY and
ASHLEY REED BATTEN;

*Plaintiffs,*

v.

TERRY JOHNSON, individually and in
his official capacity as Alamance County
Sheriff, CLIFF PARKER, individually
and in his official capacity as Alamance
County Chief Deputy Sheriff,
JONATHAN FRANKS, in his individual
capacity and in his official capacity as
consultant to the Alamance County
Sheriff and Graham Police Chief ,
ALAMANCE COUNTY SHERIFF'S
DEPUTIES JOHN AND JANE DOES #1
through #20, in their individual capacities,
MARY KRISTINE COLE, individually
and in her official capacity as Graham
City Chief of Police, JOAQUIN VELEZ,
individually and in his official capacity as
Graham Police Lieutenant, CITY OF
GRAHAM, and GRAHAM POLICE

**CORRECTED FIRST AMENDED
COMPLAINT
1:20-cv-00998**

2

OFFICERS JOHN AND JANE DOES
#21-40,

                  *Defendants.*

Plaintiffs Justice 4 the Next Generation (J4tNG), Alamance Alliance 4 Justice (AA4J), Reverend Gregory Drumwright, Edith Ann Jones, Faith Cook, Janet Nesbitt, Quenclyn Ellison on behalf of herself and her minor children , M.E. and Z.P., Melanie Mitchell, on behalf of herself and her minor children J.A. and B.A., Ernestine Lewis Ward, Edith Ward, Avery Harvey and Ashley Reed Batten by and through counsel, file this amended complaint for injunctive and declaratory relief and damages pursuant to Fed. R. Civ. P. 15 (a)(2) (Defendants having provided written consent on November 24, 2020) against Defendants Sheriff Terry Johnson, Chief Deputy Sheriff Cliff Parker, Jonathan Franks, Alamance County Sheriff's Office ("ACSO") Deputies John and Jane Does #1 through #20 (whose names are presently unknown), Graham City Police Chief Mary Kristine "Kristy" Cole, Graham Police Lieutenant Joaquin Velez, Graham City Police Officers John and Jane Does #21 through #40 (whose names are presently unknown), and the City of Graham, and allege as follows:

**INTRODUCTION**

1.      On October 31, 2020, the last day of early voting and same-day voter

3

registration in North Carolina, and three days before the November 2020 General Election, Defendants unlawfully planned and orchestrated the violent dispersal of a peaceful and non-partisan march to the West Elm Street early voting site in Graham, North Carolina. Participants in the October 31 "I am Change March to the Polls" ("the March" or "the October 31 March") were physically, emotionally, and mentally injured when Alamance County Sheriff's deputies and City of Graham police officers indiscriminately used pepper spray on peaceful marchers, including children, the elderly, and people with disabilities. Terrified by these actions and suffering the painful effects of pepper spray, many participants, including Plaintiffs Jones, Harvey and Batten, were unable to proceed to the polls that day. Plaintiff Harvey was unable to vote at all in the 2020 election because Defendants' actions precluded him from registering on October 31.

2. It has long been recognized that "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takashi*, 504 U.S. 428, 433 (1992) (cleaned up). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Courts have recognized "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd* 673 F.3d 192 (3d Cir. 2012), *cert. denied* 133 S. Ct. 1471 (2013).

3. Defendants' actions aggravated and further escalated the already charged

4

atmosphere for voters in North Carolina. Defendants' deputies and officers, by planning, authorizing, and deploying excessive use of force against Plaintiffs, have deprived Alamance County voters, including those who attended the March, and members of Plaintiffs J4TNG and AA4J of their fundamental right to vote free from intimidation, harassment, threats, or other forms of coercion.

4. The right to engage in peaceful protest and to be free from objectively unreasonable force from police authorities are both enshrined in the Constitution. Political protests and marches "ha[ve] always rested on the highest rung of the hierarchy of First Amendment values." *Carey v. Brown*, 447 U.S. 455, 467 (1980).

5. By using excessive force, responding to a peaceful march with pepper spray, issuing unlawful orders to disperse, and threatening arrests, Defendants violated Plaintiffs' First Amendment rights to freedom of speech, assembly, and association, and also violated the Fourth Amendment rights of Plaintiffs Drumwright, Jones, Ellison, M.E., Z.P., Cook, Mitchell, J.A., B.A., Nesbitt, Ernestine Ward, Edith Ward, Harvey and Batten (hereinafter "Individual Plaintiffs") to be free from unreasonable seizures and excessive force.

6. Plaintiffs have continued—and intend to continue—to exercise their First Amendment rights to protest police violence and white supremacy, and to encourage voter and other civic participation in Graham and Alamance County in the weeks, months, and years ahead.

7. Defendants have responded to Plaintiffs' attempts to exercise their First

5

Amendment rights since the October 31 March with continued hostility and excessive uses of force.

8.      Plaintiffs bring this action to protect their constitutional rights and to stop Defendants' actions that violate federal and state law.

## PARTIES

9.      Plaintiff J4tNG is an unincorporated association of community organizations organizing for racial justice and an end to police violence and other forms of systemic racial oppression. To fulfill that mission and purpose, Plaintiff J4tNG organized and participated in "get out the vote" drives for the 2020 election in North Carolina and across the country. Defendants' unlawful acts at the March frustrate Plaintiff J4tNG's overall mission and purpose, as well as that of the March itself—to encourage its members and other attendees to vote by marching to the West Elm early voting polling place.

10.     Defendants' unlawful acts have also caused J4tNG to divert resources away from its other racial justice activities in order to prevent and guard against voter intimidation in Alamance County. For example, J4tNG organized the November 3 "We're Ready 4 Change" march to complete the march to the pools derailed by Defendants on October 31. Defendants' unlawful actions on October 31 also caused harm to Plaintiff J4tNG's individual and organizational members. Plaintiff J4tNG brings claims in this action on behalf of itself and its members.

11.     Plaintiff Alamance Alliance for Justice (AA4J) is an unincorporated

6

membership organization of Alamance County community leaders, parents, grandparents and youth with the mission of connecting with like-minded individuals and organizations to empower their voices where it pertains to racism, injustice and oppression. AA4J fights for political, educational, social, and economic equality for all citizens of Alamance County and provides platforms to educate residents on issues relating to systemic injustice and racism while promoting social reforms. To fulfill its mission, AA4J members participate in activities to encourage voting, such as voter registration drives and the October 31 March. AA4J co-organized the October 31 March along with Plaintiff J4tNG.

12.     Defendants' unlawful acts on October 31 frustrated Plaintiff AA4J's mission and purpose for the March itself—to encourage its members and other attendees to vote by marching to the West Elm early voting polling place. For example, AA4J helped organize the November 3 "We're Ready 4 Change" march to complete the march to the pools derailed by Defendants on October 31. Defendants' unlawful actions at the October 31 March, including their use of pepper spray, caused harm to Plaintiff AA4J's members. AA4J intends to continue its public advocacy and engagement, including public demonstrations and protests for racial justice in Alamance County.

13.     Plaintiff Gregory B. Drumwright is a Black resident of Guilford County, North Carolina, a Professor of Communications at High Point University, a community organizer and social justice activist, and Senior Minister of the Citadel Church in Greensboro. He is the Lead Organizer of Plaintiff J4TNG. Plaintiff Drumwright helped

7

organize and led the March on October 31, 2020. He will continue to gather Alamance residents and to organize rallies, marches, and protests related to these same issues in Graham and Alamance County in the coming months and years. Plaintiff Drumwright was injured by Defendants' unlawful actions, including their use of pepper spray at the March.

14.     Plaintiff Edith Ann Jones, who goes by Ann Jones, is a white resident of Graham, North Carolina. She is registered to vote in Alamance County and is a life-long resident of Alamance County. Plaintiff Jones has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Jones attended the March and intended to go vote with other attendees at the West Elm Street early voting polling place on October 31. She was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. As a result of Defendants' unlawful actions, she was unable to vote on October 31.

15.     Plaintiff Quenclyn Ellison is a Black resident of Burlington, North Carolina. She is registered to vote in Alamance County. Plaintiff Ellison is the President of AA4J, which joined with Plaintiff J4tNG to help organize and participate in the March. Plaintiff Ellison has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Ellison attended the October 31 March and was injured by Defendants' unlawful actions, including their unlawful use of pepper spray, during the March.  Plaintiff Ellison is a parent and guardian of minors M.E. and Z.P. and brings suit on their behalves pursuant to Fed. R. Civ. P. 17(c)(1)(A), as well as her own behalf.

8

16.     Plaintiff M.E. is the fifteen-year-old daughter of Plaintiff Ellison. Plaintiff M.E. attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. Her mother, Plaintiff Ellison, asserts claims on M.E.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

17.     Plaintiff Z.P. is the eleven-year-old son of Plaintiff Ellison. Plaintiff Z.P. attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. His mother, Plaintiff Ellison, asserts claims on Z.P.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

18.     Plaintiff Faith Cook is a Black resident of Graham, North Carolina.  She is registered to vote in Alamance County. Plaintiff Cook has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Cook attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray at the March.

19.     Plaintiff Melanie Mitchell is a white resident of Graham, North Carolina. She is registered to vote in Alamance County. Plaintiff Mitchell has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Mitchell attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. Plaintiff Mitchell is a parent and guardian of minors J.A. and B.A. and brings suit on their behalves pursuant to Fed. R. Civ. P. 17(c)(1)(A) as well as on her own behalf.

20.     Plaintiff J.A. is the eleven-year-old daughter of Plaintiff Mitchell. Plaintiff

J.A. attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. J.A.'s mother, Plaintiff Mitchell, asserts claims on J.A.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

21.     Plaintiff B.A. is the five-year-old daughter of Plaintiff Mitchell. Plaintiff B.A. attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. B.A.'s mother, Plaintiff Mitchell, asserts claims on B.A.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

22.     Plaintiff Janet Nesbitt is a Black resident of Graham, North Carolina. She is registered to vote in Alamance County. Plaintiff Nesbitt has a disability and uses an electric scooter to move around. Plaintiff Nesbitt has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Nesbitt attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March.

23.     Plaintiff Ernestine Lewis Ward is an elderly Black woman and a resident of Burlington, North Carolina.  She is registered to vote in Alamance County. Plaintiff Ernestine Ward has been actively involved in the Alamance County Branch of the North Carolina NAACP since the 1970s and is a longtime community activist. She has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Ernestine Ward attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March.

10

24.     Plaintiff Edith Ward is a Black resident of Burlington, North Carolina.  She is registered to vote in Alamance County. Plaintiff Edith Ward attended the October 31 March with her mother, Plaintiff Ernestine Ward, and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March.

25.     Plaintiff Avery Harvey is a Black resident of Graham, North Carolina, has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Harvey attended the October 31 March and was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. He planned to register and vote on October 31 at the Elm Street One-Stop early voting and registration site at the end of the March to the Polls, but Defendants' actions kept him from doing so. Plaintiff Harvey was therefore unable to vote in the 2020 election.

26.     Ashley Reed Batten is a white resident of Hillsborough, North Carolina. She is registered to vote in Orange County. Plaintiff Batten has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. She attended the March and intended to vote in Hillsborough at the end of the March. Plaintiff Batten was injured by Defendants' unlawful actions, including their use of pepper spray, during the March. As a result of Defendants' unlawful actions, she was unable to vote on October 31.

27.     Defendant Terry S. Johnson ("Defendant Johnson" or "the Sheriff") is sued in his official capacity as Sheriff of Alamance County and in his individual capacity, is

11

domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Johnson is the chief law enforcement officer of Alamance County and is responsible for the policy, practice, supervision, and implementation and conduct of Alamance County Sheriff's Office (ACSO) matters. As such, he has the authority to assign duties to sheriff's deputies and enforce local ordinances in effect throughout the county. *See* N.C. Gen. Stat. § 162-1 *et seq.*

28.     At all relevant times, Defendant Johnson was acting within the scope of his employment and under color of state law.

29.     Defendant Cliff Parker ("Defendant Parker") is sued in his official capacity as Chief Deputy of the ACSO and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Chief Deputy Parker is second in command to Defendant Johnson as law enforcement officer of Alamance County and is responsible for implementing Defendant Johnson's policies and practices and supervising the conduct of ACSO deputies. As such, he has the authority to assign duties to sheriff's deputies and enforce local ordinances in effect throughout the county. *See* N.C. Gen. Stat. § 162-1 *et seq.*

30.     At all relevant times, Defendant Parker was acting within the scope of his employment and under color of state law.

31.     Defendant Jonathan R. Franks ("Defendant Franks") is sued in his official capacity as a "crowd control" consultant hired by the ACSO and/or GPD and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of

12

this Court. Upon information and belief, Defendant Franks is Commanding Officer of Greensboro Police Department's Special Operations Division and was responsible for giving orders and assigning duties to ACSO's deputies and Graham Police officers on October 31, 2020, as well as and on other dates when Plaintiffs AA4J and J4tNG and their members have gathered in and around Graham's public square to protest voter intimidation, police brutality and white supremacy.

32.     At all relevant times, Defendant Franks was acting within the scope of his employment and under color of state law.

33.      Defendants ACSO Does #1–20, whose true names are unknown to Plaintiffs and could not be discovered by Plaintiffs as of the date of the filing of this action, are all officers, agents, and/or employees of the ACSO. At all relevant times, Defendants ACSO Does #1-20 were acting within the scope of their employment and under color of state law.

34.     Defendant City of Graham ("the City") is a municipal corporation organized under North Carolina law. *See* N.C. Gen. Stat. § 160A-11. The GPD and its police chief operate under the authority of the City. The City, acting through the GPD Chief, is responsible for the policy, practice, supervision, implementation, and conduct of all GPD matters, including the appointment, training, supervision, and conduct of all GPD personnel.

35.     At all times relevant to this action, the City Manager delegated his authority to make policy related to policing and control of assemblies, marches, protests and rallies

13

in the City to the GPD Chief and authorized her to make final policy related to policing and control of assemblies, marches, protests and rallies in the City.

36.    Pursuant to this delegation and City ordinance, GPD Chief was the chief policymaker for the City on matters related to policing and maintaining order related to marches, protests, rallies, and other public assemblies within the City's jurisdiction. *See* City of Graham Ordinances, Ch. 2, art. IV, div. 1, § 2-120.

37.    At all times relevant to this action, the GPD Chief possessed final authority to establish municipal policy with respect to City police conduct at such events, including the use of force by City police officers, and the timing, location, control and containment of marches, rallies, protests, and other assemblies within the City's jurisdiction.

38.    Defendant Mary Kristine "Kristy" Cole ("Defendant Cole") is sued in her official capacity as Chief of the Graham Police Department (GPD) and her individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Cole is in charge of GPD and has final authority on the policy, practice, supervision, and implementation and conduct of GPD matters. She is in charge of assigning duties to GPD officers as she "thinks best for the good order of the city" and ensuring that GPD officers "faithfully perform their duties." City of Graham Ordinances, Ch. 2, art. IV, div. 1, § 2-120; *see also* Ch. 2, art. IV, div. 1, § 2-126.

39.    At all relevant times, Defendant Cole was acting within the scope of her employment and under color of state law.

14

40.     Defendant Joaquin Velez ("Defendant Velez") is sued in his official capacity as Lieutenant of the GPD and his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. As Patrol Operations Lieutenant, Defendant Velez is responsible for patrol functions supervision, the Special Response Team, and tow inspections and management, and supervises a team of 21 GPD officers.

41.     Defendant Velez is responsible for the policy, practice, implementation, and supervision of all matters related to the GPD Patrol Division, the division responsible for first response to the events of October 31, 2020. At all relevant times, Defendant Velez was acting within the scope of his employment and under color of state law.

42.     Defendant Velez is responsible for training and supervising all GPD Patrol Division personnel, including by intervening in situations to ensure that GPD personnel obey the laws of the United States and the State of North Carolina.

43.     Defendants GPD officer Does #21–40, whose true names are unknown to Plaintiffs and could not be discovered by Plaintiffs as of the date of the filing of this action, are all officers, agents, and/or employees of the GPD. At all relevant times, Defendant GPD Does #21-40 were acting within the scope of their employment and under color of state law.

## JURISDICTION AND VENUE

44.     Plaintiffs bring this action under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3),

and 52 U.S.C. § 10307(b) to redress the deprivation, under the color of state law, of rights secured by federal law and the United States Constitution.

45.    Plaintiffs have standing to enforce these rights and all rights asserted herein.

46.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, under 28 U.S.C. § 1343 because this action requests equitable or other relief under statues protecting the right to vote and civil rights.

47.    This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the federal law claims asserted by Plaintiffs that they are part of the same case or controversy under Article III of the U.S. Constitution.

48.    This Court has personal jurisdiction over Defendants as residents of North Carolina.

49.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

50.    This Court has the authority to provide the declaratory and injunctive relief requested pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202.

16

## STATEMENT OF FACTS

**Political Expression Is Protected by Constitution and Statute**

51.     The Constitution and laws of this country protect the people's right to lawfully assemble and express their political and social viewpoints, whether at the ballot box or in a public forum. *See* U.S. Const. amends. I, XIV, XV.

52.     Despite the plain text of these constitutional protections, the right to engage in political expression has not been equally enjoyed by all. Specifically, communities of color have historically faced significant interference with these rights by both private and government actors alike, requiring both legislative and judicial intervention. *See generally* Justin Hansford, *The First Amendment Freedom of Assembly as a Racial Project*, 127 Yale L.J. F. 685 (2018), http://www.yalelawjournal.org/forum/the-first-amendment-freedom-of-assembly-as-a-racial-project.

53.     Through both the Ku Klux Klan Act of 1871 (the Ku Klux Klan Act") and Section 11(b) of the Voting Rights Act, Congress has provided statutory protections against voter intimidation, harassment, and violence in order to effectuate the full intent of the constitutionally secured right to vote for all. Under these acts, invasions of physical space and intimations of possible future violence, prosecution, or legal action based on a voter's presence at the polls constitute unlawful voter intimidation.

54.     Further, the Supreme Court has repeatedly held that the criminalization of, or law enforcement interference with, peaceful protests and demonstrations expressing "dissatisfaction with the policies of this country" infringes on "core . . . First Amendment

values," even where the speakers or their viewpoints are politically unpopular or offensive. *Texas v. Johnson,* 491 U.S. 397, 411 (1989); *see also, e.g., Cox v. State of La.,* 375 U.S. 559 (1965).

## Notwithstanding Legislation and Enforcement Efforts, Official Interference with Political Expression Remains A Problem

55. Despite significant legislation aimed at allowing people to register to vote and cast their ballot without fear of actual or attempted intimidation, threats, or coercion, efforts to intimidate voters have persisted in North Carolina and across the country.

56. In 2000, Black voters in Florida complained about police traffic stops on Election Day, according to a report by the U.S. Commission on Civil Rights.[1] And in 2010, advocates raised concerns regarding voter suppression when North Carolina police set up traffic checkpoints between primarily Black apartment complexes and polling locations.[2] In 2016, within the first few hours of polls opening, over 4,000 reports of intimidation and suppression were called into the Election Protection hotline nationally.[3] These complaints included, for example, reports of a crowd aggressively confronting voters as they arrived to a polling location, causing some of them to leave before casting their ballot, and lines of cars adorned with Confederate flags driving past polling

---

[1] U.S. Commission on Civil Rights, *Voting Irregularities in Florida During the 2000 Presidential Election* (2001), https://www.usccr.gov/pubs/vote2000/report/ch2.htm.
[2] Nancy McLaughlin and Joe Killian, *Dems, blacks question timing of checkpoint*, Greensboro News & Record, Nov. 2, 2010, https://greensboro.com/news/political/dems-blacks-question-timing-of-checkpoint/article_8ad13789-60e3-5520-bfb3-168dc58d5bdc.html.
[3] Alan Neuhauser, *Voter Intimidation Complaints Surge*, U.S. News & World Report, Nov. 8, 2016, https://www.usnews.com/news/politics/articles/2016-11-08/voter-intimidation-complaints-surge.

18

locations.[4]  As recently as 2018, voters in Georgia raised concerns of voter intimidation after police stopped groups of senior citizens on their way to the polls.[5]

57.     Within Alamance County, the October 31 March was not the first and only time that Defendant Johnson's deputies and Defendant Cole's officers have acted to interfere with the rights of voters in Alamance County.

58.     On October 29, two Latinx organizers from Poder NC Action, a 501(c)(4) organization that promotes civic and leadership development in the Latinx community, and supports candidates that support their values, were in Graham to canvass and provide voter education materials to community members. While they were parked in a Graham parking lot awaiting their canvassing assignment, the organizers were questioned by an ACSO deputy about their activities. After pulling out of the parking lot, the organizers were followed by a second ACSO deputy for 20 to 30 minutes.

59.     Similarly, despite longstanding principles protecting the right to peaceful protest, demonstrations against white supremacy and police brutality have faced significant interference and violence by law enforcement in North Carolina and across the country.

60.     Outside of North Carolina, at least 68 instances of police officers escalating violence during protests in the wake of George Floyd's killing have been captured in

---

[4] *Id.*
[5] Astead Herndon, *Georgia Voting Begins Amid Accusations of Voter Suppression*, N.Y. Times, Oct. 19, 2018, https://www.nytimes.com/2018/10/19/us/politics/georgia-voter-suppression.html.

19

detail on video and reported upon by one news outlet alone.[6] Within North Carolina, law

enforcement officials have followed suit. In Asheville, police were caught on video and

subsequently issued an apology for destroying medical supplies and water bottles at a

medic tent intended to serve anti-racist protestors.[7] In addition to Graham, officers have

deployed tear gas, pepper spray, rubber bullets, and other "non-lethal" dispersal methods

on anti-racist protestors in Wilmington[8], Charlotte[9], and Raleigh.[10] Whereas unarmed

protestors attending demonstrations against white supremacy and police brutality have

faced arrest across the state, no action was taken against protestors open-carrying

firearms at numerous demonstrations for other causes.[11]

---

[6] Zipporah Osei, Mollie Simon, Moiz Syed, Lucas Waldron, *We are Tracking What Happens to Police After They Use Force on Protestors,* Pro Publica, Sept. 9, 2020, https://projects.propublica.org/protest-police-videos/.

[7] Minyvonne Burke, *N.C. police chief apologizes after video shows officers destroying medic tent set up for protestors,* NBC News, June 2. 2020, https://www.nbcnews.com/news/us-news/n-c-police-chief-apologizes-after-video-shows-officers-destroying-n1225716.

[8] Johnathan Haynes, *Tear gas: Controversial weapon used in Wilmington protests,* Star News, June 2, 2020, https://www.starnewsonline.com/story/news/2020/06/02/tear-gas-controversial-weapon-used-in-wilmington-protests/113475580/.

[9] Alison Kuznitz, Fred Clasen-Kelly, and Lauren Lindstrom, *'Wave goodbye, they're all about to get gassed': CMPD planned tear gas attack, video shows,* The Charlotte Observer, https://www.charlotteobserver.com/news/local/article245270810.html.

[10] *Raleigh police used tear gas 252 times, city spent more than $1 million on George Floyd protests, report says,* ABC 11, Sept. 15, 2020, https://abc11.com/raleigh-police-protests-george-floyd-in-may/6424640/.

[11] *See, e.g. Armed activists gather in support of Morganton Confederate Statue,* June 27, 2020, WBTV, https://www.wbtv.com/2020/06/27/armed-protesters-gather-support-morganton-confederate-statue/; Josh Shaffer and Andrew Carter, *Armed group marches in downtown Raleigh to protest coronavirus stay-at-home order,* The News & Observer, May 1, 2020, https://www.newsobserver.com/news/local/article242428081.html.

Case 1:20-cv-00997-CCE-LPA   Document 25   Filed 12/14/20   Page 20 of 51

**Plaintiffs Frequently March and Demonstrate to Advance Racial Justice and Civic Participation in Graham and Alamance County**

61.     Plaintiffs are all actively involved in community organizing in Alamance County, including mobilizing residents on racial justice issues and voter participation through exercise of their rights to speech and assembly.

62.     Plaintiff Drumwright and others sued Defendants Johnson and then-Graham Police Chief Jeffrey Prichard and local elected officials on July 2, 2020 to enforce First Amendment rights to speech and assembly on the streets of Graham. *See NAACP, Alamance Branch v. Peterman, et al.,* 1:20-cv-00613- CCE-LPA, Dkt. 1, Dkt. 27. In particular, Plaintiff Drumwright and others sought to enforce their rights to speak and assemble on the grounds of the Historic Courthouse in Graham and challenged the city and county policies that prevented them from doing so.

63.     On July 6, 2020, this Court entered a consent Temporary Restraining Order restraining Graham and Alamance county officials from enforcing a Graham City ordinance ("the Ordinance") prohibiting more than two people from protesting in Graham without a permit. *Id.,* Dkt. 15.

64.     On July 11, 2020, Plaintiff J4tNG led a peaceful march in the City of Graham to protest police brutality and white supremacy. Plaintiff Drumwright applied for, and received permission from, the City of Graham, the NC Department of Transportation, and Alamance County officials to lead the march on NC Hwy 87 from Burlington to the Confederate monument located in Graham's Historic Courthouse Square for a rally in front of the monument at the junction of North Main Street and

Court Square, the rotary which circles the Historic Courthouse. Among other things, he was granted permission to erect a stage in the street and use a public address ("PA") system powered by a generator.

65.    Graham's City Council subsequently repealed the Ordinance on July 14, 2020, *NAACP, et. al. v. Peterman, et. al.,* Dkt. 27-1, and on August 14, 2020, this Court entered a preliminary injunction enjoining Alamance County officials from prohibiting all protests on many spaces in and around the Historic Courthouse. *Id.*, Dkt. 63.

66.    AA4J has also organized marches and demonstrations to advance racial justice and civic participation and protest police brutality in Graham and Alamance County since the summer of 2020. Those demonstrations were routinely disrupted or derailed by GPD officers and/or ACSO deputies—even after this Court's August 14 preliminary injunction enjoining ACSO and the County from continuing their blanket ban on protest on the Historic Courthouse grounds.

**Plaintiffs Drumwright and J4tNG Sought and Obtained Permission from City and County Officials for the March and Attempted to Work with Officials to Ensure a Peaceful and Safe March**

67.    On or about August 21, 2020 in response to this Court's August 14 preliminary injunction order, Alamance County introduced a "Facility Use Policy" which laid out rules for large groups wishing to use the Historic Courthouse grounds and a permit process for reserved use.

68.    On October 8, 2020, Plaintiff Drumwright wrote the City of Graham to announce J4tNG's plans for a peaceful, non-partisan march to the polls focused on racial

Case 1:20-cv-00997-CCE-LPA   Document 25   Filed 12/14/20   Page 22 of 51

justice issues from 11 AM until 2 PM on Saturday, October 31, and to request the City's permission for the planned March.

69.     On October 11, 2020, Defendant Cole responded that, due to the City's current lack of a permitting system, Plaintiff Drumwright was required to appear at the next City Council meeting to request authorization for his October 31 March plans.

70.     Plaintiff Drumwright attended the City's October 13 Council meeting to request authorization for the March plans. In both his October 8 letter and at the Council meeting, he explained that he intended to conduct the October 31 March as he had the July 11 event.

71.     On October 20, 2020, Reverend Drumwright also applied for and received a permit to utilize the Historic Courthouse grounds on October 31 for the rally portion of the March pursuant to Alamance County's new Facility Use Policy.

72.     As described in Plaintiff Drumwright's permit application and in various subsequent (including in-person) communications with Defendant Cole and her representatives and Defendant Johnson's representatives between October 9 and October 30, the only logistical differences between the July 11 and October 31 events were that the October 31 march was to end at the West Elm Street Early Voting location, with the rally (including speaker presentations from a small stage using a PA system) to occur on the Historic Courthouse North entrance landing, steps, sidewalks and pedestrian area next to the Confederate monument.

73.     Plaintiff Drumwright requested authorization to erect a stage at the end of

North Main as he had been allowed to do on July 11, and for short-term closure of the rotary area at the north end of the Historic Courthouse.

74.    At its October 13 meeting, the City's attorney instructed the City Council that it would not act on Plaintiff Drumwright's requests. The Council advised Plaintiff Drumwright that he must coordinate logistics for the March and rally with Defendant Cole.

75.    In addition to the written communications with Defendant Cole, Plaintiff Drumwright met with Defendant Cole in person on October 20 to discuss the route, stage and street closure needs. Defendant Cole told Plaintiff Drumwright she would not close any streets or allow a stage as had been done on July 11, but on October 30 agreed that she would temporarily close streets for the march to proceed from Wayman's Chapel down North Main Street until marchers arrived on the Historic Courthouse grounds.

76.    On October 24, Defendant Cole emailed Plaintiff Drumwright that she would need to increase staffing of police and fire departments for Plaintiff J4tNG's "parade" on October 31.

77.    On October 26, Plaintiff Drumwright wrote to Defendant Cole again about marchers' safety, and specifically raised concerns about Defendant Cole's statement that she would be increasing the police presence at the March (emphasis in original):

> Given the fact that we convened a safe march on July 11th in the same space we seek to use now, it does not seem necessary to have a large police presence on Oct 31. **We especially do not want police occupying the North landing and steps of the courthouse because that is where our rally will be.** A large police presence always seems to result in black people and anti-racist protestors getting arrested simply for standing there chanting and holding signs about justice, while neo-

24

confederate demonstrators are allowed to be and do and say as they wish, no matter how offensive their words, gestures, or symbols**. I want to be clear that I am strongly opposed to Graham or ACSO deploying large numbers of police, particularly police in riot gear brandishing batons, tear gas and other weapons at our demonstration on Oct 31. That show of force has routinely and repeatedly resulted in harm to protestors and chilling of their First Amendment rights.** If you are aware of some identifiable threat by counter-demonstrators to our marchers which you believe necessitates large numbers of police in the court square during our march and rally, please advise immediately.

78.     Defendant Cole did not raise any concerns to Plaintiff Drumwright about violent counter-protestors, nor did she articulate why a large, armed police presence would be needed at the October 31 March.

79.     On October 28, Defendant Cole emailed Plaintiff Drumwright and his undersigned counsel, attaching GPD's "public safety plan" for the October 31.

80.     On  October 30, Plaintiff Drumwright, with counsel present, met again with Defendant Cole and Defendant Johnson's representatives to try to ensure marchers' safety the following day and to correct the change, indicated in the "public safety plan" that Defendant Cole had made to the final destination of the March, which had always been planned to end at the Elm Street One-Stop Early Voting site.

81.     Defendant Cole stated that she would not allow any street closures other than a temporary closure of North Main Street to allow marchers to safely travel to the Historic Courthouse grounds, and refused to agree to close the North end of the traffic rotary at the Courthouse Square during the rally. She also refused to authorize set up of the stage and PA system in the same location it had been on July 11.

82.     The County attorney agreed that Plaintiff Drumwright could put a small

stage on the Courthouse grounds.

83.     At no time did Defendants explain why armed police would be deployed or needed to manage the event.

**Plaintiffs March on October 31 to Encourage Voting and Support Racial Justice**

84.     On Saturday morning, October 31, a group of about 200-250 people, including Plaintiffs Drumwright, Jones, Ellison, M.E. and Z.P., Mitchell, J.A., B.A., Cook, Ernestine Ward, Harvey, Batten, and additional members of J4tNG and AA4J gathered at Wayman Chapel AME Church in Graham for the March.

85.     Defendant Cole met the marchers in the parking lot near the chapel, stated that she would be closing the street for them to march all the way to the Historic Courthouse grounds, and told them that she had State troopers there to "help close the streets," and added, "the street is yours."

86.     Plaintiff Drumwright spoke to those assembled, reminding them before the march began to spread out and keep their nose and mouth coverings on in compliance with COVID-19 social distancing protocols.

87.     The participants included the Mayor of Burlington, NC as well as candidates for county commissioner and school board.

88.     The March commenced around 11:30 AM, as participants, including Plaintiffs Drumwright, Jones, Harvey, Ellison, M.E., Z.P., Mitchell, J.A., B.A., Cook, Ernestine Ward, Batten, and additional members of J4tNG and AA4J, proceeded from Wayman's Chapel AME Church up North Main Street towards the Confederate

26

monument that fronts the north side of the Historic Courthouse.

89.     Plaintiff Edith Ward joined the March on the way to the Historic
Courthouse square.

90.     The marchers included numerous small children and senior citizens.

91.     During that time, marchers were permitted to walk in the road and were
escorted by Graham police, as provided in GPD's October 28 "public safety plan" and as
stated by Defendant Cole in the parking lot just before the march began.

92.     When marchers peacefully passed through the intersection of Harden Street
and North Main, about a block from the Confederate monument and Historic Courthouse,
Plaintiff Drumwright asked them to halt so that he could explain the significance of the
space they were about to enter.

93.     As he had done since the March began, Plaintiff Drumwright spoke to the
marchers using his portable PA system. He gave a short speech about Wyatt Outlaw, the
first Black elected city official in Graham who was lynched by white supremacists with
assistance from local police in 1870, in what the GPD calls Sesquicentennial Square, on
the northeast corner across from the Historic Courthouse.

94.     State Highway Police who were escorting the march from the rear in their
patrol cars blocked North Main, and the GPD cars that had escorted the march from the
front pulled around the Court Square and stopped near the corner of East Elm street,
beside Passion Fusion Grill.

95.     The March then proceeded to the Courthouse and stopped again for 8

minutes and 46 seconds of silence in symbolic remembrance of the 8 minutes and 46

seconds that George Floyd was pinned to the ground by a police officer's knee on his

neck, killing Mr. Floyd. Spread out in compliance with COVID-19 protocol, the

approximately 250 participants, including Plaintiffs Drumwright, Jones, Ellison, M.E.,

Z.P, Mitchell, J.A., B.A., Cook, the Wards, Harvey, Batten, and additional members of

J4tNG and AA4J were kneeling, standing, sitting or lying face down in the area of North

Main street and Court Square that was temporarily closed to traffic by the law

enforcement vehicles.

96.    There was a row of armed ACSO deputies at the top of the steps in front of

the Courthouse's North entrance, and on top of the Courthouse.

**Defendants Deploy Pepper Spray and Shut Down the March and Rally**

97.    Immediately upon the end of that period of silence, Plaintiff Drumwright

told the crowd to wait for a moment while he put up the stage. Plaintiff Drumwright and

several J4tNG members then began erecting the small stage and sound system on the

North landing where Defendant Johnson's deputies (standing at the top of the steps of the

Courthouse in front of its North entrance) instructed them to do so.

98.    Easy access to most sidewalk areas around the Courthouse were blocked by

city-erected barricades.

99.    Within seconds after the silent vigil ended, and without giving the marchers

any warning, direction, or opportunity to clear the street, one or more of Doe GPD

officers #21-40, working in coordination, suddenly began indiscriminately pepper

spraying the peaceful marchers—many of whom were still making their way to their feet.

100. Plaintiff Drumwright turned from setting up the stage and, seeing the actions of Doe GPD officers #21-40, began speaking to the marchers in an effort to calm the situation. Plaintiff Drumwright also alerted the GPD officers that they had just sprayed children and elderly, peaceful people.

101. Plaintiff Jones instantly felt her eyes and nostrils burning. She smelt a horrible odor from the spray. She turned and warned marchers behind her to move back.

102. Plaintiffs M.E. and Z.P., along with Plaintiff Ellison, her mother, her 17 year old and 7 year old nieces, her 9 and 4 year old nephews, and her sister, were all hit by the spray, experiencing burning eyes, nose and throat, confusion and panic.

103. Plaintiff Z.P. vomited from the spray, as did Plaintiff Ellison's sister and nephews. Plaintiff Ellison saw chaos unfolding around her as people were hit by the spray.

104. Plaintiff Cook felt her eyes burning and started choking. She thought she might be having a panic attack because she did not understand what was happening and thought she might die.

105. Plaintiff Mitchell felt her eyes, nostrils, and throat burning and began coughing. Her five-year-old daughter, Plaintiff B.A., ran away in terror, forcing Mitchell to search for her in the chaos. Mitchell found B.A. near Sesquicentennial Square (also known as Wyatt Outlaw Park), vomiting. Plaintiff J.A., Mitchell's eleven-year-old daughter was gagging, and at one point asked Mitchell, "Am I going to die?"

29

106.   Plaintiff Batten was approximately six feet away from one of Defendant Johnson's deputies Does #1-20 who pepper sprayed her directly as she helped an elderly Black woman in the crowd get away from the area.

107.   Plaintiff Edith Ward was indirectly hit by this first round of pepper spray, which entered her eyes, nose, and mouth. She has long suffered from seasonal asthma, and immediately felt a burning sensation in her eyes, nose, mouth, and throat, and began coughing intensely and having some difficulty breathing. After this initial spray, she moved toward the side of the crowd in order to be closer to her mother, Plaintiff Ernestine Ward.

108.   Plaintiff Harvey was hit by the spray, and immediately felt its irritation to the skin on his face and his eyes. His breathing was also impacted.  He was assisted by a medic, who helped him wash his face and hands with milk and flush his eyes out with water.  Plaintiff Harvey then turned to help others who had been hit with the spray.

109.   Plaintiff Ernestine Ward was not directly exposed to this first round of pepper spraying. Before the spraying began, she had moved away from most of the crowd of marchers in order to minimize her potential COVID exposure and get a better view of the speakers. She did, however, see GPD officers spraying in the direction of other marchers and witnessed some of the resulting panic.

110.   At that point, Plaintiff J4TNG and AA4J members and other marchers who had been at the Wyatt Outlaw Park were trying to use the crosswalk to get to the courthouse grounds, and one or more of Doe GPD officers #21-40 stopped them and

30

started to arrest them.

111.   Plaintiff Drumwright stepped down from the stage to de-escalate the situation and make sure the J4tNG members and marchers could cross the street and get to the Courthouse grounds. Plaintiff Drumwright then brought on the first speaker, Burlington's Mayor, followed by several other speakers.

112.   During the first several speakers, Plaintiff Harvey escorted another March participant, who was suffering from the effects of the GPD officer's initial deployment of pepper spray, from the Courthouse grounds to the Verdict restaurant at the corner of West Elm and Northwest Court Square.  Plaintiff Harvey ordered some food and drink from the Verdict and, while waiting for the order on the sidewalk in front of the restaurant, listened to the speakers.

113.   GPD Officer Jordan and two or more of Defendant GPD Does #21-40 approached Plaintiff Harvey and told him to move to the "designated area." After Plaintiff Harvey explained that he was waiting on his food, had a right to be on the sidewalk and therefore would not move, GPD Officer Jordan and two or more Doe GPD Officers #21-40 put hands on Plaintiff Harvey and arrested him.

114.   Just before 1:00pm, without giving prior warning or notice, one of Defendants ACSO Does #1-20 attempted to disconnect the sound amplification system. Plaintiff Drumwright approached the deputy to ask what he was doing.

115.   Some of Defendants ACSO Does grabbed Plaintiff J4tNG's equipment, then grabbed Plaintiff Drumwright and members of Plaintiff J4tNG.

31

116. Suddenly and again with no warning or dispersal order, Defendants' officers and deputies, including at least some of Doe ACSO Deputies #1-20 and at least some of Doe GPD officers #21-40, worked in coordination to pepper spray the marchers a second time, including members of Plaintiffs J4tNG and AA4J.

117. Plaintiffs Drumwright and Ernestine and Edith Ward, among others who were there near the stage, were hit with the spray. Marchers and other AA4J and J4tNG members, including Plaintiff Ellison, felt the effects of the spray in their eyes and noses and tried to get themselves and others away.

118. Ms. Ernestine Ward, who is elderly, is allergic to cigarette smoke and was severely affected by the pepper spray. She experienced a burning sensation in her eyes and throat, began having difficulty breathing, and feared for her life. Plaintiff Ernestine Ward later had to be treated by a medical doctor for damage to her respiratory system from the spray.

119. At least one of Defendant ACSO Does #1-20 or Defendant Cole's officer Does #21-40 sprayed in the direction of Plaintiff Janet Nesbitt. The spray hit Plaintiff Nesbitt in her mouth, nose, and eyes, causing her extreme breathing difficulties. Plaintiff Nesbitt was shaking uncontrollably and felt like she was suffocating.

120. Defendants' officers stood nearby but did not assist Plaintiff Nesbitt. AA4J members carried her to get help from paramedics who were participating in the march and providing those injured by the spray with medical attention. Plaintiff Nesbitt's scooter was damaged at some point in the chaos. Plaintiff Edith Ward witnessed Plaintiff

32

Nesbitt's convulsions, and later described feeling deeply traumatized by the scene.

121.   Plaintiff Batten was standing next to Plaintiff Nesbitt during this second deployment of pepper spray. The spray also hit Plaintiff Batten in her mouth, nose, and eyes, causing her extreme breathing difficulties and rendering her unable to see as she tried to assist Plaintiff Nesbitt.

122.   Plaintiff Batten was wearing contact lenses and had to receive assistance removing them to flush her eyes. A fellow marcher helped her flush her eyes, walk her to the medic cart, and then took her to the EMS station for further medical attention. Plaintiff Batten later had to be treated by a medical doctor for damage to her respiratory system from the spray.

123.   Some of Defendant Johnson's deputy Does #1-20 and some of Defendant Cole's officer Does #21-40, working in coordination, began shouting at marchers to disperse.

124.   Without providing marchers adequate time to disperse or providing any instruction on where or how they should move, Defendants began dispensing large volumes of pepper spray into the crowd a third time, without warning, even as marchers tried to leave the area.

125.   The deputies and officers did not indicate what authority they had to suspend the First Amendment in this way.

126.   Marchers, including Plaintiffs Drumwright, Ellison, M.E., Mitchell, Cook, Edith and Ernestine Ward, members of J4tNG and AA4J, were hit by pepper spray,

33

experiencing many of the same painful symptoms they experienced before, but at a more intensified level.

127.   Plaintiff Drumwright was arrested by ACSO Corporal Bernard Kilmer and additional ACSO deputy Does #1-20, for misdemeanor "failure to leave the premises when riotous activity was occurring," citing N.C. Gen. Stat. § 14-288.5. Other J4tNG members were arrested as well.

128.   As many marchers, including Plaintiffs Cook, Ellison, Mitchell and the Wards, attempted to disperse, they were chased and sprayed repeatedly with pepper spray by Defendant Cole's officer Does #21-40.

129.   During the dispersal and afterwards, some of Defendant Cole's deputy Does #21-40 blocked off the street leading to the Elm Street early voting polling location, effectively obstructing marchers from proceeding to that polling site.

130.   Plaintiffs Ernestine and Edith Ward attempted with other marchers to flee the pepper spray and get to the polling place located a block away at Elm and Maple; however, one or more of Doe GPD officers #21-40 blocked their path.

131.   As they began to head towards North Main Street in compliance with the officers' orders, multiple Doe GPD officers #21-40 who lined the street pepper sprayed Plaintiffs Ernestine and Edith Ward and the other marchers.

132.   Plaintiff Ernestine Ward and other marchers took a long route to the polling place to avoid the officers blocking West Elm Street, traveling north on North Main Street, taking a left onto West Harden Street, taking another left onto North Maple Street,

34

and walking two blocks south on Maple Street to the polling place (located at 115 South Maple Street).

133. Plaintiff Cook was able to make her way to the Elm St. early voting site and voted, despite having been pepper sprayed and intimidated by the Defendants, and still coughing and feeling pain from the pepper spray. Feeling unsafe, she asked Plaintiff Mitchell to accompany her and wait outside for her as she went into the polling place.

134. After Plaintiff Cook voted, she walked to the Alamance County Detention Center to check on friends who had been arrested.

135. ACSO deputies warned her to stay on the grass median between the parking lot of the Detention Center and the street or she would also be arrested.

136. Using a megaphone but remaining on the grass, Plaintiff Cook began singing "We're Ready for Change."

137. After a few minutes, approximately seven of ACSO deputy Doe officers #1-20 arrested Plaintiff Cook without warning. She was detained for several hours, eventually released with a misdemeanor charge for "inciting a riot."

138. Altogether, Defendants' officers and deputies arrested twenty people in connection with the March, including two poll observers and an Alamance News reporter covering the events.

139. At all times during and following the March, Plaintiffs and members of Plaintiff organizations J4tNG and AA4J remained peaceful.

140. Parts of the events were captured on video recorded by the News &

35

Observer. ("the News & Observer video"), available at

https://www.newsobserver.com/news/local/article246861942.html.

141.     The News & Observer video shows an older man being restrained by three of Defendant GPD officers Does #21-40  (0:52-1:07), as well as a journalist with a camera being restrained by two police officers and then approached by two additional Defendant GPD officers Does #21-40 who tried to pry his camera from his hands (1:14-1:25).

142.     In the video, protesters say to a police officer, "You sprayed a kid," and the Defendant GPD officer Doe responds, "I did," (1:25-1:28).

143.     The video also shows a Defendant GPD Doe officer shouting "Get moving, you f-g pricks" as he sprays pepper spray at protesters while they try to walk away along a sidewalk.

144.     Because of Defendants' conduct, the planned march to the polls was abruptly terminated. Some voters, including Plaintiffs Jones and Batten, were actually deterred from voting on October 31. Because of their pepper spray-related injuries, they could not go to the polls that day as planned. Plaintiff Harvey was unable to vote at all in the 2020 election because of Defendants' actions.

145.     Following the March, a neo-Confederate counterdemonstrator reported that Defendants had previously warned him and his fellow pro-Confederate counterdemonstrators to move away from the square while the rally at the Courthouse was taking place, and after seeing Defendants pepper spray the marchers, he understood

36

why they had been forewarned.

146.     On November 3, Election Day, Plaintiff J4tNG members and Plaintiff Drumwright were leading a second, peaceful march to the polls to complete the objective that Defendants had thwarted on October 31. As part of the November 3 march, Plaintiff Drumwright led marchers past the Graham Community Center polling place, ensuring that the route of the march was well outside of the 50 feet "buffer zone" established by state law.[12]

147.     As they passed, Plaintiff Drumwright encouraged marchers who had not yet voted to stop and do so. Plaintiff Jones, who was prevented from voting by Defendants' actions at the October 31 March, stopped at the polling site in order to vote.

148.     Approximately four GPD officers stationed themselves prominently at the Graham Community Center polling place at the same time the marchers approached. Voters wishing to enter the polling place had to walk through or closely around this group of GPD officers to reach the doors of the polling place.

149.     The GPD officers' cars also obstructed curbside voter access for approximately eight minutes. Even after moving their cars away from the curbside voting area, GPD officers remained at the Community Center polling cite for approximately 30 minutes—long after the march had passed.

150.     GPD officers' presence at the polling place intimidated marchers who had been pepper sprayed a mere three days before, as well as other voters.

---

[12] *See* N.C. Gen. Stat. § 163-166.4.

151. For example, because of her experience at the October 31 March and the police presence at the polling place, Plaintiff Jones did not feel secure walking into the polling place alone. An Elon University film student attending the November 3 March agreed to accompany Plaintiff Jones to the entrance of the polling location, and used his camera equipment to film the police on their way to the entrance, at Plaintiff Jones's request.

**Defendants' Conduct Intimidated Voters in the Exercise of their Fundamental Right to Vote**

152. Plaintiff J4tNG has members who are lawfully registered voters in Alamance County, who attended the March and were similarly intimidated from voting by Defendants' violent actions. Other members of Plaintiff J4tNG experienced both intimidation and an attempt to intimidate, threaten, and coerce such that they were prevented or may be prevented in the future from exercising their right to vote.

153. Plaintiff AA4J has members who are lawfully registered voters in Alamance County who attended the March and were similarly intimidated from voting by Defendants' violent actions. Other members of Plaintiff AA4J experienced both intimidation and an attempt to intimidate, threaten, and coerce such that they were prevented or may be prevented in the future from exercising their right to vote.

154. Defendants Cole, Parker, Franks, Velez, and Johnson acted in concert to plan, direct, authorize, and approve the violent crowd control tactics employed by GPD officers and ACSO deputies against voters peacefully marching to the polls.

155. Defendants' activities constitute an attempt to intimidate, threaten, and

38

coerce citizens, like Plaintiffs Jones, Harvey, Cook and Batten and members of Plaintiffs AA4J and J4tNG who are Alamance County voters, from participating in the election in a manner that prevents them from exercising their constitutional right to vote and from encouraging others to do so.

156.   Defendants' actions harassed, threatened, and intimidated voters and peaceful marchers.

157.   Defendants Johnson, Cole, and the City have insisted through spokespersons that their deputies' and officers' violent actions were appropriate and justified because of alleged violations of the Alamance County Facility Use permit and/or permissions granted by Defendant Cole for the October 31 March, specifically: the use of a gas generator to power sound amplification, and the presence of some marchers in the north end of the Courthouse rotary street during the 8 minutes and 46 seconds long moment of remembrance for George Floyd.

158.   Defendants' actions are themselves inconsistent with the enforcement provisions of the Facility Use Policy, the stated intent of which is "to deescalate and secure compliance," noting that "[e]nforcement should be at a last resort."

159.   The Facility Use Policy states that "[v]iolators will be provided an explanation as to the violation of law being committed and requested to refrain from continuing the conduct or relocate," and indicates that a written warning should be issued for any violation prior to an arrest.

160.   Upon information and belief, Defendants provided no explanations of any

39

violations being committed, and no written warnings, before deploying pepper spray and commencing to arrest protestors in alleged violation of their Facility Use Policy.

161.    Further, none of these alleged violations constitute cause for use of pepper spray against any Plaintiffs, much less the widespread and indiscriminate use of pepper spray against entirely peaceful marchers, including children and the elderly.

162.    Defendants' violent suppression of Plaintiffs' rights to assemble for a march to the polls constitutes an attempt to intimidate, threaten, and coerce voters such as Individual Plaintiffs Jones, Cook, Batten, Harvey, and Organizational Plaintiffs J4tNG and AA4J members in an attempt to prevent and discourage them from exercising their right to vote.

163.    The above-referenced conduct violates Section 11(b) of the Voting Rights Act, the Ku Klux Klan Act, and the First and Fourteenth Amendments. These violations have caused Individual Plaintiffs and J4tNG and AA4J members irreparable harm.

164.    Defendants' actions violated Plaintiffs' clearly established rights, of which a reasonable person would have known.

**Defendants' Conduct Injured and Chilled Voters and Others in the Exercise of their First Amendment Rights**

165.    As a result of Defendants' unlawful actions, Plaintiffs have suffered injuries entitling them to damages, including significant physical, emotional, and mental pain and suffering.

166.    Individual Plaintiffs and members of J4tNG and AA4J intend to participate in future non-violent protests in Graham, including in the Historic Courthouse area.

40

167. Because of the violent response of ACSO and City officials, fewer persons will likely attend such events in the future out of fear that law enforcement officers will harm them. Parents will be discouraged from bringing their children even to public assemblies advertised as peaceful, and where the organizers have obtained permit, limiting these parents' ability to teach their children about values and issues that are important to them, and limiting their own ability to attend if they cannot arrange for childcare. Senior citizens and people with disabilities will be discouraged from participation in future gatherings, because their safety is particularly threatened by Defendants' violent crowd control tactics.

168. Defendants' actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest.

169. The actions and inactions of Defendants had the effect of denying people the ability to peaceably assemble, march, vote, and protest. They also represent seizure and objectively unreasonable uses of force.

170. Individual Plaintiffs and members of the organizational Plaintiffs are suffering continuing harm in that they are threatened with objectively unreasonable use of force by Defendants in the future.

171. Defendants have demonstrated continued hostility to Plaintiffs' attempts to participate in non-violent protests and otherwise exercise their First Amendment rights since the October 31 March.

172. For example, AA4J and its members organized and participated in a peaceful demonstration in front of the Historic Courthouse in Graham on November 16, 2020. When AA4J members peacefully attempted to attend and offer public comment at the meeting of the Alamance County Board of Commissioners ("BOC") being held that evening in the Historic Courthouse, Defendants Johnson and ACSO deputies again used excessive force against AA4J members—intimidating and harassing them, and later physically and emotionally injuring some of them during their unlawful arrests as they were leaving the BOC meeting.

173. Further, Defendant Johnson has charged Plaintiff Drumwright with additional felonies and misdemeanors amidst his continued attempts to organize peaceful demonstrations in Alamance County since the October 31 March.

174. Absent judicial intervention, Plaintiffs will continue to face threats for the exercise of their fundamental First Amendment rights.

## CAUSES OF ACTION

**Count I:** **Violation of the First Amendment (All Plaintiffs against all Defendants)**

175. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

176. Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the free expression, free association, and assembly rights protected under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs J4tNG and AA4J assert this claim on behalf of themselves and their members.

42

177. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

178. As described above, Defendants' activities to restrict and suppress Plaintiffs' speech and assembly at the October 31 March, including their use of unlawful dispersal orders, threats of arrest, and use of pepper spray to forcibly disperse and suppress the speech of those peacefully marching to the polls, violates Plaintiffs' First Amendment rights.

**Count II:   Violation of the Fourth Amendment (All Plaintiffs against all Defendants)**

179. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

180. Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of their rights against unreasonable searches and seizures protected under the Fourth and Fourteenth Amendments to the U.S. Constitution. Plaintiffs J4TNG and AA4J assert this claim on behalf of their members.

181. In the following paragraphs, references to the Fourth Amendment include the Fourth Amendment as applied to the states through the Fourteenth Amendment.

182. As described above, Defendants' issuance of unlawful dispersal orders and use of pepper spray and arrests to forcibly disperse a peaceful march to the polls and peaceful pro-voting rally unreasonably seized Plaintiffs and violated their Fourth Amendment rights.

**Count III:**     **Violation of Section 11(b) of the Voting Rights Act (Plaintiffs Jones, Harvey, Batten, Cook, J4tNG, and AA4J against all Defendants)**

183.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

184.     The Voting Rights Act also protects against intimidation in both elections and registration efforts.

185.     Section 11(b) of the Voting Rights Act provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307.

186.     Defendants violated Section 11(b) of the Voting Rights Act by suppressing, and attempting to suppress, through unlawful dispersal orders, use of pepper spray, and threats of arrest, the efforts of Plaintiffs Jones, Cook, Harvey, Batten, and other marchers, including members of Plaintiffs J4tNG and AA4J, to march to the polls.

187.     These actions intimidated, threatened or coerced, and/or attempted to intimidate, threaten, or coerce eligible Alamance County voters concerned about racial justice issues from going to the polls.

188.     Defendants' violent conduct would intimidate or attempt to intimidate an objectively reasonable individual and did in fact prevent Plaintiff Jones and other voters from exercising their constitutional right to vote on the last day of the early voting period.

**Count IV:    Ku Klux Klan Act of 1871 (Plaintiffs Jones, Harvey, Batten, Cook, J4tNG and AA4J against all Defendants)**

189.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

190.    Plaintiffs Jones, Cook, Harvey, Batten, and J4tNG, and AA4J, on behalf of their members, bring a claim under the second clause of 42 U.S.C. § 1985(3), which provides that:

> [I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

191.    The Ku Klux Klan Act of 1871 (the "Ku Klux Klan Act") was the last of the Enforcement Acts—legislation passed during Reconstruction to protect the suffrage rights of formerly enslaved people, including by protecting them and their supporters from violence, intimidation, and harassment.

192.    The Ku Klux Klan Act provides for damages and equitable relief "if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of . . . an elector for President or Vice President, or as a Member of Congress

45

of the United States; or to injure any citizen in person or property on account of such support or advocacy." 42 U.S.C. § 1985(3).

193.    The Ku Klux Klan Act provides that an action will lie against the conspirators so long as "one or more persons engaged" in the conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy." *Id.*

194.    Even as to those persons who do not directly participate in those activities, the Ku Klux Klan Act makes it unlawful to conspire with others to promote, organize, and otherwise facilitate those efforts.

195.    Defendants violated 42 U.S.C. § 1985(3) by knowingly conspiring with each other to unlawfully disperse a march to the polls, with the purpose of discouraging and intimidating voters from exercising their constitutional right to vote.

196.    Defendants Johnson, Parker, Cole, Velez, and Franks, and the City's deployment of their deputies and officers and all Defendants' coordination regarding use of pepper spray, and detention and arrest of attendees, constituted substantial steps in furtherance of the conspiracy.

197.    Defendants knew or should have known at the time of their actions that they would prevent or deter constitutionally eligible voters like Plaintiffs Jones, Cook, Batten, Harvey and members of Plaintiffs J4tNG and AA4J from exercising their right to vote in elections for President and members of Congress.

198.    Defendants' actions would intimidate, discourage, or prevent an objectively reasonable individual from exercising their right to vote in elections for President and

members of Congress.

199.    As a result of Defendants' unlawful conspiracy, Plaintiffs have suffered

damages, including significant physical, emotional, and mental pain and suffering.

**Count V:     Violation of Article I, Section 14 of the North Carolina Constitution (all
               Plaintiffs against all Defendants in their official capacities)**

200.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully set

forth in this claim.

201.    Article I, Section 14 of the North Carolina Constitution provides: "Freedom

of speech and of the press are two of the great bulwarks of liberty and therefore shall

never be restrained, but every person shall be held responsible for their abuse."

202.    Article I, Section 14 provides at least the same level of protection for free

speech as the First Amendment.

203.    The North Carolina Constitution authorizes a cause of action for damages

against state officials in their official capacity when they violate the rights found in

Article I, including the right to free speech. *See Corum v. Univ. of N. Carolina Through

Bd. of Governors*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992) ("A direct action

against the State for its violations of free speech is essential to the preservation of free

speech.").

204.    Plaintiffs lack an adequate state common law or statutory remedy to recover

for a violation of their state constitutional right to free speech.

205.    Defendants' activities to restrict and suppress Plaintiffs' speech relating to

the October 31 March, including their use of unlawful dispersal orders, threats of arrest,

47

and use of pepper spray to forcibly disperse those marching to the polls, violates

Plaintiffs' state constitutional right to free speech.

**Count VI:** **Violation of Article I, Section 12 of the North Carolina Constitution (all Plaintiffs against all Defendants in their official capacities)**

206. Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

207. Article I, Section 12 of the North Carolina Constitution provides: "The people have a right to assemble together to consult for their common good[.]"

208. The North Carolina Constitution provides a cause of action for damages against state officials in their official capacity when they violate the rights found in Article I. *See Corum*, 330 N.C. at 782, 413 S.E.2d at 289 ("The civil rights guaranteed by the Declaration of Rights in Article I of our Constitution are individual and personal rights entitled to protection against state action . . . .").

209. Plaintiffs lack an adequate state common law or statutory remedy to recover for violations of their state constitutional right to assembly.

210. Defendants' activities to restrict and suppress Plaintiffs' assembly relating to the October 31 March, including their use of unlawful dispersal orders, threats of arrest, and use of pepper spray to forcibly disperse those marching to the polls, violates Plaintiffs' state constitutional right to assembly.

48

**Count VII:   Common Law Assault and Battery/Excessive Force (Individual Plaintiffs against all Doe Defendants in their individual capacities)**

211.   Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

212.   Doe Defendants #1-40 committed assault by making a show of violence in deploying pepper spray against Individual Plaintiffs and committed battery by touching Individual Plaintiffs with pepper spray against their will.

213.   In so doing, Doe Defendants used an unreasonable level of force given the circumstances and acted arbitrarily and maliciously.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(a)   Enjoin, and enter a declaratory judgment stating, that Defendants' dispersal orders, use of pepper spray, and arrests against peaceful marchers violated Plaintiffs' rights to free speech and assembly and against unreasonable searches and seizures under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 12 and 14 of the North Carolina Constitution, and

(b)   Enjoin, and enter a declaratory judgment stating, that Defendants' dispersal orders, use of pepper spray against, and arrests of peaceful marchers to the polls violates the rights of Plaintiffs Jones, Cook, Harvey and Batten, and members

49

of J4tNG and AA4J under Section 11(b) of the Voting Rights Act, and 42 U.S.C. §1985;

(c)  Award Plaintiffs their damages, including punitive damages;

(d)  Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and 52 U.S.C. § 10310, and as otherwise permitted by law; and

(e)  Order such other relief as this Court deems just and equitable.

Respectfully submitted this 14th day of December, 2020.

/s/ Elizabeth Haddix
Elizabeth Haddix
North Carolina Bar No. 25818
ehaddix@lawyerscommittee.org
Mark Dorosin
North Carolina Bar No. 20935
mdorosin@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
P.O. Box 956
Carrboro, NC 27510
Tel: 919-914-6106

/s/ Jennifer Nwachukwu
Jennifer Nwachukwu
Maryland Bar No. 20869
jnwachukwu@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Tel: 202-662-8300
*Notice of Special Appearance Filed*

/s/Jaclyn Maffetore
Jaclyn Maffetore
North Carolina Bar No. 50849
jmaffetore@acluofnc.org

50

Kristi L. Graunke
North Carolina Bar. No. 51216
kgraunke@acluofnc.org
Daniel K. Siegel
North Carolina Bar No. 46397
dsiegel@acluofnc.org
ACLU of North Carolina Foundation
P.O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

Jason Keith
North Carolina Bar No. 34038
Keith & Associates, PLLC
241 Summit Avenue
Greensboro, NC 27401
Tel: 919-914-6106

*Counsel for Plaintiffs*