## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SYLVESTER ALLEN, JR., *et al.*,<br><br>     *Plaintiffs*,<br><br>v.<br><br>CITY OF GRAHAM, *et al.*,<br><br>     *Defendants*. | **1:20-cv-0997-CCE-LPA** |
| JUSTICE FOR THE NEXT GENERATION, *et al.*,<br><br>     *Plaintiffs,*<br><br>    v.<br><br>TERRY JOHNSON, individually and in his official capacity as Alamance County Sheriff*, et al.,*<br><br>     *Defendants*. | **1:20-cv-00998-CCE-LPA** |

## JUSTICE FOR THE NEXT GENERATION, et al., PLAINTIFFS' RESPONSE IN OPPOSITION TO CITY OF GRAHAM DEFENDANTS' MOTION TO DISMISS

### FACTUAL BACKGROUND

On October 31, 2020, many residents of the City of Graham and Alamance County, North Carolina awoke expecting to participate in the electoral process by voting in the 2020 Presidential Election. But the City of Graham, its Chief of Police Kristi Cole, and Graham Police Department ("GPD") Lt. Joaquin Velez ("Defendants" or "Graham Defendants") had other plans.

1

On October 31, 2020, Plaintiff Gregory Drumwright led hundreds of citizens—many of them members of the Plaintiff organizations Alamance Alliance For Justice ("AA4J") and Justice 4 the Next Generation ("J4tNG")—in the I Am Change March To The Polls (the "March"). FAC ¶ 84. The March's purpose was to draw attention to issues of systemic racism in the City of Graham (the "City") and Alamance County and to encourage members of the community who had not already voted to exercise their constitutional right to vote that day, the last day of early voting and registration. *Id.* ¶¶ 72, 80. On the day of the March, Graham and Alamance County law officers deployed violent crowd control tactics indiscriminately, using pepper spray to forcibly disperse peaceful marchers to the polls. *Id.* ¶¶ 99, 116, 124, 131. The officers and deputies arrested twenty people in connection with the March, including two poll observers and an Alamance News reporter covering the events. *Id.* ¶ 138. Some Plaintiffs and members of Plaintiffs' organizations were unable to vote that day, nor in the 2020 Election, as a result of Defendants' actions. *Id.* ¶¶ 25, 144, 152. Plaintiffs have brought this action under the United States Constitution, the Voting Rights Act, the Ku Klux Klan Act, the North Carolina Constitution, and North Carolina common law seeking remedies for their injuries.

The Graham Defendants' motion to dismiss Plaintiffs' complaint raises irrelevant arguments and inapplicable doctrines.[1] Their brief discredits Plaintiffs' factual allegations,

---

[1]Defendants also make two material misrepresentations to the court. Mem. 5, n. 4. Contrary to their representation that "The City was not aware of any concerns or objections to the ordinance until it received the first TRO motion in [Case 1:20-cv-00613-CCE-LPA]," some of the undersigned counsel wrote to the City and County on

which is entirely inappropriate at the motion to dismiss stage. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (the court "accept[s] as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff."). Defendants' arguments are meritless and their Motion should be denied.

## ARGUMENT

### I. Plaintiffs Have Stated A Claim Under Section 11(b) Of The Voting Rights Act (Count III)

Plaintiffs bring their claims for violation of the Voting Rights Act of 1965, 52 U.S.C. § 10301 *et seq.* (the "VRA"), under Section 11(b), which provides that "[n]o person, whether acting under color of law or otherwise," shall or attempt to "intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote" or "for urging or aiding any person to vote." 52 U.S.C. § 10307(b). Section 11(b)'s prohibitions are intentionally broad. *See Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 Civ. 8668, 2020 WL 6305325, at *12 (S.D.N.Y. Oct. 28, 2020) ("Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote, regardless of race.").

---

June 26, 2020, a week before filing the complaint and motion for TRO, notifying them that the City's ordinance was unconstitutional. 1:20-cv-00613-CCE-LPA, DE 8. Neither Defendant responded to that letter. Additionally, contrary to Defendants' representation, it did not repeal its ordinance until after the court issued a Consent TRO. *Id.*, DE 15. Defendants also neglect to mention that Plaintiffs' dismissal of their claims with prejudice was pursuant to a settlement agreement between the parties. *Id.*, DE 68.

Defendants argue: (i) "A VRA claim requires allegations that voting rights were denied based on race or color"; (ii) "[c]omplaints that allege misconduct not related to voting but that thereafter adversely affected voting do not raise to the level of a VRA claim;" (iii) "Plaintiffs did not allege that any defendant interfered with them while engaging or attempting to engage in voting activities;" and (iv) "there are no allegations that the City viewed or treated the protest at the courthouse as voting activity." Mem. 6-7. None of these arguments has merit.[2]

First, as is plain from its text, Section 11(b) does not require a showing that voting rights were denied on the basis of race.[3] *See League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) [hereinafter, "*LULAC*"] ("[T]he Court does not find that a showing of specific intent or racial animus is required under § 11(b)."). Defendants have confused Section 11(b) with Section 2(a).

---

[2] No case cited by Defendants involved claims brought pursuant to Section 11(b) of the Voting Rights Act. None involves allegations similar to those alleged by Plaintiffs here. *See Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 647 (E.D. Pa. 2018) (dismissing plaintiffs' Voting Rights claim, which was only mentioned once in the complaint, based on an analysis of Section 2 of the Voting Rights Act); *Smith v. Montgomery Police Dep't*, 2016 WL 11440446, at *3 (M.D. Ala. Oct. 27, 2016) (dismissing "perfunctory" voting rights discrimination claim by plaintiff who alleged that his voting rights were violated because his mailbox key was seized during an arrest a year prior to the 2016 primary election); *Smith v. Montgomery Police Dep't*, 2016 WL 7424489 (M.D. Ala. Dec. 23, 2016) (adopting in part recommendations in *id.*, but granting leave to amend to give pro se plaintiff an opportunity to allege reasonably particular facts concerning his voting rights claim).

[3] In fact, the legislative history of Section 11(b) makes clear that "[t]he prohibited acts of intimidation need not be racially motivated" and "no subjective purpose or intent need be shown." 1965 U.S.C.C.A.N. 2437, 2462.

Second, conduct that puts someone "in fear of harassment and interference with their right to vote" is sufficient to sustain a Section 11(b) claim. *LULAC*, 2018 WL 3848404, at *4 (citing *Damon v. Hukowitz*, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) ("Intimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct.")). This "naturally includes egregious conduct, such as acts of violence." *Nat'l Coal. on Black Civic Participation*, 2020 WL 6305325, at *16. Persons "voting or attempting to vote" and those "urging or aiding any person to vote or attempt to vote" are protected by Section 11(b). 52 U.S.C. § 10307(b). This includes conduct that could (or did) adversely affect voting, even if the people targeted by the conduct were not engaged in voting at the time. *See, e.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (activity to encourage voter registration is protected conduct under Section 11(b)); *LULAC*, 2018 WL 3848404, at *4 (finding that plaintiffs sufficiently alleged intimidation where defendants publicly linked plaintiffs' "names and personal information to a report condemning felonious voter registration.").

Furthermore, Plaintiffs *have* alleged that they were "engaging or attempting to engage in voting activities" at the time of Defendants' egregious conduct. Specifically, Plaintiffs allege: (1) they were engaged in a peaceful, non-partisan march to the West Elm Street early voting site, FAC ¶¶ 1, 9, 68; (2) the purpose of the March was to urge and aid Plaintiffs and attendees to vote, *id.* ¶¶ 9, 11–12, 68; (3) Defendants were aware that the purpose of the March was to encourage voting, *id.* ¶¶ 68, 70–72, 75, 80; (4) several Plaintiffs intended to vote as part of the March to the polls, *id.* ¶¶ 14, 25–26, 144, 155; and

5

(5) several Plaintiffs attempted to go to the polling location after the March was terminated by Defendants' conduct but Defendants again interfered, *id.* ¶¶ 130–33.

Concerning specific allegations of intimidation, threats, or coercion, Plaintiffs allege that: (1) Defendants' conduct in pepper spraying and arresting attendees of the March abruptly and intentionally terminated the march to the polls, FAC ¶¶ 1, 3, 68, 99, 123–25, 127144; (2) Defendants actively prevented Plaintiffs from proceeding to the polling location, *id.* ¶¶ 128–30; (3) Defendants' conduct intended to and actually did intimidate, prevent, and deter several Plaintiffs from voting, *id.* ¶¶ 3, 14, 25–26, 133, 144, 151 152–53, 155-56, 162, 185–87; and (4) even after their egregious conduct on October 31, on Election Day, Defendants positioned themselves in front of the polling location to intimidate Plaintiffs and other voters, *id.* ¶¶ 146–51.

Plaintiffs have sufficiently alleged facts to state a claim under Section 11(b) of the VRA and Defendants' motion to dismiss that claim should be denied.

## II. The City Of Graham May Not Avoid Liability For The Actions Of The Other City Defendants

Plaintiffs have brought claims under 42 U.S.C. § 1983 against the City for violations of Plaintiffs' First and Fourth Amendment rights under the United States Constitution, FAC Counts I and II, and for violations of the Voting Rights Act and Ku Klux Klan Act, *id.* Counts III and IV. Plaintiffs have additionally brought free speech and assembly claims against the City under Sections 12 and 14 of the North Carolina Constitution. *Id.* Counts V and VI. Defendants argue that the § 1983 claims should be dismissed as to the City because "[c]onclusory allegations that there was an actionable policy or custom and reference to

6

the alleged actions by individual defendants is insufficient to survive a motion to dismiss." Mem. 8. They further argue that the City is immune to Plaintiffs' state law claims under the doctrine of governmental immunity. *Id.* at 12. These arguments are without merit.

### A. Plaintiffs' § 1983 Claims Allege A Constitutional Deprivation Attributable To The City of Graham (Counts I and II)

The U.S. Supreme Court has explained that "[l]ocal governing bodies," such as the City of Graham, "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690 (1978).

"To state a cause of action against a municipality, a section 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008). Plaintiffs easily clear this threshold.

The Graham Defendants argue that the § 1983 claims should be dismissed as to the City because "[a] municipality may only be held liable for federal constitutional harms where the harm is directly attributable to the entity itself," and thus, the City "cannot be held liable for the final decisions of its chief of police because the City has not invested such final power in that position." Mem. 7. This argument is meritless.

7

### 1. Defendant Cole Acted As A Policymaker On Behalf Of The City

*"*[T]he power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level." *Pettiford*, 556 F. Supp. 2d at 530. Such policy may also be found in a "course of action tailored to a particular situation" that is chosen by the governmental entity's "authorized decisionmaker." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 244-45 (4th Cir. 1999) (municipal policy "may also be found in formal or informal ad hoc 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy.").

"The Supreme Court has expressly noted that '[a]uthority to make municipal policy . . . may be delegated by an official who possesses such authority' to another official." *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016) (citing *Pembaur*, 475 U.S. at 483) (alterations in original). Here, Plaintiffs allege that "the City Manager delegated his authority to make policy related to policing and control of assemblies, marches, protests and rallies in the City" to Defendant Cole, "and authorized her to make final policy related to policing and control of assemblies, marches, protests and rallies in the City." FAC ¶¶ 35–36.

Defendants' argument that the "Complaint nakedly asserts that the city manager conveniently delegated final authority for matters pertaining to protests to Chief Cole," and that "[t]he City cannot be held liable for the final decisions of its chief of police because the City has not invested such final power in that position," Mem. 10, flatly contradicts the

8

facts alleged in the Amended Complaint, which states: "At its October 13 meeting . . . [t]he Council advised Plaintiff Drumwright that he must coordinate logistics for the March and rally with Defendant Cole." FAC ¶ 74. These allegations must be accepted as true for the purposes of a motion to dismiss. *Wikimedia Found.*, 857 F.3d at 208.

Further, the Amended Complaint alleges facts demonstrating that Defendant Cole was the key person in authority for the City involved in planning the March: Defendant Cole handled route planning and street closures, FAC ¶¶ 75 and 81; staffing of police and firefighters, *id.* ¶ 76; and public safety protocols, namely, the City's "public safety plan," *id.* ¶¶ 79–80. On the day of the event, Defendant Cole "met the marchers in the parking lot near the chapel, stated that she would be closing the street for them to march all the way to the Historic Courthouse grounds, told them that she had State troopers there to 'help close the streets,' and added, 'the street is yours.'" *Id.* ¶ 85. These events demonstrate that Defendant Cole was the chief authority in making "decisions[s] regarding a course of action in response" to the March. *Pembaur*, 475 U.S. at 481.

The Fourth Circuit has held that far less specific allegations of delegated authority are adequate at the motion to dismiss stage. *See Edwards*, 178 F.3d at 245 (finding allegations "that the City delegated authority to its agents and employees . . . to formulate, develop and administer employment and personnel policies and practices for the City" sufficient); *see also Cherry v. City of Greensboro, No. 12-CV-217, 2013 WL 422857, *8 (M.D.N.C. Feb. 4, 2013)* ("*Edwards* was decided before *Twombly* and *Iqbal*, but there is no contention that the latter render the former infirm."). Thus, Plaintiffs' allegations are

more than enough to establish Defendant Cole as having policymaking authority on behalf of the City of Graham with regard to the March.

### 2. Defendant Cole Deprived The Plaintiffs Of Their Constitutional Rights

Defendants next argue that liability against the City should be foreclosed because "[t]here are no facts demonstrating that Chief Cole made decisions regarding the deployment of OC Vapor in general or in the context of the October 31 events." Mem. 10. Again, these arguments miss the mark. "[E]ven where city policies do not 'directly command[ ] or authorize constitutional violations,' they may nonetheless cause the violation by providing 'tacit authorization' to unconstitutional conduct." *Price v. City of Fayetteville, N.C.*, 22 F. Supp. 3d 551, 563 (E.D.N.C. 2014). Such was the case here.

As Plaintiffs allege, Defendant Cole as the Chief of Police was the "final authority" regarding the use of the violent crowd control tactics that were deployed on Plaintiffs during the March. FAC ¶ 37. These allegations are sufficient, at this juncture, to support the claim that Defendant Cole at least authorized GPD officers "to unlawfully disperse a march to the polls, with the purpose of discouraging and intimidating voters from exercising their constitutional right to vote." *Id*. ¶ 194.

Defendant Cole's actions, either through her "tacit authorization" or specific direction, constituted official policy that directly led to the deprivation of the Plaintiffs' constitutional rights. *Price*, 22 F. Supp. 3d at 562. Accordingly, the City's Motion with respect to Plaintiffs' §1983 claims should be denied.

**B.** **The City Of Graham Is Not Immune To Plaintiffs' State Law Claims (Counts V, VI, and VII)**

In addition to their federal claims, Plaintiffs have brought claims against the City under Article I, Sections 12 and 14 of the North Carolina Constitution for violations of their rights to free speech and free assembly. FAC ¶¶ 204, 209. Defendants argue these claims should be dismissed under the doctrine of governmental immunity and because Plaintiffs' "allegations do not contain any facts showing Graham waived immunity." Defendants further argue Plaintiffs "asserted federal claims as well as a common law claim for battery," and therefore have other adequate state remedies. Mem. 12–13. These arguments are meritless.

First, sovereign immunity is not a defense to free speech and free assembly claims under the North Carolina Constitution. *Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 785–86 (1992) ("The doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights."). Accordingly, "when there is a clash between these constitutional rights and sovereign immunity, the constitutional rights must prevail." *Id.* at 786. Plaintiffs need not allege a waiver. *See id.*

Second, the presence of federal claims has no affect on claims brought under the state Constitution. *Barrett v. Bd. of Educ. of Johnston Cty., N.C.*, 13 F. Supp. 3d 502, 514 (E.D.N.C. 2014), *aff'd on other grounds*, 590 F. App'x 208 (4th Cir. 2014) ("A plaintiff can assert a direct claim under the North Carolina Constitution only when there is no adequate remedy *at common law or under a state statute*.") (emphasis added); *see also*

11

*Corum*, 330 N.C. at 789 (allowing plaintiff to bring causes of action for free speech violation under both § 1983 and the North Carolina Constitution).

Third, Defendants provide no support for the argument that certain Plaintiffs' common law claims for battery against the individual Doe Defendants are an adequate remedy for free speech and assembly injuries. Indeed, North Carolina courts have already ruled that, as Plaintiffs allege, FAC ¶ 204, no such remedy exists for the alleged deprivation of the right to freedom of speech. *See Corum*, 330 N.C. at 783 ("Having no other remedy, our common law guarantees plaintiff a direct action under the State Constitution for alleged violations of his constitutional freedom of speech rights.").This Court considered and rejected similar arguments in *Randleman v. Johnson*, 162 F. Supp. 3d 482, 489 (M.D.N.C. 2016). In *Randleman*, as here, the defendant argued without support that the mere allegation of another state law claim provided plaintiff "an adequate remedy under state law because he has 'at least the opportunity to enter the courthouse doors and present his claim and the possibility of relief under the circumstances.'" *Id.* The Court rejected the argument because it "fail[ed] to articulate the contours of North Carolina case law that would be informative on the question of" how Randleman's other tort claims could "provide the 'possibility of relief' under North Carolina law." *Id.* The Court held that "[i]n the absence of such explanation," the motion must be denied. *Id.* Here too, the City makes no attempt to explain how the battery claim asserted by some Plaintiffs[4] could provide an

---

[4] Defendants ignore that Organizational Plaintiffs have brought claims under the North Carolina Constitution, but cannot bring common law claims for battery.

12

adequate remedy for the alleged violations of freedom of speech and assembly. Just as in *Randleman*, "in the absence of such explanation," Defendants' motion to dismiss Counts V, VI, and VII as to the City should be denied.

## III.     The Individual Graham Defendants Are Not Immune To Plaintiffs' Claims

In addition to the claims brought against the City of Graham, Plaintiffs have also brought claims against Defendants Cole, Velez, and Franks (the "Individual Graham Defendants") under both federal and state law. Defendants argue the federal claims are barred by the doctrine of qualified immunity and are otherwise duplicative. They also argue the Individual Graham Defendants are immune to the state law claims through public official immunity. Mem. 13–19. These arguments are without merit.

### A.     Qualified Immunity Does Not Bar The Federal Claims

Qualified immunity shields officials from liability when they make "a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances" confronted. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). To successfully state such a claim against a government official, a plaintiff must allege: (1) the allegations underlying the claim substantiate a violation of a federal statutory or constitutional right and (2) the official violated a clearly established right that a reasonable person would have known. *Price*, 22 F. Supp. 3d at 559. Qualified immunity does not apply where no reasonable official in the defendant's position could conclude that the defendant's conduct was permissible. *Taylor v. Riojas*, 141 S. Ct. 52, 543 (2020).

As a threshold matter, Defendants' argument fails because, as they acknowledge, "[q]ualified immunity is a highly fact specific inquiry." Mem. 16; *see also id.* at 14 ("The inquiry is fact intensive, focused on the totality of circumstances and not confined to neat sets of legal rules."). By definition, such a "fact specific inquiry" will depend on the facts shown by discovery and cannot be resolved on a Rule 12(b)(6) motion. With all inferences drawn in Plaintiffs' favor as required at this stage, the allegations in the First Amended Complaint are more than sufficient.

### 1. Defendants Violated The First And Fourth Amendments

"[T]he Supreme Court has already well articulated" that the First Amendment prohibits "interfer[ence] with demonstrations unless there is a 'clear and present danger' of riot, imminent violence, interference with traffic or other immediate threat to public safety." *Jones v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308–309 (1940)).

The Fourth Amendment prohibits the "use of pepper spray on a non-resisting, non-fleeing individual, suspected of a non-violent misdemeanor." *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 914 (E.D. Mo. 2020) (*citing Tatum v. Robinson*, 858 F.3d 544, 548-550 (8th Cir. 2017)); *Park v. Shiflett*, 250 F.3d 843, 852-53 (4th Cir. 2001) (irresponsible use of pepper spray twice at close range on unarmed individual was excessive force violating Fourth Amendment); *Meyers v. Balt. Cty.*, 713 F.3d 723, 735 (4th Cir. 2013) ("The use of any 'unnecessary, gratuitous, and disproportionate force,' whether arising

14

from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured.").

Supervisors may be held liable "under § 1983 . . . if the supervisor failed or refused to intervene when a constitutional violation took place in his presence" or "if the supervisor created a policy or custom under which the constitutional violation occurred." *B.J.G. ex rel. McCray v. St. Charles County Sheriff*, No. 4:08-cv-1178, 2010 WL 1838414, at *3 (E.D. Mo. May 6, 2010), *aff'd sub nom. B.J.G. ex rel. McCray v. St. Charles County Sheriff*, 400 F. App'x 127 (8th. Cir. 2010); *Randall v. Prince George's Cty.*, 302 F.3d 188, 203 (4th Cir. 2002) ("Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly.") (citations omitted). Defendants Cole (Chief of GPD), and Velez (Lt. of GPD) are the top law enforcement officials for the City of Graham. FAC ¶¶ 38, 40–41. They are responsible "for the policy, practice, supervision, and implementation and conduct" of GPD officers. *See id.* ¶ 38. Plaintiffs allege that these individuals, together with Defendant Franks, *id.* ¶ 31, planned, directed, and authorized the suppression of Plaintiffs' free speech and assembly rights through the authorized deployment of violent crowd control tactics.

Plaintiffs allege Defendant Cole deployed a "large, armed police presence" at the March. FAC ¶ 78. She ensured that armed GPD officers were near the marchers at all times. *See, e.g.*, *Id.* ¶ 91. She unilaterally changed the destination of the March from the Elm Street One-Stop Early Voting site to the Historic Courthouse grounds. *Id.* ¶ 80. During the

15

March, GPD blocked "access to most sidewalk areas" with barricades. *Id.* ¶ 98. They also blocked the route to the polling place. *Id.* ¶ 130.

Once the Plaintiffs were corralled, the GPD officers, "working in coordination" with each other and the Alamance deputies, on multiple occasions and "without warning," disrupted Plaintiffs' peaceful, non-violent demonstration by deploying pepper spray into the crowd. FAC ¶¶ 99, -116, 124. Even as Plaintiffs attempted to disperse, "they were chased and sprayed repeatedly with pepper spray." *Id.* ¶ 128. GPD obstructed Plaintiffs from fleeing to the polling place and routed them back towards North Main Street where multiple GPD officers "lined the streets" and pepper sprayed the Plaintiffs. *Id.* ¶¶ 130–131. At no point did Defendants Cole, Velez, or Franks intervene to protect the Plaintiffs, despite being onsite and in charge of GPD response to the crowd. When all reasonable inferences are drawn in favor of Plaintiffs—as they must at this stage— the allegations are more than sufficient to state a claim against Defendants Cole, Velez, and Franks.

## 2. Defendants Violated The VRA And The KKK Act

In addition to violating their First and Fourth Amendment rights, the Individual Graham Defendants' authorization of violent crowd control tactics at the March prevented certain Plaintiffs from voting at the March's conclusion, as originally planned; Plaintiff Harvey was unable to register that day due to Defendants' actions, so he could not vote in the 2020 election FAC ¶ 144; *see also id.* ¶¶ 152–153 (each of the Organizational Plaintiffs had members "who attended the March and were similarly intimidated from voting by Defendants' violent actions."). The Individual Defendants knew that Plaintiffs intended to

16

march to the polls to participate in the last day of the early voting and registration period. FAC ¶¶ 68, 75–83. Defendants authorized GPD officers to broadly deploy pepper spray to disperse a peaceful march that was explicitly intended to end at the polls, and to otherwise prevent Plaintiffs from voting. *See id.* ¶ 129.

As explained above, Section 11(b) of the VRA prohibits any intimidation, threatening, or coercion of "any person for voting or … any person for urging or aiding any person to vote or attempt to vote," 52 U.S.C. § 10307(b).[5] Similarly, the Ku Klux Klan Act of 1871 prohibits "two or more persons" from preventing "by force, intimidation, or threat, any citizen who is lawfully entitled to vote" from voting in a federal election. 42 U.S.C. § 1985(3).

The right to vote is perhaps the most sacred right enshrined in the United States Constitution. *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (the "right of individuals . . . to cast their votes effectively" is "among our most precious freedoms."). No reasonable officer would believe that the violent suppression of Plaintiffs' rights on October 31, including pepper spraying marchers and blocking roads leading to the polling place, would be permissible under either statute. Plaintiffs have specifically alleged that the Doe Defendants, in their individual capacities, acted "arbitrarily and maliciously." FAC ¶ 212; *see Lopp v. Anderson*, 251 N.C. App. 161, 168 (2016) (noting that "Plaintiffs have specifically alleged that Defendant Officers acted with malice."); FRCP 9(b) ("Malice,

---

[5] North Carolina's Board of Elections affirms these protections. *See* Memo 2020-30, North Carolina State Bd. of Elections, October 9, 2020, *available at* https://bit.ly/3bjbHgY (last visited March 4, 2021).

intent, knowledge, and other conditions of a person's mind may be alleged generally."). Accordingly, qualified immunity is unavailable. *Taylor*, 141 S. Ct. at 54 (denying qualified immunity because "no reasonable . . . officer could have concluded that" their conduct was permissible). [6]

## IV. The Organizational Plaintiffs Have Standing To Pursue Their Claims

Defendants argue the organizational Plaintiffs—AA4J and J4tNG—lack standing to bring their claims in this lawsuit. Mem. 19-22. Defendants, again, are wrong.

Under Article III of the Constitution, "an organizational plaintiff may have standing to sue in two ways: (i) on its own behalf (organizational standing); or (ii) on behalf of its members (representational or associational standing)." *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 388 (M.D.N.C. 2019) (citation omitted). AA4J and J4tNG have sufficiently alleged standing under both theories, and Defendants do not contest organizational standing; their motion to dismiss AA4J's and J4tNG's claims for lack of standing should be denied on that basis alone.[7] But, as shown below, AA4J and J4tNG have adequately alleged associational standing too.

---

[6] Defendants also move to dismiss the state tort claims for assault and battery against the Doe Defendants, arguing that these officers "qualify for public official immunity." Mem. 18. But the attorneys for the City of Graham have repeatedly asserted *that they do not represent the Doe Defendants and have refused to accept service on their behalf.* Accordingly, they cannot appropriately move to dismiss claims against the Doe Defendants.

[7] AA4J and J4tNG specifically alleged that Defendants' unlawful actions "frustrate[ed] [their organizational] mission and purpose" by causing them to redirect resources by organizing a second march on Election Day, November 3, 2020. FAC ¶¶ 9-12. A "drain

### A.    AA4J And J4tNG Have Associational Standing

AA4J and J4tNG have associational standing to sue on behalf of their members. To demonstrate associational standing, AA4J and J4tNG "must allege that: '(1) [their] own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.'" *Southern Walk v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Md. Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991)). To satisfy the first element of this test, an organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id*. (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

AA4J and J4tNG's allegations easily satisfy these standards. First, each organization alleged that at least one of their members was harmed.  Plaintiffs allege that AA4J President, Quenclyn Ellison, "was injured by Defendants' unlawful actions, including their unlawful use of pepper spray," FAC ¶ 15, and that J4tNG's Lead Organizer, Gregory Drumright, "was injured by Defendants' unlawful actions, including their use of pepper spray." *Id*. ¶ 13.

---

on [an] organization's resources . . .constitutes far more than simply a setback of the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Where, as here, an organization is forced to redirect its resources due to a defendant's unlawful actions, "there can be no question that the organization suffered an injury in fact" sufficient for organizational standing. *See also North Carolina State Conf. of NAACP v. North Carolina State Bd. of Ed.*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 616-17 (M.D.N.C. 2016).

19

Second, the complaint details how the interests AA4J and J4tNG seek to protect are germane to their respective organizational purposes. The complaint alleges that AA4J's organizational purpose includes "fight[ing] for political, educational, social, and economic equality for all citizens of Alamance County" by, among other things, "participat[ing] in activities to encourage voting, such as voter registration drives and the October 31 March." FAC ¶ 11. Similarly, the complaint alleges J4tNG's organizational purpose includes "organizing for racial justice and an end to police violence and other forms of systemic racial oppression" by, among other things, "organiz[ing] and participat[ing] in 'get out the vote drives.'" *Id.* ¶ 9. In other words, organizing and leading public demonstrations like the March *is* one of the purposes of AA4J and J4tNG, and one of the purposes of this lawsuit is to ensure Defendants cannot illegally and violently disrupt future marches as they did on October 31, 2020. This Court has previously denied motions to dismiss complaints similar to this one. *See, e.g.*, *Guilford Coll.*, 389 F. Supp. 3d at 389 (holding in a challenge to an educational visa policy that the American Federation of Teachers had associational standing because its "mission includes advancing the interests of its members . . . who wish to serve as teachers" and "advocat[ing] for its members' interests before governmental bodies and in court"). The Court should do so again here.

Finally, the organizational Plaintiffs' injunctive relief claims do not require the participation of any individual member. In cases seeking injunctive relief, it can "reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975).

20

Defendants argue that AA4J and J4tNG fail this prong because "constitutional harms and defenses are determined based on the unique facts of each case." Mem. 21. But this argument underscores precisely why their motion should be denied: if Defendants are correct, then resolution of this issue will depend on the facts shown by discovery and cannot be resolved on a Rule 12(b)(6) motion.

### C. That AA4J And J4tNG Are Unincorporated Organizations Is Irrelevant

Defendants argue AA4J and J4tNG lack Article III standing because they are unincorporated associations that have not filed an "assumed business name certificate" under a North Carolina state statute. This argument is meritless.

As an initial matter, because Defendants provide no legal authority showing that AA4J or J4tNG were required to file an assumed business name certificate to establish standing under Article III of the U.S. Constitution, *see* Mem. 20, they have waived this argument and the Court need not consider it. *See Hayes v. Self-Help Credit Union*, No. 1:13-CV-880, 2014 WL 4198412 at *2 (M.D.N.C. Aug. 22, 2014) (Eagles, J.) (deeming a plaintiff's arguments waived where "she has cited no legal authority of any kind" to support them, noting that "[i]t is not the role or the responsibility of the Court to undertake the legal research needed to support or rebut a perfunctory argument.").

Putting aside Defendants' waiver, their argument is meritless. First, Article III standing in federal court "does not depend on [a] party's . . . standing in state court." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985); *see also* Protect Our Parks, Inc. v. Chicago Park Dist., 971 F.3d 722, 731 (7th Cir. 2020). (state law "obviously cannot

21

alter the scope of the federal judicial power."). Thus, the fact that neither AA4J nor J4tNG filed an "assumed business name certificate" under North Carolina law does not bear on whether they have Article III standing to bring their claims in federal court.

Second, the state statute on which Defendants rely, N.C. Gen. Stat. § 1-69.1, does not apply to AA4J or J4tNG. That statute, on its face, states that "[u]incorporated nonprofit associations are subject to Chapter 59B of the General Statutes and *not this section*." N.C. Gen. Stat. § 1-69.1(b) (emphasis added). AA4J and J4tNG are nonprofit associations; even if their Article III standing turned on state law, Defendants' reliance on § 1-69.1 would be misplaced. Moreover, Chapter 59B of the General Statutes merely sets forth tests that are identical to those for organizational and associational standing under federal law. *See* N.C. Gen. Stat. § 59B-8(a) ("A nonprofit association, in its name, may institute . . . a judicial . . . . proceeding."); *id*. § 59B-8(b) ("A nonprofit association may assert a claim in its name on behalf of its members . . . if one or more of them have standing to assert a claim in their own right . . .[and] the interests the nonprofit association seeks to protect are germane to its purposes."). Thus, even if Chapter 59B applied, AA4J and J4tNG would have standing for the reasons set forth above.

### D. That Some Members Of J4tNG Are Other Organizations Is Irrelevant

Defendants assert that J4tNG lacks standing because "its members are other organizations" and therefore it "does not represent the constitutional rights of individual members." Mem. 22. Again, Defendants waived this argument by failing to provide any legal authority. *Hayes*, 2014 WL 4198412 at *2. And in any event, Defendants' argument

is meritless because it focuses only on *associational* standing, which requires that an organizational plaintiff allege its members have standing to sue in their own right. *Southern Walk*, 713 F.3d at 184. As noted above, Defendants do not contest that J4tNG and AA4J have *organizational* standing to sue on their own behalf. Moreover, that some of J4tNG's members are other organizations does not matter, because at least one of J4tNG's members, Gregory Drumright, is an individual with standing to sue in his own right. *Summers*, 555 U.S. at 498 (for associational standing, to show that its members would have standing to sue in their own right, an organization must "make specific allegations establishing that *at least one* identified member had suffered or would suffer harm." (emphasis added)).

## CONCLUSION

For the reasons discussed above, the City of Graham Defendants' Motion to Dismiss should be denied.

Respectfully submitted, this the 5th day of March 2021.

/s/ Elizabeth Haddix
Elizabeth Haddix
North Carolina Bar No. 25818
ehaddix@lawyerscommittee.org
Mark Dorosin
North Carolina Bar No. 20935
mdorosin@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
P.O. Box 956
Carrboro, NC 27510
Tel: 919-914-6106

/s/ Jennifer Nwachukwu
Jennifer Nwachukwu
Maryland Bar No. 20869
jnwachukwu@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Tel: 202-662-8300
*Notice of Special Appearance Filed*

/s/Jaclyn Maffetore
Jaclyn Maffetore
North Carolina Bar No. 50849
jmaffetore@acluofnc.org
Kristi L. Graunke
North Carolina Bar. No. 51216
kgraunke@acluofnc.org
Daniel K. Siegel
North Carolina Bar No. 46397
dsiegel@acluofnc.org
ACLU of North Carolina Foundation
P.O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

Jason Keith
North Carolina Bar No. 34038
Keith & Associates, PLLC

24

241 Summit Avenue
Greensboro, NC 27401
Tel: 919-914-6106

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Relying on the word count function of Microsoft Word, I hereby certify that this brief complies with the word limitations set forth in LR 7.3.

/s/ Elizabeth Haddix
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on March 5, 2021, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system, which will send notice to counsel for Defendants.

/s/ Elizabeth Haddix
*Counsel for Plaintiffs*