IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:20-cv-00997-CCE-LPA

| | |
|---|---|
| SYLVESTER ALLEN, JR. *et al*., <br><br> *Plaintiffs*, <br><br> v. <br><br> CITY OF GRAHAM, *et al*., <br><br> *Defendants*. <br><br><br> GREGORY DRUMWRIGHT, *et al*., <br><br> *Plaintiffs,* <br><br> v. <br><br> TERRY JOHNSON, individually and in his official capacity as Alamance County Sheriff, *et al*., <br><br> *Defendants*. | **CITY DEFENDANTS' REPLY TO DRUMWRIGHT PLAINTIFFS [D.56] IN SUPPORT OF MOTION TO DISMISS THE DRUMWRIGHT COMPLAINT** |

Plaintiffs' opposition to the City Defendants' motion to dismiss is noteworthy as much as for what it says, as for what it does not say. At no point do Plaintiffs dispute the overarching objection in the City Defendants' motion that Plaintiffs rely on generalized allegations against generalized classes of defendants, without identifying specific alleged bad acts by specific defendants against specific plaintiffs. In their response, as in their pleadings, Plaintiffs rely upon general arguments and extensive recitation of case law, most of which is inapposite to the issues

1

presented by the City Defendant's motion. Plaintiffs punctuate their effort by peddling disinformation and conspiracy which they did not plead in their complaint.

Plaintiffs' defense of their Voting Rights Act ("VRA" (Count III)) claim start by arguing that they need not demonstrate racial animus and that fear of harassment is sufficient interference with voting rights to be actionable. Plaintiffs shadowbox with a strawman as those are not the flaws noted by the City Defendants in their motion to dismiss.

The deficiency with Plaintiffs' Voting Rights Act claim is that the disrupted protest was not "voting related activity" but was instead a march to the Alamance County courthouse to rally for social justice and protest the Confederate memorial. After declaring victory over their strawmen, the Drumwright Plaintiffs turn to the real issue and cite numerous paragraphs supposedly supporting the claim that the disrupted October 31 event fall within § 11(b) of the VRA. Plaintiffs argue "Defendants were aware that the purpose of the march was to encourage voting" and cite to paragraphs 68,70-72, 75 and 80 of their amended complaint. [D. 25.] Those paragraphs cover both Plaintiffs efforts to obtain a permit and coordinate their march, to include discussing the logistics of the march leading up to the day of the event. Plaintiffs cite to their allegations regarding obtaining a permit for the rally at the courthouse. [D.25, ¶¶ 71, 72.]

Plaintiffs did not attach their permit to the complaint, but the court may nonetheless review it. "In determining a motion for judgment on the pleadings, the court may consider documents incorporated by reference in the pleadings." *Parks v. Alteon, Inc.*, 161 F. Supp. 2d 645, 649 n.1 (M.D.N.C. 2001); *accord Benson v. Life Ins. Co. of N. Am.*, No. 5:14-CV-377-BR, 2014 WL 6666944, at *1 (E.D.N.C. Nov. 24, 2014). Attached at Exhibit A hereto is Plaintiff's permit incorporated by reference into Plaintiffs' pleadings.

Contrary to Plaintiffs' arguments, their permit was not titled, "March to the Polls."

2

Plaintiffs titled their permit, I AM CHANGE MARCH. Under "Mission/Purpose of Event," Plaintiffs state "March/Social Justice Rally." They selected the entirety of the Courthouse property for the event. The words "voting" and the phrase "March to the Polls" are nowhere on the permit.[1]

The Drumwright Complaint specifically alleges specific facts regarding what happened. Plaintiffs allege that at the end of their march, as they entered Sesquicentennial Square, the marchers knelt and laid down in the state highway at North Main and Courthouse Square to commemorate the death of George Floyd. They allege the Graham Police Department began deploying pepper spray "within seconds" of the vigil ending. [D.25, ¶¶ 95, 99.] They also alleged that at the conclusion of the vigil, Reverend Drumwright told marchers to wait while he and others began building the stage. In Plaintiffs' telling, when law enforcement began deploying pepper spray, Reverend Drumwright returned from the stage, attempted to calm the situation and escorted marchers across the street to the stage. [*Id*. ¶¶ 97, 100, 111.] The march transitioned to the rally at the courthouse stage. At approximately 1 p.m. (90 minutes into the march and rally), and after several speakers, ACSO deputies attempted to disconnect the sound amplification system, which led to a physical altercation with Reverend Drumwright, and law enforcement, allegedly both ACSO and GPD, deployed pepper spray. [*Id*. ¶¶ 114-16.] At some unspecified time later, law enforcement deployed pepper spray a third time to clear the town square after

---

[1] Related, the Drumwright Plaintiffs include in their pleadings and cite in part in the response brief to the negotiations between Drumwright and Haddix with Graham leading up to October 31. [D.25 ¶¶ 76-82.] Again, those allegations allow for incorporating the actual communications into the pleadings pursuant to Rule 12(c). In those communications, regarding the march, Chief Cole stated, "The road closures is only temporary to accommodate the march until **it reaches its final destination, which I though[t] was the historic courthouse**." Haddix responded, "Understood" and then instructed Chief Cole regarding Drumwright's stage and demands regarding counter protesters. *See* Exhibit B, hereto, at p. 2. The Court could take these communications into consideration pursuant to Rule 12(c).

instructing the protest to disperse. [*Id.* ¶¶ 123-24.]

The Drumwright Complaint alleges disbursement of pepper gas after a memorial for George Floyd, after a physical altercation with law enforcement over the Plaintiffs' sound amplification system being used at the county courthouse, and after being told to disburse from the area after the altercation. These are the specific factual allegations from the Drumwright Complaint. These facts do not disclose voting or voting related activities. Memorializing George Floyd is not related to voting rights, at least not directly. Nor are disputes over a sound amplification system at a social justice rally and efforts by law enforcement to clear the area thereafter.

These facts become even more clear when Plaintiffs' allegations are coupled with their permit recited in the complaint. The specific factual allegations, permit and the communications with Graham referenced in the complaint clearly show a social justice protest at the Alamance County Courthouse that was allegedly wrongfully disrupted and disbursed; protestors had planned to go vote nearby thereafter, but some did not or were not able to do so after the confrontation with law enforcement. The social justice protest at the courthouse alongside the Confederate memorial was not voting nor a voting related activity, at least not within the context of the VRA.

The cases cited by the Drumwright Plaintiffs do not advance their arguments, at least not their non-strawman arguments. Those cases do, however, demonstrate what courts find to be voting-related activities. The holding in *League of United Latin Am. Citizens -Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018), involved defendants who distributed publications falsely accusing plaintiffs of illegally registering to vote, illegally voting and committing voting related felonies. Even after the substantial mistakes in their analyses and methodologies were pointed out, the defendants

4

continued to publish the reports. The primary issues before that court were whether public distribution of such defamatory nature about the plaintiffs' voting activities constituted "intimidation" under the VRA and whether racial animus was required. *Id.* at *3-4.

In *National Coal. on Black Civic Participation v. Wohl*, No. 20 Civ. 8668 (VM), 2020 WL 6305325 (S.D.N.Y. Oct. 28, 2020), the defendants sent out thousands of robo-calls that expressly discouraged voters from voting by mail based on false statements that their voting information could be used to execute arrest warrants, collect outstanding debts and track people for mandatory vaccination. *Id*. at *3. The statements were false, sent across a multi-state area and were designed for the sole purpose of suppressing voting.[2]

The VRA prohibits intimidation and threats directed at people for voting or urging or aiding any person to vote. 52 U.S.C. § 10307. The VRA defines "[t]he terms 'vote' or 'voting' [to] include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." *Id.* § 10310(c)(1). As noted above, Plaintiffs' social justice protest activities plainly do not fall within the scope of this definition. Further, the cases Plaintiffs cite demonstrate what courts have found fall within the scope of prohibited activity under the VRA. Confrontations regarding clearing roadways after a memorial vigil and disputes over sound broadcast equipment and clearing the courthouse square

---

[2] Plaintiffs' reliance on *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968), is misplaced as that case focused on whether criminal prosecutions for alleged VRA activities could be removed to federal court. There was no analysis of what type of activities fell within the scope of the Act.

5

after altercations with law enforcement are not the type of facts found within the language of the VRA nor in the cases cited by Plaintiffs. This Court should dismiss Count III from the Drumwright Complaint.

The Drumwright Plaintiffs next defend their claims for municipal liability against the City of Graham based on the alleged involvement of Chief Cole in planning the logistics of the march and protest. Specifically, the Drumwright Plaintiffs rely upon the fact the City Council directed Drumwright to "coordinate logistics for the March and rally" with Chief Cole, as alleged in their complaint at paragraph 74. The Drumwright Plaintiffs then articulate where in their complaint they specifically allege how Chief Cole was responsible for such logistics by handling the route planning, street closures, staffing the event and even meeting with marchers prior to their march to explain how the Graham Police Department was assisting their effort. [D.56, p. 9.]

There are two fatal problems with the Drumwright Plaintiffs' theory of municipal liability. Foremost, the City Defendants do not believe Plaintiffs are suing over municipal decisions regarding the logistics of the march and rally. The City Defendants cannot be certain since, as previously explained, the Drumwright Plaintiffs do not articulate precisely (at all) in their complaint what the alleged policy was that violated their constitutional rights. Presumptively, however, this suit is not about which streets Chief Cole chose or where she authorized Drumwright to set up a stage if he wanted a location other than the courthouse grounds.

The Drumwright Plaintiffs specifically address in their arguments what they failed to articulate in their complaint: the policy for which they seek redress is "violent crowd control tactics … deployed on Plaintiffs during the March." [D.56, p. 10.] Presumably this means GPD's use of OC Vaper to clear the streets just prior to the courthouse rally and after the rally ended. Assuming *arguendo* Chief Cole was the final policy maker for the event logistics, the English

6

language is not malleable enough to extract authority for "crowd control tactics" from authority over "event logistics."

The second flaw is that the Council's directing Drumwright to coordinate logistics with Chief Cole is not a delegation of final authority over the event, divesting the City Manager of his authority over Chief Cole and the GPD.[3] Again, there is simply no way to maneuver the English language found in Plaintiff's complaint to obtain the necessary conclusion that Chief Cole was the final decision making authority for logistics, let alone for crowd control tactics and use of force policies.

Plaintiffs rely upon the Supreme Court's decision in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), a holding that established that a County could be held liable for a single order by a county official without the chance of the order occurring again. In that case, the county prosecutor ordered deputies to break into an office to search for witnesses even though the deputies lacked a warrant. (Subsequently, warrantless forced entries were held to be unconstitutional.) The Court specifically found that under Ohio law, county prosecutors then had legal authority to "establish county policy under appropriate circumstances … ." *Id*. at 484. In the course of coming to their conclusion and taking pains to reconcile that holding with *Monell*, the Court explained:

> The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *See, e.g.*, *Oklahoma City v. Tuttle*, 471 U.S., at 822–824, 105 S. Ct., at 2435–2436. ***The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable*** …. We hold that municipal liability under § 1983 attaches where—***and only where***—a

---

[3] This argument from Plaintiffs is particularly disappointing and cynical. The same attorney telling this Court that Chief Cole was the final authority for the March/Rally logistics, is also the same individual who did not hesitate to directly appeal to the City Manager seeking to overturn Chief Cole's decisions regarding those logistics. See Haddix emails to City Manager Maness at Ex. B, hereto, pages 4-7.

7

> deliberate choice to follow a course of action is made from among various alternatives by ***the official or officials responsible for establishing final policy with respect to the subject matter in question***.

*Id*. at 481-83 (emphasis added). Graham respectfully submits that, as a matter of law and English language, the Council's directing a citizen to coordinate the logistics of a march and rally with the police chief is not a delegation of final authority to promulgate use of force and crowd control policies.

Plaintiffs rely upon *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016), where reversing a summary judgment as to constitutional deprivation, the panel instructed the trial court upon remand to review whether the police chief's internal policies he promulgated and enforced within the department constituted final authority as to those policies, a holding inapposite to the issues here. *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) expressly condones allegations of pleading bare elements for municipal liability, devoid of supporting facts, precisely what the Court subsequently rejected in *Iqbal* and *Twombly*. Plaintiffs rely upon the unpublished opinion of *Cherry v. City of Greensboro*, No. 12-CV-217, 2013 WL 422857, at *8 (M.D.N.C. Feb. 4, 2013) as authority that the contrary holdings of *Iqbal* and *Twombly* do not apply to *Edwards*. But the defendant in *Cherry* did not contend "that the analysis and conclusion of *Edwards* would not withstand the *Iqbal*/*Twombly* standard, and the court therefore decline[d] to engage in that examination." *Id.* at *8 n.6. The City Defendants maintain Plaintiffs' pleading falls short of *Iqbal* and *Twombly*, so *Cherry* does not apply.

The Drumwright Plaintiffs also claim they have alleged claims sufficient to withstand qualified immunity against Chief Cole, Lt. Velez and Officer Franks in their individual capacities. The theory of liability appears to be that Chief Cole and Lt. Velez are in positions of authority within GPD, and together with Officer Franks, they "planned, directed, and authorized

the suppression of Plaintiffs' free speech and assembly rights through the authorized deployment of violent crowd control tactics." [D.56, p. 15 (citing D.25, ¶¶ 31, 38).]

What the Drumwright Plaintiffs argue next is almost stunning in its calculated disinformation. Plaintiffs argue Chief Cole "unilaterally" directed the marchers to the courthouse grounds instead of to the early voting site, "ensured" armed GPD officers stayed near the marchers, blocked sidewalks and streets, and once Chief Cole succeeded in "corralling" Plaintiffs, law enforcement deployed pepper spray on the unsuspecting marchers, stopped them from fleeing, but in fact "routed them back towards North Main Street where multiple GPD officer 'lined the streets' and pepper sprayed the Plaintiffs." [*Id.* at pp. 15-16.]

There are numerous problems with Plaintiffs' argument.[4] To the Rule 12 issues immediately at hand, this repulsive conspiracy theory is not found articulated in the Drumwright Complaint. To the contrary, the complaint explains GPD worked with Plaintiffs to escort them to the courthouse. The marchers knelt/laid down in the state highway and after not promptly clearing the state highway, GPD deployed OC vaper to clear the roadway. The marchers progressed to Drumwright's planned speeches and rally. After some meaningful time, an altercation occurred after ACSO attempted to seize a generator used by Plaintiffs, law enforcement responded with pepper spray and thereafter at least OC Vaper was used to clear the square after the rally/protest was suspended. [D.25, ¶¶ 95, 99, 97, 100, 111, 114-116, 123-124.] There are no facts in the pleadings that Cole, Velez and/or Franks worked with ACSO to surreptitiously route marchers to the courthouse square where law enforcement planned and

---

[4] Foremost, this attorney argumentation is part of a calculated disinformation effort warranting this Court's harshest sanctions against attorneys who hide behind litigation immunity to publish grossly reckless and highly incendiary defamation against public servants. Cole, Velez and Johnson and their families live in these communities and Plaintiffs' public, fabricated allegations against them have long lasting consequences.

9

waited not just to ambush the marchers with pepper spray, but to somehow route the fleeing marchers back again into a line of armed officers waiting to spray them again. Such shameful attorney argumentation is a double fallacy—it does not exist in the pleadings and it did not happen in reality, the former being dispositive at this stage.

As also set forth above, the Drumwright Plaintiffs applied for and obtained a permit to protest at the County Courthouse. For them to now tell this Court that Chief Cole conspired to divert the marchers there as part of a conspiracy with ACSO is demonstrably false by the very permit referenced in (but not attached to) the Drumwright Plaintiffs' complaint.[5] *See* Ex. A hereto.

Third, there are no facts alleged whatsoever detailing how, when or where Chief Cole, Lt. Velez or Officer Franks participated in this alleged vile conspiracy or setting forth that they stood idly by and watched it unfold. The Drumwright Complaint includes factual details regarding the course of events, and also discloses detailed facts regarding alleged harm suffered by particular Plaintiffs. There are not, however, any facts tying Cole, Velez or Franks to any of those detailed allegations or to their latest theories. In fact, Franks is not tied to any facts in the complaint. Plaintiffs' complaint is also entirely silent as to how Cole, Velez and Franks supposedly "failed to intervene."

Finally (due to space constraints), Plaintiffs argue that because this is a federal case, their unincorporated entities need to comply with state law regarding the capacity of entities formed under the laws of North Carolina. In short, none of the cases cited by Plaintiffs stand for the

---

[5] Exhibit B hereto also shows that the attorney, Elizabeth Haddix, who authored the gross conspiracy theory against Cole, Velez and Franks in Plaintiffs' response, also instructed Chief Cole on October 30-31 on how Haddix wanted the protest organized *at the courthouse grounds* and demanded that the surrounding streets be closed to traffic, which necessarily requires street barricades. *See* Haddix emails, pp. 4-7, Ex. B hereto.

10

proposition that state law governing an entity's capacity to sue and be sued is inapplicable to federal legal proceedings.

Plaintiffs also argue that N.C. Gen. Stat. § 1-69.1(a)(3) is inapplicable to J4tNG and AA4J because they are a "not for profit" unincorporated associations and thus subject to provisions of Chapter 59B regarding non-profit associations. If that is true, they must be dismissed. Plaintiffs' allegations do not, however, state they are a nonprofit unincorporated association, let alone that they are such under the definition of such an entity in North Carolina. [*See* D.25, ¶¶ 9, 11; *see also* N.C. Gen. Stat. § 59B.] More importantly, contrary to Plaintiffs' claim, the rules governing capacity to sue are not the same under § 59B as they are for general association standing in federal court. To the contrary, one of the express conditions for legal capacity of a North Carolina nonprofit association to sue on behalf of a member is that "neither the claim asserted nor the relief requested requires the participation of a member or a person referred to as a 'member' by the nonprofit association." § 59B-8(b). It is not possible to adjudicate the constitutional rights and alleged deprivations of J4tNG and AA4J members without the participation of those members. Since they now claim to be nonprofit associations governed by Chapter 59B, J4tNG and AA4J lack standing to participate in this lawsuit and should be dismissed with prejudice.

Plaintiffs' remaining arguments are addressed in the City Defendants' opening memorandum and authorities cited therein. For these reasons, the City Defendants pray the court grant their motion to dismiss.

Respectfully submitted, this the 2nd day of April 2021.

By:    */s/ Anthony J. Biller*
        Anthony J. Biller
        NC State Bar No. 24,117
        Adam P. Banks

NC State Bar No. 47,559
2601 Oberlin Rd, STE 100
Raleigh, NC 27608
Telephone: (919) 414.0313
Facsimile: (919) 782.0452
Email: ajbiller@envisage.law
Email: abanks@envisage.law

*Attorneys for City of Graham, Kristi Cole
Joaquin Velez, and Jonathan Franks*

12

# CERTIFICATE OF COMPLIANCE

Relying on the word count function of Microsoft Word, I hereby certify that this brief complies with the word limitations set forth in LR 7.3.

/s/ *Anthony J. Biller*
Counsel for the City of Graham Defendants