IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:20-cv-00997-CCE-LPA

| | |
|---|---|
| SYLVESTER ALLEN, JR. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>CITY OF GRAHAM, *et al.*,<br><br>*Defendants*.<br><br>GREGORY DRUMWRIGHT, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>TERRY JOHNSON, individually and in his official capacity as Alamance County Sheriff, *et al.*,<br><br>*Defendants*. | **CITY DEFENDANTS' REPLY TO ALLEN PLAINTIFFS [D.54] IN SUPPORT OF MOTION TO DISMISS THE ALLEN COMPLAINT** |

Plaintiffs' opposition to the City Defendants' motion to dismiss is noteworthy as much as for what it says, as for what it does not say. As an overall concern, at no point do Plaintiffs dispute the overarching objection in the City Defendants' motion that Plaintiffs rely on generalized allegations against generalized classes of defendants, without identifying specific alleged bad acts by specific defendants against named plaintiffs. Plaintiffs' attempts to evade the strictures of Rule 8 through misplaced case law fares no better.

1

Plaintiff's first arguments regarding their Voting Rights Act and corresponding conspiracy claim are important for what may be a dispositive point of agreement—the relevance of Plaintiffs' protest permit. Plaintiffs' voting rights arguments are long on case law arguments and almost entirely silent on analyzing those portions of their complaint that would align with the cases they cite. Plaintiffs' reference to its allegations in support of their VRA claim are limited to one sentence—that they had a permit for "an event titled 'March to the Polls' …," which obviously, given its title, pertained to voting. [D.54, p. 7.] Plaintiffs cite to three paragraphs in their complaint that reference their permit. [D.24, ¶¶ 41, 55, 69.] The City Defendants agree; Plaintiffs' march permit is compelling, even dispositive, as to whether their event was a voting related activity. The Court may and should review Plaintiffs' permit, which Plaintiffs repeatedly referenced but chose not to attach to their complaint.

"In determining a motion for judgment on the pleadings, the court may consider documents incorporated by reference in the pleadings." *Parks v. Alteon, Inc.*, 161 F. Supp. 2d 645, 649 n.1 (M.D.N.C. 2001); *accord Benson v. Life Ins. Co. of N. Am.*, No. 5:14-CV-377-BR, 2014 WL 6666944, at *1 (E.D.N.C. Nov. 24, 2014). Attached at Exhibit A hereto is Plaintiff's permit incorporated by reference into Plaintiffs' pleadings.

Contrary to Plaintiffs' arguments, their permit was not titled, "March to the Polls." Plaintiffs' titled their permit, I AM CHANGE MARCH. Under "Mission/Purpose of Event," Plaintiffs state "March/Social Justice Rally." They selected the entirety of the Courthouse property; "voting" and "March to the Polls" are nowhere on the permit.[1]

As previously stated, Plaintiffs allege Defendants deployed pepper spray after marchers

---

[1] The Allen Plaintiffs also allege they had a permit to lay down in the state highway to commemorate George Floyd. [D.24, ¶55.] Even if it were true Graham issued such a permit (they did not), commemorating the death of Mr. Floyd was also not a voting rights activity.

knelt and laid down in the state highway at North Main and Courthouse Square to commemorate George Floyd and failed to timely disburse after being ordered to do so. [D.24, ¶¶ 54-56, 62.] From there, the marchers set up a stage from which the Reverend Drumwright and others gave speeches. Approximately 30 minutes into the speeches, according to the allegations, unidentified law enforcement officers attempted to unplug Plaintiffs' generator, and thereafter, law enforcement deployed pepper spray into the crowd and then used pepper spray to clear out "individuals who were allegedly not moving fast enough to leave." [*Id.*, ¶¶ 69, 71, 74-76.]

The VRA defines "[t]he terms 'vote' or 'voting' [to] include all action necessary to make a vote effective." 52 U.S.C. § 10310(c)(1). The allegations, particularly when coupled with Plaintiff's permit incorporated into the complaint, allege a social justice protest at the courthouse that was wrongfully disrupted and disbursed; protestors had planned to go vote nearby thereafter, but some did not after the confrontation with law enforcement at the protest. The social justice protest at the courthouse alongside the Confederate memorial was not voting nor a voting-related activity, at least not within the context of the VRA.[2]

None of the cases cited by the Allen Plaintiffs are relevant to the facts of this case. Those cases do, however, demonstrate what courts have found to be voting-related activities. In *National Coal. on Black Civic Participation v. Wohl*, No. 20 Civ. 8668 (VM), 2020 WL 6305325 (S.D.N.Y. Oct. 28, 2020), the defendants were sending out thousands of robo-calls that expressly discouraged voters from voting based on false statements that their voting information could be used against them in various way. *Id*. at *3. The statements were false, and were for the purpose

---

[2] If such attenuated activities were subject to section 11(b) of the VRA, then the Allen Plaintiffs' own conduct at the march, namely blocking traffic near a polling place while participating in a march, a video of which shows participants raising Black Power fists, could have violated the Act.

3

of suppressing voting.

Similarly, in *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967), in 1963, the Sherriff's office covering Selma, Alabama, arrested (and convicted) civil rights workers working for and with the Voters League for interviewing people waiting in a voter registration line, for attending a voting registration meeting, and arrested and prosecuted the field secretary overseeing the voter registration activities on trumped up charges of vagrancy. *Id.* at 737-39. The court found a clear pattern: each person arrested was "prominently active" in voter registration of minorities and the criminal prosecutions levied against each person were baseless. *Id.* at 741-42.

The holding of *Katzenbach v. Original Knights of Ku Klux Klan,* 250 F. Supp. 330, 341 (E.D. La. 1965) addressed in extensive and toe-curling detail the KKK's deliberate, systematic campaign of violence and economic punishment directed at Black Americans who registered to vote, assisted those who did or who participated in desegregation, in the early 1960s in and around Bogalusa, La., a campaign to which the KKK apparently admitted at the trial stage. *Id*. at 337-344.

This is not Selma, 1963 and the Graham Police Department is not a terrorist organization. *Cf. Shelby County, Ala. v. Holder*, 133 S. Ct. 2612, 2618 (2013) ("There is no denying, however, that the conditions that originally justified these measures [section 5 preclearance under the VRA] no longer characterize voting in the covered jurisdictions."). Defendants are local law enforcement officers serving their community. Plaintiffs' advocating for social justice and against the Confederate memorial were not voting related activities, at least nowhere near the caliber of activities addressed in the cases upon which Plaintiffs rely.

The Allen Plaintiffs also argue courts have "recognized" VRA claims "in circumstances far more attenuated from the act of voting than Defendants' actions at the March." [D.54, p. 13.]

4

But the circumstances at issue in the two cases they cite for that proposition, *United States v. Bruce*, 353 F.3d 474 (5th Cir. 1965), and *NCBCP*, 2020 WL 6305325, were not removed from voting activities. The City Defendants' have already discussed the voter-intimidation conduct at issue *NCBCP* above.

The plaintiff in *Bruce* alleged that he had "urge[d] his Negro neighbors and friends to seek to register and vote," but ultimately found his attempts to register voters "rebuffed" by registrars citing a "requirement which the Federal courts [had] since invalidated." *Id.* at 476. The *Bruce* court read the plaintiff's allegations concerning his insurance business *in context*, finding the complaint detailed "acts being of such a nature as actually to put an end to his activities in the field of voter registration, and his removal from his home county." *Id.*; *see also NCBCP*, 2020 WL 6305325, at *18 (noting that "in context, it is not difficult to see how" defendants' conduct may cause reasonable Black voters to resist voting out of fear). Here, there are no allegations that the City Defendants "put an end" to the Allen Plaintiffs' voting activity. Further, *Bruce* was decided under the pleading framework of *Conley v. Gibson*, 355 U.S. 441 (1957), which the Supreme Court since discarded in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The Allen Plaintiffs fail to state a claim.

The Allen Plaintiffs' next argument regarding their federal constitution claims are troubling and legally misplaced.[3] Their arguments start with the premise The City of Graham should be held liable because Chief Cole was the police chief, with authority over the police force, and she "expressly ratified" and defended the decision by her officers to "instruct white supremacist counter-protestors to leave the courthouse area" and then proceed to pepper spray Plaintiffs.

---

[3] As noted in the opening memorandum, the Allen Plaintiffs' run roughshod over Rule 11 and, in their federal constitutional arguments, they again repeatedly ignore that Rule's constraints.

Plaintiffs' racially charged allegation is, at best, a half-truth.

The October 31, 2020 event was organized by Plaintiff Gregory Drumwright, as shown by his name and signatures at the aforementioned permit at Exhibit A hereto. Rev. Drumwright was and still is represented by attorney Elizabeth Haddix. As shown at Exhibit B, hereto, Ms. Haddix clearly communicated Plaintiffs' demands of law enforcement heading into the protest. On October 31, at 10:44 AM, minutes before Plaintiffs' march was set to commence, Ms. Haddix instructed Chief Cole:

> Rev. Drumwright will set his PA and platform up at Sesquintennial [sic] Square. He will be speaking to the rally participants … . As you know, those areas are all reserved for exclusive use between 11-2pm for participants in this event who support The message of this event. **Therefore, we expect GPD and ACSO to intervene if necessary to remove counter demonstrators (which will include folks with Confederate and other similar symbols) from the permitted area during that time. Counter demonstrators may be within ear range, but at a far enough distance so that they do not interfere with or obstruct Rev. Drumwright's message or the message of any other speakers he has at this event.**

Haddix email to Cole, *Discuss Oct 31 Drumwright March* (Oct. 31, 2020) (emphasis added) (Ex. B hereto). It is true that GPD moved counter protestors away from Plaintiffs at the outset of the protest, but they did so precisely because Plaintiffs' attorney demanded it be done. While Rule 12(b) allows Plaintiffs to ask this Court to ignore at this stage what Plaintiffs' attorney demanded, Rule 12(c) and perhaps Rule 11 open the door to the Court considering that Plaintiffs' demanded the very conduct they now claim gives rise to their claims for municipal liability and defeats qualified immunity.

Even if the Court allows Plaintiffs to pursue claims at this stage based on actions Plaintiffs demanded, Plaintiffs' claims against the City of Graham still fail. The precedent cited by Plaintiffs do not support their argument that agents acting with their scope of their *authority* is sufficient to sustain municipal liability. To the contrary, that is precisely the theory of *respondeat*

*superior*, which the Supreme Court expressly rejected. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

Plaintiffs argue that ratification by a "policymaker" such as Chief Cole is sufficient to sustain a claim for municipal liability. [D. 54, pp. 15-17.] The very cases upon which Plaintiffs rely demonstrate the opposite. The holding in *Davison v. Loudon Cty. Bd. of Supervisors,* No. 16-cv-932, 2016 WL 4801617, at *6 (E.D. Va. Sept. 14, 2016) underscores *the City's* argument. In that case, the issue was whether the County Board of Supervisors was liable for condoning the suppression of the plaintiff's speech. There was no dispute that the Board of Supervisors was the final authority for the County. Further, that case also undermines the second proposition for which Plaintiffs cite it—that Rule 12(b)(6) review is inappropriate, since that court dismissed several of the plaintiff's claims. *See id.* *9 (dismissing the majority of § 1983 claims).

Plaintiff's reliance upon *Skeen v. Washington Cty. Sheriff's Office*, No. 1:20CV00017, 2020 WL 6688550, at *4-6 (W.D. Va. Nov. 12, 2020) is similarly misplaced. In that case, faced with formulaic allegations bereft of specific facts, the court dismissed the complaint at the Rule 12 stage. Regarding a theory of ratification, the court held "the sheriff's ratification must still have plausibly caused the alleged constitutional violation to avoid improperly relying on the theory of respondeat superior." *Id*. at *5. No such facts are alleged sub judice. Finally, there was no dispute in *Skeen* that the sheriff was the final authority for the sheriff's office. Plaintiffs rely also on *Shinaberry v. Town of Murfreesboro*, 2018 WL 1801417 (E.D.N.C. Apr. 16, 2018) for the argument that a post-event GPD press conference constituted ratification. However, the *Shinaberry* court dismissed § 1983 claims against a municipality for deficient pleadings. The court found that "Shinaberry's amended complaint does not plausibly allege that Hinton's

7

alleged conduct resulted from any Town policy or that Hinton had final policymaking authority." *Id*. *3. No facts are alleged regarding the press conference details nor how the unidentified press conference statements (by an unidentified party) caused the alleged constitutional deprivations.

Plaintiffs also rely on the holding in *Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450 (M.D.N.C. 2016) as part of their errant arguments against Chief Cole's qualified immunity, addressed below. In that decision, Judge Osteen conducted a detailed analysis of Greensboro's ordinances regarding the authority of its police chief. Faced with a nearly identical ordinance as Graham's, and with nearly identical arguments regarding municipal liability by that plaintiff, Judge Osteen granted the City of Greensboro's motion to dismiss. Judge Osteen found the Greensboro ordinances vested final authority regarding law enforcement measures with the Greensboro city manager and the factual allegations of the complaint failed to demonstrate a delegation to the contrary. *Id*. at 472-77. *Armstrong* is squarely on point with the facts and ordinances of this case.

Plaintiffs' reliance on the unpublished opinion *Estate of Bryant v. Baltimore Police Dep't*, 2020 WL 673571, *36 (D. Md. Feb. 10, 2020) is also misplaced. That case dealt with a police department's alleged deliberate withholding of exculpatory evidence and fabrication of evidence, as part of a murder trial. At the Rule 12(b)(6) stage, the trial court found the plaintiff specifically alleged a policy and practice of failing to turn over exculpatory evidence and that the police department had a practice of fabricating evidence. The plaintiff included several paragraphs of specific examples of such established policies and practices. *Id*. In this case, the Allen complaint itself does not articulate the alleged unconstitutional policy and does not set forth any facts showing any final policy maker for the City or by Chief Cole ratifying or endorsing such policy.

In their briefing, the Allen Plaintiffs argue "Chief Cole made a general policy of pepper spraying in response to protests . . . ." [D. 54, p. 15.] That specific policy allegation is not found in their second amended complaint nor are there facts pled sufficient to support such a conclusion.

Plaintiff's argument that the post-protest press conference ratified the alleged conduct and gives rise to municipal liability fails as a matter of law. As the *Skeen* court observed, "[a]ny such ratification, entirely subsequent to the alleged violation, does not plausibly illustrate a policy that was the moving force behind the ultimate violation. Thus, the plaintiff's ratification theory, as alleged, must fail." *Skeen*, 2020 WL 6688550, at *6 (internal citations and quotation marks omitted).

Plaintiffs' arguments against qualified immunity for Chief Cole and Officer Velez also fail to overcome the fatal defects in their pleadings. Relying upon the holding in *Armstrong*, 190 F. Supp. 3d at 464, Plaintiffs argue Chief Cole faces individual liability for her "subsequent conduct in defending the use of pepper spray and refusing to investigate officers for their use of force." [D. 54, p. 11.] Yet again, Plaintiffs' precedent fails them. In *Armstrong*, Judge Osteen ***granted*** the police chief's motion to dismiss based on qualified immunity. "Here, there is no allegation that [the Police Chief] was involved specifically in or around the particular misconduct alleged against Plaintiff." *Id*. at 465. Such again is the case. There are no facts alleged that link Chief Cole directly to the alleged harm suffered by Plaintiffs. Related, as in *Skeen*, Chief Cole's alleged "subsequent conduct" could not have caused the alleged deprivations.

Apparently unconcerned regarding Rule 11, the Allen Plaintiffs continue their fantastic allegations against their alleged super-villain, Lt. Velez. There is one thing consistent though in their impugning him—a continued lack of specifics. Lt. Velez allegedly personally engaged in

9

every one of the types of bad acts (accept the press conference) alleged by Plaintiffs, but there is not one, single specific act alleged other than safely shuffling away white-supremacist counter-protesters. Whom, if anyone, did Lt. Velez "pepper spray"? Which paramedics did he "block" from giving aid to whom? When? Where? Velez is the only individual specifically named to these general allegations of bad acts. These are not even "unadorned, the defendant-unlawfully-harmed me accusations," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), because there are no "me's" identified. The allegations do not provide Velez with fair notice; they leave him to speculate as to whom he allegedly harmed and how. The pleadings are deficient.

Such generalized allegations are also remarkable in the context of the pleadings. The Allen Plaintiffs devoted 32 paragraphs to specific bad acts allegedly suffered by specific Plaintiffs, yet Velez is not mentioned once in those specific allegations. [*See* D. 24, ¶¶ 98-129.] The Rule 12 precedent cited by Plaintiffs routinely states the specific bad acts allegedly committed by the specific defendants. Not only do specific facts tying defendants to the alleged harms provide fair notice to the defendants, they also allow the court to understand what each person is alleged to have done for purposes of evaluating potential liability and immunity. Plaintiffs accuse Velez of several types of bad acts. With the exception of his clearing counter-protestors prior to the protest (as Haddix demanded), Plaintiffs allegations do not plead specific facts demonstrating Velez engaged in those alleged actions. The claims against him should be dismissed, with leave granted to amend to specifically allege his alleged misconduct and which Plaintiffs he allegedly harmed.

Finally, Plaintiffs argue that because this is a federal civil rights case, their unincorporated entity, Future Alamance, has standing to represent unidentified members, irrespective of State law regarding an entity's capacity to sue and be sued. Plaintiffs are

10

Case 1:20-cv-00997-CCE-LPA   Document 68   Filed 04/02/21   Page 10 of 13

every one of the types of bad acts (accept the press conference) alleged by Plaintiffs, but there is not one, single specific act alleged other than safely shuffling away white-supremacist counter-protesters. Whom, if anyone, did Lt. Velez "pepper spray"? Which paramedics did he "block" from giving aid to whom? When? Where? Velez is the only individual specifically named to these general allegations of bad acts. These are not even "unadorned, the defendant-unlawfully-harmed me accusations," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), because there are no "me's" identified. The allegations do not provide Velez with fair notice; they leave him to speculate as to whom he allegedly harmed and how. The pleadings are deficient.

Such generalized allegations are also remarkable in the context of the pleadings. The Allen Plaintiffs devoted 32 paragraphs to specific bad acts allegedly suffered by specific Plaintiffs, yet Velez is not mentioned once in those specific allegations. [*See* D. 24, ¶¶ 98-129.] The Rule 12 precedent cited by Plaintiffs routinely states the specific bad acts allegedly committed by the specific defendants. Not only do specific facts tying defendants to the alleged harms provide fair notice to the defendants, they also allow the court to understand what each person is alleged to have done for purposes of evaluating potential liability and immunity. Plaintiffs accuse Velez of several types of bad acts. With the exception of his clearing counter-protestors prior to the protest (as Haddix demanded), Plaintiffs allegations do not plead specific facts demonstrating Velez engaged in those alleged actions. The claims against him should be dismissed, with leave granted to amend to specifically allege his alleged misconduct and which Plaintiffs he allegedly harmed.

Finally, Plaintiffs argue that because this is a federal civil rights case, their unincorporated entity, Future Alamance, has standing to represent unidentified members, irrespective of State law regarding an entity's capacity to sue and be sued. Plaintiffs are

dismissive of N.C. Gen. Stat. § 1-69.1(a)(3), stating that state "pleading requirements" are irrelevant in federal court. While it is certainly true that North Carolina's rules of civil procedure and precedent regarding pleadings requirements are inapposite to Plaintiff's claims, it is not true that § 1-69.1(a)(3) is a rule of state civil procedure. Instead of a rule of procedure, § 1-69.1(a)(3) is the statute that conveys legal authority for unincorporated associations to sue or be sued in North Carolina. That authority is predicated on certain procedures, to include the filing of a certificate of assumed name and providing notice of who in fact the entity is.

Yet again, Plaintiffs' cited legal authority impeach Plaintiffs' argument. The court in *N. Iredell Neighbors for Rural Life v. Iredell Cty.*, 196 N.C. App. 68, 75 (2009), specifically held the unincorporated plaintiff "did not have standing to bring suit" precisely because it failed to comply with the legal standing requirements of § 1-69.1(a)(3). Plaintiffs' second cited case regarding standing, *Jackson v. Mecklenburg Cty.*, No. 07-cv-218, 2008 WL 2982468, at *2 (W.D.N.C. July 30, 2008), says absolutely nothing about the legal capacity and standing of unincorporated entities; the quoted portions only regard the North Carolina rules of civil procedure. That opinion, did, however, include Rule 12(b)(6) dismissals of the plaintiff's § 1983 claims against the county and its officials. *Id.* at *4, *7. Plaintiff's standing arguments lack merit and Future Alamance should be dismissed.

Respectfully submitted, this the 2nd day of April 2021.

By:     */s/ Anthony J. Biller*
Anthony J. Biller
NC State Bar No. 24,117
Adam P. Banks
NC State Bar No. 47,559
2601 Oberlin Rd, STE 100
Raleigh, NC 27608
Telephone: (919) 414.0313
Facsimile: (919) 782.0452
Email: ajbiller@envisage.law

11

Email: abanks@envisage.law

*Attorney for City of Graham, Kristi Cole  
Joaquin Velez, and Jonathan Franks*

## CERTIFICATE OF WORD COUNT

    The undersigned hereby certifies that the foregoing document complies with the word count limitations of L.R. 7.3(d)(1).

    This the 2nd day of April, 2021.

By:   */s/ Anthony J. Biller*
Adam P. Banks
NC State Bar No. 24,117
2601 Oberlin Rd, STE 100
Raleigh, NC 27608
Telephone: (919) 414.0313
Facsimile: (919) 782.0452
Email: abanks@envisage.law
