**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

SYLVESTER ALLEN, JR., et al.,    )
    )
             Plaintiffs,    )
    )
             v.    )    1:20CV997
    )
CITY OF GRAHAM, et al.,    )
    )
             Defendants.    )


GREGORY DRUMWRIGHT, et al.,    )
    )
             Plaintiffs,    )
    )
             v.    )    1:20CV998
    )
TERRY JOHNSON, in his official    )
and individual capacities as    )
Alamance County Sheriff, et al.,    )
    )
             Defendants.    )


**MEMORANDUM OPINION AND ORDER**

This case comes before the Court on the Partial Consent Motion for Leave to Take Limited Early Discovery and to Extend the Time Limit for Service (Docket Entry 55).[1] For the reasons that follow,

---

1 The Court (per United States District Judge Catherine C. Eagles) previously "consolidated [the above-captioned cases] for all pre-trial proceedings" (Docket Entry 22 at 2), at which time "Allen v. City, 20cv997, [wa]s designated as the lead case" (id.), with "all pleadings, motions, briefs, and other allowable filings [to] be filed in that case only" (id.). The attorneys in the lead case recently reported a settlement of that case subject to certain approvals. (See Docket Entries 72, 73.) Because that settlement remains tentative and resolution of the instant Motion remains necessary regardless of any settlement of the lead case, the Court has entered this order as to both cases. Unless otherwise noted, parenthetical citations refer to the Docket in the lead case.

the Court will grant in part and will deny in part the instant Motion, by declining to permit the proposed early discovery, but extending the deadline for service of process on any proper Defendant(s) presently sued as John or Jane Doe.

<u>INTRODUCTION</u>

A total of 20 individual and three organizational Plaintiffs instituted the above-captioned actions against the City of Graham, Alamance County, and five named law enforcement officers from the Graham Police Department ("GPD") and the Alamance County Sheriff's Office ("ACSO") (collectively, the "Named Defendants"), as well as at least 40 and (depending on overlap between the two actions) up to 70 unnamed GPD and ACSO law enforcement officers (collectively, the "Doe Defendants"). (<u>See</u> Docket Entries 24, 25.) The Named Defendants answered and moved for dismissal or judgment on the pleadings. (<u>See</u> Docket Entries 31, 42, 45, 48, 49, 50, 52.) During the pendency of those motions and before the setting of an initial pretrial conference, Plaintiffs filed the instant Motion, seeking "leave to take limited discovery prior to the Rule 26(f) conference for the purpose of ascertaining the identities of the [] Doe Defendants, and an extension of time to effect service on the Doe Defendants in accordance with Rule 4(m)" (Docket Entry 55 at 1 (internal parenthetical omitted); <u>see also</u> Docket Entry 57 (Memorandum of Law)). Defendants City of Graham, Mary Kristine (Kristy) Cole, Jonathan Franks, and Joaquin Velez (collectively,

2

the "Graham Defendants") responded (see Docket Entry 69), and Plaintiffs replied (see Docket Entry 71).

DISCUSSION

"The designation of a John [or Jane] Doe defendant is generally not favored in the federal courts; it is appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." Chidi Njoku v. Unknown Special Unit Staff, No. 99-7644, 217 F.3d 840 (table), 2000 WL 903896, at *1 (4th Cir. July 7, 2000) (unpublished); see also Strauss v. City of Chicago, 760 F.2d 765, 770 n.6 (7th Cir. 1985) ("[A]llowing a complaint to be filed against an unnamed party in the first place is viewed with disfavor."); Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980) ("As a general rule, the use of 'John Doe' to identify a defendant is not favored.").[2]  Moreover, the United States Court of Appeals for the Fourth Circuit recently rejected the position "that a court may dismiss a suit for failure to name a John [or Jane] Doe defendant *only* if it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court." Attkisson v. Holder, 925 F.3d 606, 628 (4th Cir. 2019) (internal quotation

---

2 In fact, as well-explained by another court in this Circuit, good reasons exist to deem suits against John or Jane Doe(s) not only disfavored but precluded. See Price v. Marsh, No. 2:12CV5442, 2013 WL 5409811, at *3-5 (S.D.W. Va. Sept. 25, 2013) (unpublished).

3

marks omitted) (emphasis in original); <u>see also</u> <u>id.</u> (reiterating "that, as to John Doe defendants, the district court is in a better position than [an appellate court] to ascertain what treatment should be given and when" and "defer[ring] to the wisdom of the district judge in dismissing the John Doe defendants" (internal quotation marks omitted)). In other words, circumstances may warrant a district court declining to permit a case to proceed as to unnamed defendants, <u>even if</u> the plaintiff(s) likely could identify the unnamed defendants through discovery.

This case may present just such a circumstance, at least as to many (if not most) of the (40 to 70) Doe Defendants, because (in the main) "Plaintiff[s] ha[ve] failed to differentiate the alleged wrongful conduct between [the Doe] Defendants; instead, [Plaintiffs' pleadings] repeatedly lump[] the [Doe] Defendants [and even all Defendants] together . . . . Under Rule 8(a), grouping multiple defendants together in a broad allegation is insufficient to provide the defendants with fair notice of the claims against them and the grounds for relief." <u>Bagwell v. Dimon</u>, No. 1:14CV495, 2015 WL 2374614, at *7 (M.D.N.C. May 18, 2015) (Biggs, J.) (unpublished) (internal quotation marks omitted); <u>see also</u> <u>SD3, LLC v. Black & Decker (U.S.) Inc.</u>, 801 F.3d 412, 422 (4th Cir. 2015) ("[I]f [a complaint] fails to allege particular facts against a particular defendant, then the defendant must be dismissed."); <u>Jiangmen Kinwai Furniture Decoration Co. v. IHFC Props., LLC</u>, No.

4

1:14CV689, 2015 WL 5944278, at *2 n.1 (M.D.N.C. Oct. 13, 2015)
(Eagles, J.) (unpublished) ("One is also unable to tell which
defendant did what, since [the plaintiff] treated the two new
proposed defendants and [the original defendant] as one actor in
[the plaintiff's] allegations."); Luna-Reyes v. RFI Constr., LLC,
57 F. Supp. 3d 495, 503 (M.D.N.C. 2014) (Schroeder, J.) (requiring
filing of more definite statement where "the complaint repeatedly
makes factual allegations generally directed at 'Defendants,'
without any distinction between them," because "[s]uch a conclusory
and shotgun approach to pleading fails to provide each [d]efendant
the factual basis for the claim(s) against him or it and therefore
deprives them and the court of the opportunity of determining
whether there are sufficient facts to make a claim against each
[d]efendant plausible" (emphasis omitted)); Parker v. White, No.
5:12CT3082, 2012 WL 6701771, at *2 (E.D.N.C. Dec. 26, 2012)
(unpublished) ("[T]he complaint must provide each John Doe
defendant with fair notice of the specific facts upon which his
individual liability rests.").

Specifically, Plaintiffs' operative pleadings contain these
material allegations regarding the Doe Defendants (en masse):

1) "Defendants John and Jane Does #1-15 . . . are all
officers, agents, and/or employees of GPD" (Docket Entry 24, ¶ 15;
see also id., ¶ 16 ("At all relevant times, Defendants John and
Jane Does #1-15 were acting within the scope of their employment as

GPD officers."); Docket Entry 25, ¶ 43 ("Defendants [] Does #21-40
. . . are all officers, agents, and/or employees of the GPD. At
all relevant times, [they] were acting within the scope of their
employment and under color of state law."));

2) "Defendants John and Jane Does #16-30 . . . are all
officers, agents, and/or employees of ACSO" (Docket Entry 24, ¶ 17;
see also id., ¶ 18 ("At all relevant times, Defendants John and
Jane Does #16-30 were acting within the scope of their employment
as ACSO deputy sheriffs."); Docket Entry 25, ¶ 33 ("Defendants []
Does #1-20 . . . are all officers, agents, and/or employees of the
ACSO. At all relevant times, [they] were acting within the scope
of their employment and under color of state law."));

3) "[o]n October 31, 2020" (Docket Entry 24, ¶ 40), sometime
after "approximately 11:00 A.M." (id., ¶ 46), a group of
individuals (referred to alternately as "protesters" and "March
attendees" (id., ¶¶ 46, 48, 49)), "arrived at Court Square, [where]
dozens of officers including Defendants Velez and John and Jane
Does #1-30, were already present and in formation" (id., ¶ 49; see
also id., ¶ 50 ("The officers, including Defendants Velez and John
and Jane Does #1-30, were already wearing riot gear, gas masks, and
face shields, and had pepper spray canisters drawn."));

4) "[i]mmediately after [a] remembrance [for George Floyd],
police officers ordered the nearly 200 protesters out of the
streets and into other designated protest areas" (id., ¶ 56

6

(emphasis added)), but "[s]ome protesters, including some Plaintiffs, were unable to hear and/or understand the officers' commands" (id., ¶ 57 (emphasis added));[3]

5) "[s]everal protesters, including [Plaintiffs Dejuana] Bigelow and [Sylvester] Allen[, Jr.], observed officers on the scene communicating with each other" (id., ¶ 59) and, "[u]pon information and belief, the GPD police officers and ACSO deputies, including Defendants John and Jane Does #1-30, were communicating with each other to coordinate a plan for dispersing the crowd" (id., ¶ 60; accord id., ¶ 183);

6) "GPD police officers and ACSO deputies, including Defendants John and Jane Does #1-30, did not provide any warning that chemical irritants would be used" (id., ¶ 61);

7) "[u]pon information and belief, less than one minute after ordering protesters to clear the street and move to designated protest areas, officers . . . indiscriminately discharged pepper spray against the protesters" (id., ¶ 62) and, "[u]pon information and belief, Defendants Velez and John Does #1-30 either themselves discharged pepper spray at protesters, including Plaintiffs, or were aware of, had the opportunity to prevent, and failed to prevent other officers from discharging pepper spray" (id., ¶ 63;

---

3 Unlike other allegations in this pleading that expressly include 30 Doe Defendants as among referenced "officers" and/or "deputies" (Docket Entry 24, ¶¶ 49, 50, 52, 60, 61, 67, 70), the allegations quoted in this item do not (see id., ¶¶ 56-57).

<u>see also</u> Docket Entry 25, ¶ 99 ("Within seconds after the silent vigil ended, and without giving the marchers any warning, direction, or opportunity to clear the street, one or more of Doe GPD officers #21-40, working in coordination, suddenly began indiscriminately pepper spraying the peaceful marchers-—many of whom were still making their way to their feet."));

8) "[u]pon information and belief, the operational plan Defendant [Terry] Johnson developed after learning of the first use of pepper spray authorized deputies, including Defendant Officers John and Jane Does #16-30, to use pepper spray again" (Docket Entry 24, ¶ 67; <u>accord id.</u>, ¶ 174; <u>see also id.</u>, ¶ 184 ("Upon information and belief, Defendant Johnson formed an organizational plan for Defendants John and Jane Does #16-30 that authorized the use of pepper spray on peaceful marchers, including Plaintiffs."));

9) "[u]pon information and belief, while the March organizers were speaking to protesters, GPD and ACSO officers—-including Defendants Velez and John and Jane Does #1-30—-communicated with each other and decided to use pepper spray again" (<u>id.</u>, ¶ 70);

10) "[a]fter approximately 30 minutes, ACSO <u>deputies</u> and GPD <u>officers</u> came to the stage and attempted to unplug the generator to end the rally without explanation" (<u>id.</u>, ¶ 71 (emphasis added)),[4]

---

[4] Unlike other allegations in this pleading which expressly include 30 Doe Defendants as among referenced "officers" and/or "deputies" (Docket Entry 24, ¶¶ 49, 50, 52, 60, 61, 67, 70), the allegation here does not (<u>see id.</u>, ¶ 71). However, the companion
(continued...)

8

whereupon, "[l]ess than a minute later, ACSO <u>deputies</u> and GPD <u>officers</u> began to unleash pepper spray at the March attendees for the <u>second time</u> without explanation" (<u>id.</u>, ¶ 72 (emphasis added)), and, "[u]pon information and belief, Defendants Velez and John and Jane Does #1-30 again either themselves discharged pepper spray at protesters, including Plaintiffs, or were aware of, had the opportunity to prevent, and failed to prevent other officers from discharging pepper spray" (<u>id.</u>, ¶ 73; <u>see also</u> Docket Entry 25, ¶ 116 ("Suddenly and again with no warning or dispersal order, Defendants' [sic] officers and deputies, including at least some of Doe ACSO Deputies #1-20 and at least some of Doe GPD officers #21-40, worked in coordination to pepper spray the marchers a second time . . . .")); and

11) "[t]he pepper spray caused many of the[] elderly protesters [with respiratory problems] to go into respiratory distress" (Docket Entry 24, ¶ 78), while, "[u]pon information and belief, Defendants Velez and John and Jane Does #1-30 themselves blocked paramedics from administering aid" (<u>id.</u>, ¶ 80).[5]

_____

4(...continued)
pleading ascribes the same actions to "one of Defendants ACSO Does #1-20" (Docket Entry 25, ¶ 114), while accusing "[s]ome of Defendants ACSO Does [of] grabb[ing an organizational] Plaintiff['s] equipment, . . . [as well as an individual] Plaintiff [] and members of [that organizational] Plaintiff" (<u>id.</u>, ¶ 115).

5 The above-quoted allegations that elderly protesters experienced respiratory distress, while 30 Doe Defendants "blocked paramedics from administering aid" (Docket Entry 24, ¶ 80), (continued...)

Elsewhere, Plaintiffs' operative pleadings routinely eschew even the restriction of their allegations about use of pepper spray (and related violations of their rights) to amorphous amalgams of 15, 20, 30, or 40 Doe Defendants, in favor of (even more generic)

---

5(...continued)
followed allegations that, "[a]s March attendees, including Plaintiffs, attempted to clear out of the area and disperse, officers continued to patrol the area, deploying pepper spray a third time at individuals who were allegedly not moving fast enough" (id., ¶ 75 (emphasis added)). Unlike other allegations in this pleading which expressly include 30 Doe Defendants as among referenced "officers" and/or "deputies" (id., ¶¶ 49, 50, 52, 60, 61, 67, 70), the instant allegation as to a third use of pepper spray does not (see id., ¶ 75). Later in that pleading, however, Plaintiffs alleged (without additional context) that "Defendants Velez and John and Jane Does #1-30 discharged pepper spray, or failed to intervene to stop the discharge of pepper spray despite being able to, on at least three separate occasions at Plaintiffs Tabatha Davis, Olivia Davis, Talaun Woods, and members of Future Alamance, as well as other peaceful marchers who intended to vote at the end of the March." (Id., ¶ 140 (emphasis added); see also id., ¶¶ 142 (impliedly alleging that 30 Doe Defendants "used or failed to prevent the use of pepper spray" on "three separate occasions"), 167 (alleging that 30 Defendant Does "repeatedly used pepper spray on Plaintiffs, or were aware of, had reasonable opportunity to prevent, and failed to prevent other officers' use of pepper spray on Plaintiffs").) Other aspects of that pleading generally allege that 30 Doe Defendants used pepper spray (or, in some instances, failed to stop other officers from using pepper spray), but do not give a number of occasions. (See id., ¶¶ 150-52, 168, 171, 172, 175, 176, 196, 205.) The other operative pleading blames "Defendants" (without further specification) for "dispensing large volumes of pepper spray into the crowd a third time, without warning, even as marchers tried to leave" (Docket Entry 125, ¶ 124 (emphasis added)) and then appears to describe further uses of pepper spray by 20 Doe Defendants and a sub-group thereof after those three instances (see id., ¶¶ 128 ("As many marchers, including [five individual] Plaintiffs [], attempted to disperse, they were chased and sprayed repeatedly with pepper spray by Defendant [] Does #21-40."), 131 ("As they began to head towards North Main Street in compliance with the officers' orders, multiple Doe GPD officers #21-40 who lined the street pepper sprayed Plaintiffs Ernestine and Edith Ward and the other marchers.")).

references to "Defendants." (See, e.g., Docket Entry 24, ¶¶ 84 (alleging that three individual Plaintiffs and "at least one member of [an organizational Plaintiff] had all planned to vote on October 31, 2020, following the March; none were able to do so because of the violence Defendants directed at them and others"), 90 ("Defendants' discharge of pepper spray against individuals marching to a polling place and seeking to exercise the right to vote intimidates North Carolina voters, particularly Black voters, and is likely to deter individuals from voting."), 91 ("Defendants sent a clear message to Black voters and others who speak out against police violence directed at Black people, including Plaintiffs, that they may face pepper spray or other violence when they vote or engage in peaceful assemblies."), 94 ("Upon information and belief, Defendants' use of pepper spray on March attendees was motivated at least in part by the race of March attendees—-the majority of whom were Black, and all of whom were marching in support of the Black community."), 110 ("Defendants' intimidating and violent conduct prevented [Plaintiff Tabatha] Davis from voting at Elm Street on October 31, 2020."), 130 ("Defendants discharged, or approved the discharge of, pepper spray on protesters on at least three occasions on October 31, 2020, which caused Plaintiffs physical harm."), 134 ("Defendants deployed, or approved the deployment of, pepper spray through aerosol guns, causing the gas to spread over entire areas."), 146

11

("[One individual Plaintiff] was in fact unable to vote on Election Day because Defendants' conduct on October 31, 2020 extinguished his final opportunity to register to vote."), 155 ("Defendants' conduct would likely deter a person of ordinary firmness from participating in further marches for fear of being subject to similar force and has, in fact, actually deterred at least some Plaintiffs from participating in further demonstrations."), 160 ("Defendants' conduct was motivated at least in part by the subject matter of Plaintiffs' March--protesting police violence."), 162 ("Defendants' conduct was willful, wanton, and undertaken with reckless or callous indifference to the federally protected rights of Plaintiffs."), 191 ("After Defendants deployed tear gas following the remembrance of George Floyd, a number of marchers were injured and forced to leave."); Docket Entry 25, ¶¶ 124 ("Without providing marchers adequate time to disperse or providing any instruction on where or how they should move, Defendants began dispensing large volumes of pepper spray into the crowd a third time, without warning, even as marchers tried to leave the area."), 144 ("Because of Defendants' conduct, the planned march to the polls was abruptly terminated. . . . Plaintiff [Avery] Harvey was unable to vote at all in the 2020 election because of Defendants' actions."), 155 ("Defendants' activities constitute an attempt to intimidate, threaten, and coerce citizens, like [four individual] Plaintiffs [] and members of [two organizational] Plaintiffs []

12

. . . in a manner that prevents them from exercising their constitutional right to vote and from encouraging others to do so."), 156 ("Defendants' actions harassed, threatened, and intimidated voters and peaceful marchers."), 160 ("Upon information and belief, Defendants provided no explanations of any violations being committed, and no written warnings, before deploying pepper spray and commencing to arrest protesters . . . ."), 162 ("Defendants' violent suppression of Plaintiffs' rights to assemble for a march to the polls constitutes an attempt to intimidate, threaten, and coerce voters such as [four i]ndividual Plaintiffs [] and [two o]rganizational Plaintiffs[' ] members in an attempt to prevent and discourage them from exercising their right to vote."), 164 ("Defendants' actions violated Plaintiffs' clearly established rights, of which a reasonable person would have known."), 165 ("As a result of Defendants' unlawful actions, Plaintiffs have suffered injuries entitling them to damages . . . ."), 168 ("Defendants' actions were not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity."), 169 ("The actions and inactions of Defendants had the effect of denying people the ability to peaceably assemble, march, vote, and protest."), 171 ("Defendants have demonstrated continued hostility to Plaintiffs' attempts to participate in non-violent protests and otherwise exercise their First Amendment rights since the October 31 March."), 182 ("Defendants' issuance of unlawful dispersal

13

orders and use of pepper spray and arrests to forcibly disperse a peaceful march to the polls and peaceful pro-voting rally unreasonably seized Plaintiffs and violated their Fourth Amendment rights."), 188 ("Defendants' violent conduct would intimidate or attempt to intimidate an objectively reasonable individual and did in fact prevent Plaintiff [Edith Ann] Jones and other voters from exercising their constitutional right to vote on the last day of the early voting period."), 197 ("Defendants knew or should have known at the time of their actions that they would prevent or deter constitutionally eligible voters . . . from exercising their right to vote in elections for President and members of Congress.").)

Those broad-brush allegations stand in stark contrast to one (small) portion of one of these pleadings, where Plaintiffs singled-out four Doe Defendants (denominated as "Defendant Officers John and Jane Does #1-4") for committing discrete acts against a specific individual Plaintiff. (See Docket Entry 24, ¶¶ 114-20, 169, 197.) Notably, Plaintiffs' operative pleadings contain other allegations about distinct conduct by individual Doe Defendants and sub-groups of Doe Defendants (or law enforcement officers who meet Doe Defendants' general description) that appear likely to number fewer than 15, but Plaintiffs made no effort to differentiate those Doe Defendants from any others (such as by assigning them particular numbers). (See, e.g., Docket Entry 24, ¶¶ 82 (referencing encounter caught on video of "three GPD officers

14

restraining an elderly man"), 83 ("Th[at same] video also shows protestors inform one GPD officer, 'You sprayed a kid.' The officer appears to respond 'I did.'"), 102 (alleging that "[l]aw enforcement pepper sprayed [Plaintiff] Allen in the face"),[6] 126 ("[Plaintiff Willis] was pepper sprayed twice at the March . . . . The second time, [she] was pepper sprayed directly in the face from close range.");[7] Docket Entry 25, ¶¶ 106 ("Plaintiff [Ashley Reed] Batten was approximately six feet away from one of [the] Defendant [] Does #1-20 who pepper sprayed her directly as she helped an elderly Black woman in the crowd get away from the area."),[8] 110 ("[O]ne or more of Doe GPD officers #21-40 stopped [members of two organizational Plaintiffs] and started to arrest them."), 113 ("GPD Officer Jordan and two or more Doe GPD Officers #21-40 put hands on Plaintiff Harvey and arrested him."), 119 ("At least one of Defendant ACSO Does #1-20 or Defendant [GPD] officer Does #21-40

_____

6 The above-quoted allegation directly conflicts with later allegations in the same pleading that "Defendants deployed . . . pepper spray through aerosol guns" (Docket Entry 24, ¶ 134) and that, "[w]hen used in such a manner, pepper spray cannot be targeted at specific people or even in a discrete direction" (id.).

7 The above-quoted allegation directly conflicts with later allegations in the same pleading that "Defendants deployed . . . pepper spray through aerosol guns" (Docket Entry 24, ¶ 134) and that, "[w]hen used in such a manner, pepper spray cannot be targeted at specific people or even in a discrete direction" (id.).

8 The above-quoted allegation directly conflicts with allegations in the companion pleading that "Defendants deployed . . . pepper spray through aerosol guns" (Docket Entry 24, ¶ 134) and that, "[w]hen used in such a manner, pepper spray cannot be targeted at specific people or even in a discrete direction" (id.).

15

sprayed in the direction of Plaintiff Janet Nesbitt."),[9] 120 ("Defendants' [sic] officers stood nearby but did not assist Plaintiff Nesbitt [while she experienced pepper-spray-induced convulsions]."), 127 ("Plaintiff [Gregory] Drumwright was arrested by ACSO Corporal Bernard Kilmer and additional ACSO deputy Does #1-20 . . . ."), 130 (alleging that "one or more of Doe GPD officers #21-40 blocked [Plaintiffs Ernestine and Edith Ward's] path" as they "attempted with other marchers to flee the pepper spray and get to the polling place located a block away at Elm and Maple"), 131 ("[M]ultiple Doe GPD officers #21-40 who lined the street pepper sprayed Plaintiffs Ernestine and Edith Ward and other marchers."), 137 ("[A]pproximately seven of ACSO deputy Doe officers #1-20 arrested Plaintiff [Faith] Cook without warning."), 143 ("[V]ideo also shows a Defendant GPD Doe officer shouting 'Get moving, you f-g pricks' as he sprays pepper spray at protesters while they try to walk away along a sidewalk.").

Despite the fact that Plaintiffs' operative pleadings (almost exclusively) treat Doe Defendants (and often all Defendants) as a monolith and (repeatedly) bypass opportunities to assign particularized pseudonyms to distinguishable Doe Defendants, Plaintiffs have "request[ed] that [] the Court permit expedited

---

9   The above-quoted allegation directly conflicts with allegations in the companion pleading that "Defendants deployed . . . pepper spray through aerosol guns" (Docket Entry 24, ¶ 134) and that, "[w]hen used in such a manner, pepper spray cannot be targeted at specific people or even in a discrete direction" (id.).

16

discovery related to the identities of the Doe Defendants" (Docket Entry 57 at 13). "The Court will not allow Plaintiff[s] to go on a fishing expedition. Based on the plethora of vague allegations against unnamed persons, this is likely what will happen if the Court allows Plaintiff[s] to conduct discovery to determine the names of the individuals who allegedly violated [Plaintiffs'] rights." Nixon v. Doe, No. 3:15CV370, 2016 WL 593828, at *2 (W.D.N.C. Feb. 12, 2016) (unpublished), aff'd, 667 F. App'x 395 (4th Cir. 2016); see also Allstate Ins. Co. v. Etienne, No. 09CV3582, 2010 WL 11626966, at *4 (E.D.N.Y. Apr. 30, 2010) (unpublished) ("[E]ven the inclusion of allegations against John (or Jane) Doe defendants will not entitle plaintiffs to embark on broad fishing expeditions for unknown additional parties.").

The present procedural posture of these consolidated actions further undermines Plaintiffs' position, as "expedited discovery is not the norm, particularly where defendants have filed a motion to dismiss," Guttenberg v. Emery, 26 F. Supp. 3d 88, 97 (D.D.C. 2014). Rather, as a general matter, "[p]ursuant to Federal Rule of Civil Procedure 26, 'a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f).'" McKnight v. Pickens Police Dep't, C/A No. 8:18-3277, 2019 WL 4593578, at *2 (D.S.C. Sept. 23, 2019) (unpublished) (internal

brackets and ellipsis omitted) (quoting Fed. R. Civ. P. 26(d)(1)).[10]
Notwithstanding that default rule, "[d]iscovery can begin earlier
if authorized . . . by [court] order . . . . This will be
appropriate in some cases, such as those involving requests for a
preliminary injunction or motions challenging personal
jurisdiction." Fed. R. Civ. P. 26, advisory committee notes, 1993
amend., subdiv. (d) (emphasis added).

"[C]ourts . . . have frequently treated the question whether
to authorize early discovery as governed by a good cause standard."
8A Charles Alan Wright, et al., Federal Practice and Procedure
§ 2046.1 (3d ed. & Apr. 2021 Update) (emphasis added). "Some
courts have also treated the question in terms similar to the

---

10 In what amounts to an attempt to bypass the above-referenced default rule, Plaintiffs have contended that "courts routinely authorize limited early discovery to ascertain the identity of Doe defendants" (Docket Entry 57 at 9); however, decisions "permit[ting] expedited discovery to identify unknown defendants usually [arise in cases] when the plaintiff simultaneously can identify no defendants and legitimately fears that information leading to their whereabouts faces imminent destruction," Facebook, Inc. v. Various, Inc., No. C-11-1805, 2011 WL 2437433, at *3 (N.D. Cal. June 17, 2011) (unpublished). Here, "Plaintiff[s] face[] neither circumstance." Id. Plaintiffs' argument that "allowing for the early discovery sought at this stage in the litigation will promote judicial efficiency and fairness" (Docket Entry 57 at 9) similarly does not warrant exemption from the default rule against early discovery, see Megaupload. Ltd. v. Universal Music Grp., Inc., No. 11CV6216, 2012 WL 243687, at *3 (N.D. Cal. Jan. 25, 2012) (unpublished) ("The problem with [the p]laintiff's argument . . . is that it applies to nearly every case. It would probably always be more efficient--at least from a plaintiff's perspective--to obtain discovery from parties and non-parties before the Rule 26(f) conference . . . . Nonetheless, the federal rules, adopted after much study and thought, dictate a different procedure.").

18

criteria for a preliminary injunction," id., but that "approach . . . has been criticized," Dimension Data N. Am., Inc. v. Netstar-1, Inc., 226 F.R.D. 528, 531 (E.D.N.C. 2005) (citing cases); see also Wright, et al., supra, § 2046.1 (questioning use of preliminary injunction criteria in assessing motions for early discovery, because "permission to commence discovery is a much less aggressive order than a preliminary injunction"). After careful consideration, the Court adopts the majority view that, "a standard based upon reasonableness or good cause, taking into account the totality of the circumstances, is more in keeping with discretion bestowed upon the [C]ourt in the Federal Rules of Civil Procedure," Dimension Data, 226 F.R.D. at 531; accord, e.g., Garnett v. Zeilinger, No. 17CV1757, 2017 WL 8944640, at *1 & n.1 (D.D.C. Dec. 15, 2017) (unpublished); Chryso, Inc. v. Innovative Concrete Sols. of the Carolinas, LLC, No. 5:15CV115, 2015 WL 12600175, at *3 (E.D.N.C. June 29, 2015) (unpublished); L'Occitane, Inc. v. Trans Source Logistics, Inc., No. 09CV2499, 2009 WL 3746690, at *2 (D. Md. Nov. 2, 2009) (unpublished); contra, e.g., ForceX, Inc. v. Technology Fusion, LLC, No. 4:11CV88, 2011 WL 2560110, at *5 (E.D. Va. June 27, 2011) (unpublished).

Typically, "[t]o determine whether a request [for early discovery] is reasonable, courts look to five factors: (1) whether a motion for preliminary injunction is pending, (2) the discovery request's breadth, (3) the purpose for requesting expedited

19

discovery, (4) the burden on the defendant to comply with the requested discovery, and (5) how far in advance of the typical discovery process the request is made." Garnett, 2017 WL 8944640, at *1; accord, e.g., Democracy N.C. v. North Carolina State Bd. of Elections, No. 1:20CV457, 2020 WL 4288103, at *4 (M.D.N.C. July 27, 2020) (unpublished) (Osteen, J.); Michael v. Estate of Kovarbasich by and through Marano, No. 1:14CV212, 2015 WL 13757325, at *2 (N.D.W. Va. Apr. 10, 2015) (unpublished); JTH Tax, Inc. v. M & M Income Tax Serv., Inc., No. 6:13CV265, 2013 WL 460316, at *2 (D.S.C. Feb. 6, 2013) (unpublished). On balance, those factors tilt decidedly against Plaintiffs' early discovery request.

To begin, "[t]he first factor weighs against allowing the [requested early] discovery because there is no preliminary injunction [motion] pending," Gilpatrick v. Harper Cnty., No. 18-1245, 2018 WL 6504394, at *3 (D. Kan. Dec. 11, 2018) (unpublished). (See Docket Entries dated Nov. 2, 2020, to present (reflecting no such motion).)[11] "Although there are undoubtedly circumstances

_____

11 In the Complaint originally filed in the second of these two (since) consolidated actions, "Plaintiffs respectfully pray[ed] that the Court . . . [p]reliminarily . . . enjoin . . . Defendants' unlawful dispersal orders and use of pepper spray against peaceful marchers . . . ." (Compl. at 21, Drumwright v. Cole, No. 20CV998, Docket Entry 1 (M.D.N.C. Nov. 2, 2020).) That preliminary injunctive relief request, however, does not appear in (either of) Plaintiffs' operative pleadings. (See Docket Entries 24, 25.) Even if it did, "[a] prayer for a . . . preliminary injunction set forth in a pleading will not bring the issue before the Court prior to the time of trial. If a ruling before trial is desired, a party must separately file a motion and brief." M.D.N.C. LR 65.1(a).

where granting a motion for expedited discovery in the absence of a motion for preliminary equitable relief is warranted, the absence of such a pending motion in this case undermines a finding of good cause." Fluke Elecs. Corp. v. CorDEX Instruments, Inc., No. C12-2082, 2013 WL 566949, at *11 (W.D. Wash. Feb. 13, 2013) (unpublished); see also MNM Invs., Inc. v. HDM, Inc., No. 18-1267, 2018 WL 6413227, at *2 (D. Kan. Dec. 6, 2018) (unpublished) ("[T]he fact remains that no preliminary injunction [motion] is currently pending. This weighs against allowing the early discovery.").

The remaining factors share inter-related facets, all of which strongly disfavor allowance of the early discovery requested by Plaintiffs. For example, as concerns the fourth (burden on Named Defendants) and fifth (degree of prematurity) factors, another court persuasively has explained that:

> Because discovery typically occurs after the resolution of motions to dismiss, presenting a motion for expedited discovery prior to rulings on motions to dismiss is often disfavored. Even filing a motion for expedited discovery after briefing of motions to dismiss has concluded is well in advance of typical discovery.

> Relatedly, requiring [Named D]efendants to comply with an order for expedited discovery when the case may later be dismissed for failure to state a claim could force [them] to expend significant resources responding to discovery requests in a case where [P]laintiffs did not have a viable cause of action. At the very least, reasonableness dictates that the Court consider [pending] motion[s] to dismiss [and for judgment on the pleadings] before requiring extensive and expensive discovery.

Attkisson v. Holder, 113 F. Supp. 3d 156, 165-66 (D.D.C. 2015) (internal brackets, citations, and quotation marks omitted); see

21

also <u>Alaris Grp., Inc. v. Disability Mgmt. Network, Ltd.</u>, Civ. No. 12-446, 2012 WL 13029504, at *3 (D. Minn. May 30, 2012) (unpublished) ("[R]equiring the [d]efendant to participate in discovery when the [c]omplaint may yet be dismissed pursuant to pending Rule 12 motions would waste the resources of both parties, especially considering that no motion for preliminary injunctive relief has in fact yet been filed.").

The fourth (burden on Named Defendants) factor also overlaps with the second (breadth of discovery) and third (purpose of discovery) factors in several respects, which together counsel against permitting the proposed early discovery. "First, contrary to [Plaintiffs'] suggestion, the requested discovery appears to be extremely broad." <u>Centennial Bank v. ServisFirst Bank Inc.</u>, No. 8:16CV88, 2016 WL 7376655, at *3 (M.D. Fla. Jan. 29, 2016) (unpublished) (emphasis omitted). Second, "as a consequence of the broad scope of the requested discovery, it would likely be very burdensome for [Named] Defendants to comply with the request[ed] discovery on an expedited basis." <u>Id.</u> Third, "Plaintiff[s'] discovery requests are so broad as to be implausibly tailored for the sole purpose of discerning [Doe] Defendants' identities . . . ." <u>Facebook, Inc. v. Various, Inc.</u>, No. C-11-1805, 2011 WL 2437433, at *3 (N.D. Cal. June 17, 2011) (unpublished).

More specifically, although (according to their Memorandum) Plaintiffs simply "seek answers to four <u>narrow</u> interrogatories for

22

the sole purpose of ascertaining the true identities of Doe Defendants who used or authorized the use of force at the October 31 March" (Docket Entry 57 at 7 (emphasis added); see also Docket Entry 57-1 at 8[12] (proposing two interrogatories requiring Named Defendants to, inter alia, "[i]dentify all ACSO deputies" and "all GPD officers," "who used force, or authorized the use of force, on any Participant in the October 31 March")),[13] the limitless definition of "'[u]se of force' or 'used force'" incorporated into Plaintiffs' proposed interrogatories (Docket Entry 57-1 at 5) make them anything but narrowly and solely focused on identification of proper defendants; instead, the proposed interrogatories "sweep[] too broadly, and constitute[] an improper fishing expedition," Allstate Ins., 2010 WL 11626966, at *4, subject to judicial

---

12 This (and other) pin citation(s) to attachments to Plaintiffs' Memorandum refer to page number(s) appearing in the footer appended thereto upon docketing in the CM/ECF system.

13 The first two proposed interrogatories also demand that Named Defendants "state whether each such deputy [or officer] used force, or authorized the use of force, on any of the [] Plaintiffs" (Docket Entry 57-1 at 8), which would pose significant difficulties for Named Defendants, because (as Graham Defendants have noted) they "have no way of knowing who is, and who is not, a member of the[] organization[al Plaintiffs]" (Docket Entry 69 at 10). The remaining two proposed interrogatories – which would require Named Defendants to "[i]dentify all persons who might know the answer to the [first two proposed i]nterrogatories" (Docket Entry 57-1 at 8) and to "[d]escribe what steps [Named Defendants] took to respond to the[ first two proposed i]nterrogatories, including the identity of all persons with whom [Named Defendants] consulted and all documents that [they] reviewed" (id.) – amount to "'discovery on discovery,'[ which courts generally describe a]s not an appropriate topic of discovery," Fish v. Air & Liquid Sys. Corp., Civ. No. 16-496, 2017 WL 697663, at *6 (D. Md. Feb. 21, 2017) (unpublished).

23

preclusion as not "proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), as well as "oppressi[ve and] undu[ly] burden[some]," Fed. R. Civ. P. 26(c)(1).

In that regard, the "DEFINITIONS AND INSTRUCTIONS" (Docket Entry 57-1 at 3) for Plaintiffs' proposed interrogatories state:

> "Use of force" or "used force" <u>includes but is not limited to</u> the use of: (a) pepper spray, pepper balls, OC spray, capsaicin spray, MK-9S spray, or any other chemical agent; (b) baton, club, nightstick, or any other blunt instrument; (c) handcuffs, zipties, flexcuffs, or any other bodily restraint; or (d) <u>any other effort used to compel compliance</u>.

(<u>Id.</u> at 5-6 (emphasis added); <u>see also</u> <u>id.</u> at 7 ("The terms 'include' or 'including' do not limit the scope of the request . . . .").)

The plain language of that definition, including "the phrase 'but not limited to' renders the scope of the [proposed] interrogator[ies] undefined," <u>Segerdahl Corp. v. Ferruzza</u>, No. 17CV3015, 2018 WL 11199218, at *4 (N.D. Ill. Mar. 9, 2018) (unpublished) (some internal quotation marks omitted), as "the incorporation of the words 'including but not limited to' . . . in connection with the definition . . . renders any otherwise properly demarcated category meaningless," <u>DEI Inc. v. First Bank of Berne</u>, No. 1:10CV102, 2010 WL 3272831, at *1 (N.D. Ind. Aug. 18, 2010) (unpublished); <u>see also</u> <u>Perry v. Indiana Mich. Power Co.</u>, No. 1:07CV244, 2007 WL 3232094, at *1 n.1 (N.D. Ind. Oct. 30, 2007) (unpublished) ("The phrase 'including, but not limited to' is a

24

'fudge' that compounds the vagueness of the definition . . . ."). Moreover, if one disregarded the phrase "includes but not limited to" (Docket Entry 57-1 at 5), Plaintiffs' definition of "[u]se of force' or 'used force'" (id.) would remain grossly overbroad, given its express adoption of the vague and elastic term "any other effort used to compel compliance" (id. at 6).

For example, an officer's resort to logical appeals or moral suasion to get a protester to do something (such as move out of the path of an oncoming car) likely would qualify as "any other effort used to compel compliance" (id.).[14] Furthermore, given Plaintiffs' allegation that mere "deployment of [] deputies and officers . . . constituted [a] substantial step[] in furtherance of the conspiracy [to unlawfully disperse a march to the polls]" (Docket Entry 25, ¶ 196), any deputy/officer observed by any protester would (by Plaintiffs' definition) have "used force . . . to compel compliance" (Docket Entry 57-1 at 5-6 (internal quotation marks omitted)). In sum, the proposed interrogatories – even when stripped of the infinite expander "but is not limited to" (Docket

_____

14 Indeed, if (as Plaintiffs have alleged) "the neo-confederate or white supremacist groups that had gathered at Court Square were warned to clear the area" (Docket Entry 24, ¶ 95 (emphasis added); accord Docket Entry 25, ¶ 145), under Plaintiffs' definition of "'[u]se of force' or 'used force'" (Docket Entry 57-1 at 5), officers who gave (or authorized) any such warnings also thereby would have "used force, or authorized the use of force" (id. at 8) against those counter-protesters, as such "warn[ings] to clear the area" (Docket Entry 24, ¶ 95) would constitute "any other effort used to compel compliance" (Docket Entry 57-1 at 6).

Case 1:20-cv-00997-CCE-LPA   Document 75   Filed 05/21/21   Page 25 of 35

Entry 57-1 at 5) – still would oblige Named Defendants to
"[i]dentify all ACSO deputies" (id. at 8) and "all GPD officers"
(id.), (A) who said anything any protester could hear or (B) who
any protester could see, as well as (C) any ACSO deputy or GPD
officer who "authorized" (id.) another such deputy/officer to be so
heard or seen.[15]

Plaintiffs' definition, "[w]ith respect to a person, [of] the
word 'identify' . . . [to] mean to specify[ not just the f]ull
name[ and p]osition/job title and employer[ of officers/deputies,
but also a]ll known telephone numbers[ and a]ll known addresses
(including electronic mail addresses)" (id. at 6 (emphasis added))
further underscores the unreasonable breadth and burdensomeness of
the proposed interrogatories, as well as the implausibility of
Plaintiffs' proffered (sole) motive for their proposal (i.e., to
"ascertain[] the identities of . . . Doe Defendants" (Docket Entry
57 at 1)). "Stated more bluntly, what Plaintiff[s actually]
propose[] to do is to use the arsenal of discovery weapons . . . to
gain access to the personal [information of many officers/deputies]
. . . . Such prodigious power, which includes prominently the
power to compel . . . produc[tion of] otherwise confidential

_____

    15 Consistent with that assessment of the (over)breadth of
Plaintiffs' proposed interrogatories, images that Plaintiffs
attached to their letter to Named Defendants dated January 21,
2021, "ask[ing] that [they] identify all (not just those encircled
in red) the deputies and officers who are seen in the images"
(Docket Entry 57-2 at 2), depict officers/deputies doing nothing
more than standing or walking (see id. at 4, 10-12, 14-16).

[information], should not be granted lightly." <u>Local Acceptance Co. of Fla. v. Doe</u>, 962 F. Supp. 1495, 1496 (S.D. Fla. 1997).

As the United States Supreme Court has explained:

[T]he enforcement of the criminal laws [] require[s] the orderly preservation of great quantities of information, much of which is personal in character and potentially . . . harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. . . . [I]n some circumstances that duty arguably has its roots in the Constitution . . . .

<u>Whalen v. Roe</u>, 429 U.S. 589, 605 (1977). The home addresses, personal telephone numbers, and personal e-mail addresses of law enforcement officers possessed by their governmental employers and/or supervisors surely lie within the realm of information as to which a duty of protection (of arguable constitutional dimension) arises. <u>See, e.g.</u>, <u>Kallstrom v. City of Columbus</u>, 136 F.3d 1055, 1069 (6th Cir. 1998) (holding that Due Process Clause guards against "release of [law enforcement] officers' addresses[ and] phone numbers . . . [if] likely to result in a substantial risk to their personal security"); <u>Flanagan v. Munger</u>, 890 F.2d 1557, 1570 (10th Cir. 1989) (recognizing that "highly personal information" contained in personnel files of law enforcement officers "is protected" by "constitutional right to privacy"); <u>Zantiz v. Seal</u>, Civ. No. 12-1580, 2013 WL 2459269, at *3 (E.D. La. June 6, 2013) (unpublished) ("Discovery of the personnel files of all persons, especially law enforcement officers, presents special concerns

27

about the privacy rights of the individuals involved." (internal footnote omitted)), aff'd, 602 F. App'x 154 (5th Cir. 2015).[16]

Put in plain terms, "[s]hould th[eir personal] information fall into the wrong hands, the officers[/deputies] or their family members may suffer serious and irreparable harm. No remedy at law could adequately compensate them for any physical, psychological, or emotional trauma they might suffer at the hands of one obtaining this personal information." Kallstrom, 136 F.3d at 1068-69. Recent societal trends have only heightened concerns on this front, as "[l]aw enforcement officers . . . fall into an increasingly vulnerable population for attacks wielding their personal information for criminal purposes," Emily Roscoe & Charles Szypszak, Privacy and Public Real Estate Records: Preserving Legacy System Reliability Against Modern Threats, 49 Urb. Law. 355, 372-73 (2017), while academic commentators simultaneously praise protesters for their "impressive feats" and "ability to 'out' via 'doxing' officers who have--in the protesters' view--violated civil rights and liberties," Lenese C. Herbert, O.P.P.: How 'Occupy's'

---

16 In line with that conclusion, "[Named] Defendants have taken the position that the information Plaintiffs have requested . . . is considered confidential personnel information prohibited from disclosure without order of the Court by N.C. Gen. Stat. §160A-168." (Docket Entry 57 at 4.)

<u>Race-Based Privilege May Improve Fourth Amendment Jurisprudence for</u> <u>All</u>, 35 Seattle U. L. Rev. 727, 745 n.97 (2012).[17]

Coordinately, "'ambush-style killings of police officers have spiked recently, hitting a 10-year high in 2016," Scott E. Wolfe, et al., <u>Police Managers' Self-Control and Support for Organizational Justice</u>, 42 Law & Hum. Behav. 71, 77 (2018),[18] and "a recent study by the Pew Research Center (2017) found that 9 of 10 officers have become more concerned about their safety," <u>id.</u> at 77-78; <u>see also</u> Ronald T. Hosko, <u>Through Police Eyes —— The Ferguson Effect Scare</u>, 23 Berkeley J. Crim. L. 9, 24 (2018) (citing same study and noting that it arose from "survey of eight thousand police officers from departments with more than one hundred officers"); Michael Levin Epstein, <u>Spotlight</u>, 36 Law Enforcement Emp. Bull. 1, 1 (2019) ("[I]ncreased ambush assaults on officers, and social media posting of information on officers' home addresses

---

17 "'Doxing (sometimes spelled 'doxxing') is short for 'dropping documents,'" <u>Vangheluwe v. GOT News, LLC</u>, 365 F. Supp. 3d 850, 858 (E.D. Mich. 2019) (internal brackets omitted), i.e., "the practice of disclosing a person's identifying information (e.g., their home address) on the Internet to retaliate against and harass the 'outed' person," <u>id.</u> at 852; <u>see also id.</u> at 859 ("The goal of doxing is typically retribution, harassment or humiliation." (internal quotation marks omitted)).

18 "Some year-end reports suggested the increased ambushes [in 2016] marked a twenty-year high." Ronald T. Hosko, <u>Through Police Eyes —— The Ferguson Effect Scare</u>, 23 Berkeley J. Crim. L. 9, 26 (2018); <u>see also id.</u> (documenting that, in 2016, "the number of officers intentionally killed r[ose] over fifty percent to sixty-four officers killed by gunfire," and that "[p]olice in 2016 were physically attacked tens of thousands of times, according to law enforcement agencies' self-reported numbers").

. . . when alleged police misconduct occurs, also are mentioned as deterrents for recruitment and retention."). "Adding weight to [those] worries . . . [i]s an FBI paper, released in early 2017, known as 'The Assailant Study.' Based on investigation into fifty police assailants and dozens of fatal attacks on law enforcement officers in 2016, the results [a]re troubling . . . ." Hosko, supra, at 23–24. Of particular salience here, "twenty-eight percent of police assailants in the study were inspired by social and/or political reasons and believed that attacking police officers was their way to 'get justice' for those who had been, in their view, unjustly killed by law enforcement." Id. at 24.

Against this backdrop, any officer/deputy whose personal information the Court ordered disclosed to Plaintiffs (for the putative purpose of identifying Doe Defendants) plausibly could fear the subsequent distribution of his/her personal information (via doxxing) to a mass-audience that includes individuals like the perpetrators analyzed in The Assailant Study, who (in turn) would perceive those officers/deputies as tantalizing targets for vigilante violence, in light of Plaintiffs' allegations that Doe Defendants all shared a racist ideology that led them to callously brutalize Plaintiffs and other protesters (see, e.g., Docket Entry 24, ¶¶ 91 ("Defendants sent a clear message to Black voters and others who speak out against police violence directed at Black people, including Plaintiffs, that they may face pepper spray or

other violence when they vote or engage in peaceful assemblies."), 94 ("Upon information and belief, Defendants' use of pepper spray on March attendees was motivated at least in part by the race of March attendees—the majority of whom were Black, and all of whom were marching in support of the Black community."), 159 (implying that Doe Defendants sympathized with "neo-confederates or white supremacist groups that had gathered at Court Square"), 185 ("Defendants decided to engage in the use of pepper spray . . . at least in part due to the race of the March attendees, the majority of whom were Black.")). Plaintiffs' pursuit (prior to resolution of pending, dispositive motions) of the bulk disclosure of the home addresses, personal telephone numbers, and personal e-mail addresses of dozens of officers/deputies (some of whom may have done nothing more than appear in uniform within sight of protesters), when (at the same time) Plaintiffs' pleadings do not meaningfully differentiate among Doe Defendants, manifests (at minimum) a reckless indifference by Plaintiffs to the legitimate privacy and security interests of those officers/deputies.[19]

_____

19 To some, discussion of such interests of officers/deputies should have no place in the context of a challenge to an allegedly racially biased, law enforcement response to protest activity about allegedly racially biased, law enforcement activity. See India Thusi, Blue Lives & the Permanence of Racism, 105 Cornell L. Rev. Online 14, 27 (2020) (pronouncing expression of concern for safety of law enforcement officers and their families, "when it is done in conversation with calls for police accountability and the recognition of Black humanity," as "an attempt to qualify the recognition of Black worth" and "a statement about why 'Black Lives

(continued...)

Case 1:20-cv-00997-CCE-LPA   Document 75   Filed 05/21/21   Page 31 of 35

To the extent Plaintiffs impliedly have argued for disclosure of <u>not only</u> the names, titles, and employers – <u>but also</u> the home addresses, personal telephone numbers, and personal e-mail addresses – of at least two score officers/deputies, "so that Plaintiffs can [not only] name the appropriate individuals [but also] serve them" (Docket Entry 57 at 5), Plaintiffs' "argument overlooks Rule 4(e)(1), which permits service by 'following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located,' Fed. R. Civ. P. 4(e)(1)," <u>Stollard v. Gwynn</u>, No. 1:19CV926, 2021 WL 620706, at *5 (M.D.N.C. Feb. 17, 2021) (unpublished), <u>recommendation adopted</u>, slip op. (M.D.N.C. Mar. 29, 2021) (Osteen, J.), as well as "North Carolina state law [which] permits service via certified mail to a defendant's <u>place of employment</u>," <u>id.</u> (emphasis added) (citing <u>Moore v. Cox</u>, 341 F. Supp. 2d 570, 573 (M.D.N.C. 2004)). Nor does Plaintiffs' reference to the possibility of "entry of a mutually agreeable Consent Protective Order ('CPO') authorizing the production and protecting the confidentiality of information" (Docket Entry 57 at 4) assuage the

---

19(...continued)
Matter' should not be prioritized and why blue lives should matter more"). That perspective, however, cannot alter the Court's obligation to "administer justice without respect to persons, and . . . faithfully and impartially discharge and perform all duties . . . under the Constitution and the laws of the United States," 28 U.S.C. § 453, which requires equal solicitude for the discovery-related rights of <u>all</u> litigants (and affected non-parties).

32

Court's concerns about disclosure of the home addresses, personal telephone numbers, and personal e-mail addresses of 40 to 70 officers/deputies, given that Plaintiffs have not proffered even the outlines of any CPO (see id. at 4-5) and "three [] Plaintiffs are unincorporated organizations with undisclosed members" (Docket 69 at 10; see also Docket Entry 71 at 5 n.2 (confirming that organizational Plaintiffs will not identify their members)), such that the Court lacks adequate means to enforce any CPO.

In sum, the pertinent factors all weigh against a finding of good cause for the early discovery sought by Plaintiffs in the instant Motion. Alternatively, the instant Motion asks that the Court extend Plaintiffs' deadline to serve Doe Defendants for "sixty (60) days from the later of either: 1) entry of an order granting this partial consent motion; or 2) entry of an order authorizing the production and protecting the confidentiality of information and documents covered by N.C. Gen. Stat. §160A-168." (Docket Entry 55 at 1-2 (emphasis added).) According to Plaintiffs' Memorandum, "because Plaintiffs cannot serve defendants whose identity they do not know, there is good cause to extend Plaintiffs' time to effect service under Fed. R. Civ. P. 4(m). Plaintiffs have acted diligently. They have attempted to identify the Doe Defendants through informal discovery, and have attempted to reach an agreement to obtain the information necessary without court intervention." (Docket Entry 57 at 12; see also id. at 5

33

("Both sets of [Named] Defendants consent to Plaintiffs' [instant M]otion as it relates to an extension of time for service.").)

At present, no party has filed a motion requesting "entry of an order authorizing the production and protecting the confidentiality of information and documents covered by N.C. Gen. Stat. §160A-168" (Docket Entry 55 at 2). (See Docket Entries dated Nov. 2, 2020, to present (showing no such motion).) Nor does Plaintiffs' Memorandum forecast any date for the filing of any such motion. (See, e.g., Docket Entry 57 at 4-5 (referencing "discussions" between counsel dating back to on or about February 5, 2021, but describing those discussions as having reached "impasse").) In other words, the instant Motion effectively solicits an indefinite extension of Plaintiffs' deadline to serve Doe Defendants. The Court declines to go that far, but (given the lack of opposition from Named Defendants) will allow a more modest extension of time for service of process, pursuant to Rule 4(m).

<u>CONCLUSION</u>

Plaintiffs have not shown good cause for their proposed early discovery, but (without objection from Named Defendants) Plaintiffs may have some additional time to serve Doe Defendants.

**IT IS THEREFORE ORDERED** that the instant Motion (Docket Entry 55) is **GRANTED IN PART and DENIED IN PART**, in that (A) Plaintiffs shall not serve discovery prior to the entry of a scheduling order following the planning meeting under Rule 26(f) (except as

34

permitted by Rule 26(d)(2)), and (B) Plaintiffs shall make service of process on any Defendant(s) presently identified in Plaintiffs' operative pleadings as John or Jane Doe no later than 90 days after the entry of a scheduling order.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 21, 2021